# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LORD VERSATILE,

     Plaintiff,

v.                                             Civil Action No. 3:09CV120

GENE JOHNSON, et al.,

     Defendants.

## REPORT & RECOMMENDATION

This matter comes before the Court for an evidentiary hearing and Report and

Recommendation as to the Complaint, filed pursuant to 42 U.S.C. § 1983, by Plaintiff Lord

Versatile, a Virginia prisoner proceeding *pro se*.[1] Versatile claims that Defendants Johnson,

Jabe, Wright, Jennings, Kelly, and Robinson[2] unlawfully impeded an exercise of Versatile's

---

[1] Versatile never requested a court-appointed attorney in this action, and the Court did not seek to appoint counsel on his behalf at the evidentiary hearing. Versatile, also known as Venson Leon Coward, has initiated numerous civil actions against the Virginia Department of Corrections ("VDOC") and has proceeded *pro se* in those actions as well. *See Versatile v. Johnson, et al.*, No. 3:07cv65 (E.D. Va. filed Jan. 31, 2007); *Versatile v. Vaughan, et al.*, No. 3:05cv768 (E.D. Va. filed Nov. 8, 2005); *Coward v. Angelone*, No. 3:02cv281 (E.D. Va. filed Apr. 30, 2002); *Coward v. Garraghty*, No. 3:02cv87 (E.D. Va. filed Feb. 15, 2002); *Versatile v. Garraghty, et al.*, No. 3:01cv122 (E.D. Va. filed Mar. 2, 2001); *Coward v. Angelone*, No. 3:00cv240 (E.D. Va. filed Apr. 13, 2000); *Versatile v. Angelone, et al.*, No. 3:99cv781 (E.D. Va. filed Nov. 26, 1999); *Coward v. Angelone, et al.*, No. 3:98cv283 (E.D. Va. filed May 11, 1998); *Coward v. Macklin, et al.*, No. 3:92cv536 (E.D. Va. filed Aug. 17, 1992).

[2] Gene Johnson is the former Director of VDOC. John Jabe is the Deputy Director of Operations for VDOC. Benjamin A. Wright is the former Chairman of the VDOC Publication Review Board. W.D. Jennings is also the former Chairman of the VDOC Publication Review Board. Loretta Kelly is the Warden of Sussex I State Prison ("Sussex I"). A. David Robinson is the Central Regional Director of VDOC.

religion, the Nation of Gods and Earths ("NGE"), by banning NGE texts and periodicals, and by violating VDOC regulations governing the processing of requests for religious recognition. Defendants contend that Versatile's beliefs are not religious in nature, and that, even if they are, denying Versatile access to the contested materials is the least restrictive means to further their compelling interest in institutional safety. Defendants also claim that Versatile's request for religious recognition was processed in accordance with VDOC regulations. For the reasons that follow, the Court RECOMMENDS that Versatile's § 1983 action be DISMISSED WITH PREJUDICE.

## I. Factual and Procedural History

### A. Summary of Allegations and Claims Asserted

On February 27, 2009, Versatile filed this civil action, raising the following claims:

Claim One    Defendants Johnson, Jabe, Wright, and Jennings violated Versatile's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[3] by imposing a "blanket ban" on NGE publications, including the newspaper, *The Five Percenter*. (Compl. ¶ 11.)

Claim Two    Defendants Kelly and Robinson violated Versatile's rights under RLUIPA when they failed to comply with VDOC regulations requiring them to process Versatile's request that NGE be recognized as a religion at Sussex I. (Compl. ¶ 12.)

(*See* Dec. 31, 2009 Mem. Op. 1, *as amended by* Jan. 21, 2010 Mem. Order.) Versatile sought damages and injunctive relief.

In Claim One ("the Blanket Ban Claim"), Versatile alleges that, as a member of NGE, he is required to study the following documents: the 120 Degrees, the Supreme Mathematics, the Supreme Alphabet, NGE monthly national statements, and NGE's national newspaper, *The Five*

---

[3] 42 U.S.C. § 2000cc-1(a)(l)-(2).

2

*Percenter*. However, since 1996, VDOC has classified NGE as a Security Threat Group or gang rather than a religion. Beginning in August 2006, after conducting a review of each issue when it entered the VDOC system, VDOC disapproved every issue of *The Five Percenter*. VDOC also prohibits possession of the other works that members of NGE must study in the exercise of their beliefs.

Versatile contends that possession of NGE materials constitutes a protected exercise of religion, and that the content of the materials does not pose a serious enough threat to justify Defendants' so-called "blanket ban." Defendants, on the other hand, contend that NGE is not a "religion" for purposes of RLUIPA. Second, Defendants argue that they have not implemented a "blanket ban," but rather a narrowly tailored review process consistent with RLUIPA that targets only material harmful to institutional security.

Claim Two ("the Routing Slip Claim") arises from Versatile's submission in December 2007 of a request that VDOC recognize NGE as a religion. Defendant Kelly, the warden at Sussex I where Versatile was incarcerated, did not forward the request on to the Faith Review Committee, which would be the appropriate committee to consider such a request. In response to Versatile's subsequent grievance, Defendant Kelly explained that the committee had, just months earlier, rejected an application for NGE recognition from an inmate at Southampton Correctional Center. Defendant Kelly's decision was affirmed at the highest levels, and Versatile's grievance was deemed unfounded.

Versatile alleges that Defendant Kelly violated VDOC regulations and burdened the exercise of his religious beliefs without justification by failing to attach a routing slip to his request for religious recognition and to forward his completed request to the FRC. Defendants

3

dispute whether Kelly violated VDOC regulations and argue that her failure to act did not result in any harm.

## B. **Procedural History**

In August 2009, the parties filed cross-motions for summary judgment. By Memorandum Opinion and Order dated December 31, 2009, the Court denied Versatile's motion for summary judgment in its entirety. The Court denied in part Defendants' motion for summary judgment. As to Claim One, the Court found that Defendants had failed to demonstrate the absence of any genuine issue of material fact as to whether NGE is a religion for purposes of RLUIPA and, by simply citing to security concerns, failed to adequately demonstrate they had chosen the least restrictive means to further a compelling interest. As to Claim Two, the Court denied summary judgment in favor of Defendants because of their failure to address the factual basis of the claim. The Court, however, granted in part Defendants' motion for summary judgment with respect to Versatile's claims for monetary damages and dismissed Versatile's request for monetary damages against Defendants. The Court then referred this matter to the undersigned Magistrate Judge for such further proceedings as necessary.

On February 4, 2010, the Court, noting the need to develop a record beyond the submissions before it, ordered an evidentiary hearing. On May 27, June 1, and June 2, 2010, the Court held an evidentiary hearing to resolve the parties' claims and defenses. The parties have submitted revised proposed findings of facts and conclusions of law. (Docket Nos. 95, 98.) Based on the testimony heard and exhibits submitted at the evidentiary hearing, the Court makes the following findings of fact and conclusions of law.[4]

---

[4] The Court notes that both parties have presented evidence and argument about issues beyond those referred for resolution. The lawfulness of VDOC's restrictions on NGE adherents'

## C.    Remaining Evidentiary Issues

The Court now resolves the remaining evidentiary issues that arose during the evidentiary hearing itself or via post-hearing briefing.

During the evidentiary hearing, Defendants offered Defendants' Exhibit 22, consisting of three enclosures relating to security classifications within VDOC, for *in camera* review and admission into evidence. (Tr. 7:1-5, 233:11-234:4.) The Court reserved ruling on the admissibility of Defendants' Exhibit 22. (Tr. 234:1-4.) Approximately a month and a half after the evidentiary hearing, Defendants submitted under seal two supplemental affidavits from VDOC officials to authenticate and supplement Defendants' Exhibit 22. (Defs.' Resp. to Court Order 1.) (Docket No. 96.) Versatile objects to the admission of these supplemental affidavits, contending that they are untimely and constitute inadmissible hearsay. (Pl.'s Objection to Supp'l Affs. of Gene Johnson & Gary Clore 3.) (Docket No. 100.) The Court finds that these supplemental affidavits constitute hearsay under Federal Rule of Evidence 802 and that no exception to the hearsay rule applies to allow their admission. Therefore, the Court excludes the supplemental affidavits as inadmissible hearsay. Defendants' Exhibit 22 has not been properly authenticated in the absence of these supplemental affidavits, and thus, the Court excludes Defendants' Exhibit 22.

Versatile has also raised numerous objections within his revised proposed findings of facts and conclusions of law. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 41-44.) (Docket No. 98.) Three of these objections are general in nature, untimely, and lack specificity. For

_____

group study, fasting, and observing honor days does not fall within the scope of the District Court's referral and need not be addressed to decide Claims One and Two. The Court considers this evidence only as it relates to the determination as to whether NGE is a religion which triggers the protections of RLUIPA.

example, Versatile objects to all leading questions and subsequent answers, all hearsay statements made by Michael Duke, a witness called by VDOC, and to all mischaracterizations of NGE by Defendants. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 41, 44.) A ruling on evidence should be made "at the time the evidence is offered." *DiPaola v. Riddle*, 581 F.2d 1111, 1113 (4th Cir. 1978). Failure to make a timely and specific objection serves as a waiver to complain against the admission of evidence. *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983); Fed. R. Evid. 103(a)(1) (requiring a "timely objection . . . stating the specific ground of objection"). The Court overrules these objections due to the untimeliness and the lack of specificity.

Versatile also objects to specific testimony from VDOC Official Gary Clore,[5] and to five of Defendants' exhibits even though these exhibits have already been admitted into evidence. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 42-44.) As to Clore's testimony and the majority of the contested exhibits, Versatile attempts to re-raise objections that the Court has already overruled.[6] Other exhibits were admitted without any objection from Versatile, and Versatile now attempts to raise objections to their admission. The Court overrules these objections to the extent Versatile merely re-raises objections the Court has already considered.

---

[5] Specifically, Versatile objects on the basis of speculation to Clore's testimony regarding an NGE member's assault on a white inmate. The Court notes that it has given no weight to Clore's testimony regarding this assault and does not rely on that testimony in forming its conclusions of law.

[6] For example, at the evidentiary hearing, Versatile was shown Defendants' Exhibit 6, and Versatile identified it as "somebody's Book of Knowledge." (Tr. 83:1-2.) Versatile later objected during the evidentiary hearing, contesting the authentication of Defendants' Exhibit 6. (Tr. 302:6-23.) The Court overruled Versatile's objection and admitted Defendants' Exhibit 6 into evidence. (Tr. 303:6-7, 443:25-444:2.) Versatile now re-raises his objection, contending that Defendants' Exhibit 6 has not been properly authenticated.

To the extent Versatile raises new objections, the Court overrules them as untimely and waived. *See Parodi*, 703 F.2d at 783; *DiPaola*, 581 F.2d at 1113 ("A party should not be permitted to stand silently by and later to contest the admissibility of crucial evidence only after the fact finding has gone against him.").

## II. Applicable Law

### A. Standard of Review for RLUIPA Claims

RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States.[7] *See Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006). RLUIPA prohibits prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."[8] 42 U.S.C. § 2000cc-1(a)(1)-(2). Furthermore, "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). A plaintiff bears the initial burden of showing by a preponderance of the evidence[9] the following: (1) he or she seeks

---

[7] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[8] By comparison, in the prison context, the First Amendment prohibits only restrictions on religious exercise that are not "reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987).

[9] Given RLUIPA's silence on the standard of proof required, the Court applies the "usual preponderance of the evidence rule applicable to civil cases." *Ramsey v. United Mine Workers of Am.*, 401 U.S. 302, 306 (1971); *see also Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 225-26 (4th Cir. 2002); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988). It appears, from a review of RLUIPA decisions, that other district courts have applied the preponderance of the evidence standard as well. *See, e.g., Fletcher v. Whorton*, No. 2:06-CV-818-PMP-GWF, 2010 WL 2559882, at *3 (D. Nev. Mar. 22, 2010); *Reischauer v. Jones*,

to engage in an exercise of religion; and, (2) the challenged practice substantially burdens that exercise. 42 U.S.C. § 2000cc-2(b). Once a plaintiff establishes a prima facie case, the defendants bear the burden of persuasion on whether their practice is the least restrictive means of furthering a compelling governmental interest. *Lovelace*, 472 F.3d at 185 (*citing* 42 U.S.C. § 2000cc-1(a)).

As with the Free Exercise clause, RLUIPA applies only to beliefs that are sincerely held and that are religious in nature.[10] *See, e.g., Blount v. Fleming*, No. 7:04cv00429, 2006 WL 1805853, at *12 (W.D. Va. June 29, 2006) (explaining that generally "a statutory violation under RLUIPA involves the same threshold issues as invoked by the Free Exercise Clause"); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713 (1981) (explaining that "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause"). "[T]here is, surprisingly, no controlling circuit precedent on the question whether [NGE] is a religion." *Harrison v. Watts*, 609 F. Supp. 2d 561, 573 (E.D. Va. 2009). Thus, to fully resolve Versatile's claims, this

---

No. 2:06cv149, 2009 WL 232625, at *8 (W.D. Mich. Jan. 29, 2009); *Thompson v. Quarterman*, No. V-01-01, 2007 WL 2900564, at *3 (S.D. Tex. Sept. 30, 2007); *Men of Destiny Ministries, Inc. v. Osceola Cnty.*, No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321, at *3 (M.D. Fla. Nov. 6, 2006); *Acoolla v. Angelone*, No. 7:01cv1008, 2006 WL 2548207, at *8 (W.D. Va. Sept. 1, 2006); *Toles v. Young*, No. 7:00cv210, 2002 WL 32591568, at *9 (W.D. Va. Mar. 6, 2002).

[10] Congress enacted RLUIPA, relying on the Spending Clause, after the Supreme Court of the United States in *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), invalidated the Religious Freedom Restoration Act ("RFRA"), which relied on the Fourteenth Amendment, as applied to the states. *See Cutter v. Wilkinson*, 544 U.S. 709, 714-15 (2005) (tracing the history of congressional attempts to increase protection for exercises of religion). RFRA still governs exercises of religion in federal prisons, and because the statutes are similar, it is appropriate to rely on cases interpreting RFRA in analyzing RLUIPA claims. *See, e.g., United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006); *United States v. Winddancer*, 435 F. Supp. 2d 687, 692 (M.D. Tenn. 2006).

Court first determines whether or not Versatile has demonstrated that NGE is a religion which triggers RLUIPA's protections.

## B. Test for Determining Whether a Belief System is Religious in Nature

### 1. General Considerations

"Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his [or her] own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (footnote omitted). This is especially true in the context of prison administration, where "[i]n the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life." *Green v. Tudor*, 685 F. Supp. 2d 678, 696 n.8 (W.D. Mich. 2010) (*citing Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996)); *see also* S. Rep. No. 103-111, at 10 (announcing, in the course of the debate on RFRA, expectations that courts would continue to weed out such "masquerade[s] designed to obtain [legal] protection"). "A religion need not be based on a belief in the existence of a supreme being (or beings, for polytheistic faiths), nor must it be a mainstream faith." *Kaufman v. McCaughtry*, 419 F. 3d 678, 681 (7th Cir. 2005) (internal citations omitted). Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714. A system of religious beliefs, however, "is distinct from a 'way of life,' even if that way of life is inspired by philosophical beliefs or other secular concerns." *Kaufman*, 419 F.3d at 681 (*citing Yoder,* 406 U.S. at 215-16.)

Determining whether a system of beliefs is religious in nature is "particularly difficult when the asserted belief is a new or exotic one outside the mainstream of traditional, clearly established, religious beliefs held and practiced." *Doswell v. Smith*, No. 94-6780, 1998 WL 110161, at *3 (4th Cir. Mar. 13, 1998) (*citing Africa v. Pennsylvania*, 662 F.2d 1025, 1032-33 (3d Cir. 1981)). The United States Court of Appeals for the Fourth Circuit has explained that courts must "'avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs.'" *Doswell*, at *3 (*quoting Africa*, 662 F.2d 1031). Lower courts should rely on "objective criter[ia]" to determine whether the belief system "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer v. Landon*, 799 F.2d 929, 932, 931 (4th Cir. 1986) (*quoting United States v. Seeger*, 380 U.S. 163, 166 (1964)).

### 2. The *Africa* and *Meyers* Tests

As have other circuits, the Fourth Circuit and the Eastern District of Virginia have cited with approval the seminal United States Court of Appeals for the Third Circuit case describing several "useful indicia" to evaluate whether beliefs are religious rather than secular. *Africa*, 662 F.2d at 1032 (*cited in Doswell*, 1998 WL 110161, at *3; *Dettmer*, 799 F.2d at 931; *Harrison*, 609 F. Supp. 2d at 566); *see also Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000); *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229-30 (9th Cir. 1996). As a threshold inquiry under the *Africa* test, the plaintiff must first demonstrate that his or her beliefs are "'truly held.'" *Africa*, 662 F.2d 1031 (*quoting Seeger*, 380 U.S. at 185). The *Africa* court then applied a three-part test to determine whether a belief system was religious in nature:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a

religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.* at 1032. The *Africa* court did not intend these criteria to constitute a rigid test and instead emphasized that "'[f]lexibility and careful consideration of each belief system are needed.'" *Id.* at 1032 n.13 (*quoting Malnak v. Yogi*, 592 F.2d 197, 210 (3d Cir. 1979) (Adams, J., concurring)) (alteration in original).

The United States Court of Appeals for the Tenth Circuit has adopted the *Africa* test in modified form. *See United States v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996). In analyzing a claim brought pursuant to RFRA, in which no dispute existed that the plaintiff held his beliefs sincerely, the *Meyers* court applied the following five-part test, essentially adding two factors to the *Africa* three-part test, to determine whether the belief system at issue was religious in nature:

(1) *Ultimate Ideas*: Religious beliefs often address fundamental questions about life, purpose, and death. . . .

(2) *Metaphysical Beliefs*: Religious beliefs often are "metaphysical," that is, they address a reality which transcends the physical and immediately apparent world. . . .

(3) *Moral or Ethical System*: Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical. . . . "

(4) *Comprehensiveness of Beliefs*: Another hallmark of "religious" ideas is that they are comprehensive[, forming] an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans. . . . [and,]

(5) *Accoutrements of Religion*: By analogy to many of the established or recognized religions, [these may include] the presence of [] external signs [such as a] Founder, Prophet or Teacher. . . . Important Writings. . . . Gathering Places. . . . Ceremonies and Rituals. . . . Holidays. . . . [and/or] Diet or Fasting. . . .

*Id.* at 1483-84. The *Meyers* court determined that the belief system at issue "more accurately

espouse[d] a philosophy and/or way of life rather than a 'religion.'" *Id.* at 1484.[11]

---

[11] Aside from the *Africa* and *Meyers* tests, the Court recognizes that the United States Court of Appeals for the Second Circuit employs a test which appears to place a more subjective emphasis on the sincerity of the belief at issue. Unlike the *Africa* and *Meyers* tests, the Second Circuit appears to focus on the adherent's state of mind not just as a threshold inquiry, but also when assessing whether a belief is religious in nature, adopting "a highly 'subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system.'" *United States v. Manneh*, 645 F. Supp. 2d 98, 108 (E.D.N.Y. 2008) (*quoting Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). The Second Circuit and courts within it have "cited with approval the definition of religion espoused by philosopher William James - 'the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine.'" *Marria v. Broaddus*, No. 97 Civ.8297 NRB, 2003 WL 21782633, at *7 (S.D.N.Y. July 31, 2003) (*quoting LeFevre*, 745 F.2d at 158). Other courts have applied what they call an "objective, case-neutral" anthropological definition of religion that "parallels William James' definition." *Hardaway v. Haggerty*, No. 2:05cv70362, 2009 WL 6093273, at *7 & n.7 (E.D. Mich. Aug. 17, 2009), *adopted in relevant part*, 2010 WL 1131446 (E.D. Mich. Mar. 22, 2010).

The Court mentions these alternate means to assess whether a belief is religious in nature because the district courts that have found NGE to be a religion have employed the Jamesian or anthropological evaluative tests when making their determinations. *Hardaway*, 2009 WL 6093273, at *7; *Marria*, 2003 WL 21782633, at *11-12. Importantly, in applying the Jamesian or anthropological evaluative tests and in making their determinations that NGE is religious in nature, these courts relied on expert testimony, including testimony from expert cultural anthropologists. *Hardaway*, 2009 WL 6093273, at *3, 7; *Marria*, 2003 WL 21782633, at *3, 9 n.18, 11. As discussed below, the record before this Court does not contain any detailed anthropological expert and extensive outside community evidence that the *Marria* and *Hardaway* courts evaluated when reviewing their records. As such, their construct of review not only is not binding because the Fourth Circuit has cited the *Africa* test instead, but also cannot be applied given the record before this Court.

While the Fourth Circuit has not explicitly adopted the multi-part *Africa* test to determine whether a belief is religious in nature, it cited *Africa* with approval over then-existing Second Circuit case law utilizing the different Jamesian approach. *Dettmer*, 799 F.2d at 932. Further, the only court in the Eastern District of Virginia to consider *Marria* found its conclusion that NGE's "beliefs are religious in nature and therefore deserving of protection under the First Amendment and RLUIPA" to be "neither controlling nor persuasive." *Harrison*, 609 F. Supp. 2d at 573-74. This Court similarly finds that the more subjective approach does not offer clear boundaries that a court, and therefore litigants, must follow when evaluating or presenting claims. The Court thus declines to apply the Second Circuit's Jamesian approach when analyzing Versatile's RLUIPA claims.

### 3. This Court Will Apply a Modified *Africa/Meyers* Test

Defendants here have not disputed whether Versatile, a member of NGE since January 27, 1987 (Pl.'s Ex. 1, Versatile Decl. ¶ 3; Tr. 51:14-16), holds his beliefs sincerely. Versatile has therefore met the threshold inquiry of establishing that his beliefs are truly held. Yet, this Court still must determine whether the record before it demonstrates that the beliefs espoused by Versatile and NGE are religious in nature. To make this determination, the Court will utilize a hybrid *Africa/Meyers* test, using the following four factors: (1) whether NGE espouses a comprehensive belief system that speaks to ultimate questions;[12] (2) whether NGE expresses metaphysical ideas or beliefs; (3) whether NGE maintains an ethical or moral code; and, (4) whether NGE utilizes external signs that suggest it is a religion.

### III. Findings of Fact Relevant to Whether NGE is a Religion for the Purposes of RLUIPA

Based on the evidence and testimony presented at the evidentiary hearing, the Court makes the following factual findings relating to NGE's beliefs.

### A. Comprehensiveness of NGE's Belief System

1.  Clarence 13X or Father Allah, once a member of the Nation of Islam ("NOI"), founded NGE on October 10, 1964. (Pl.'s Ex. 1, Versatile Decl. ¶ 4; Tr. 24:11-14.) NGE adherents describe their beliefs as a "God centered culture" (Pl.'s Ex. 1, Versatile Decl. ¶ 2; Defs.' Ex. 19, Vol. 15.4, at 3), and they believe that the "Blackman with knowledge of self is in fact a God" (Pl.'s Ex. 1, Versatile Decl. ¶ 23; *see* Tr. 71:20-21). They teach that "[t]he Original Man is the Asiatic Black Man, the Maker, the Owner, the Cream of the Planet Earth, God of the

---

[12] Because there is generally a "relationship between the criterion of comprehensiveness and the existence of fundamental and ultimate ideas," *Jacques v. Hilton*, 569 F. Supp. 730, 734-35 (D.N.J. 1983), the Court combines these two *Meyers* factors into one.

Universe." (Pl.'s Ex. 5, Enc. A, Answers ¶ 1; *see also* Defs.' Ex. 4 ¶ 7; Defs.' Ex. 5 ¶ 7.) Every black woman is referred to as an Earth "[b]ecause she gives that universal life to that black child . . . ." (Tr. 154:4-9.)

2.      While the term "Allah" is used interchangeably with "God," NGE adherents recognize the term as an acronym ("Arm Leg Leg Arm Head") that refers literally to black men and their physical form. (Pl.'s Ex. 1, Versatile Decl. ¶ 23; Tr. 84:1-9.) NGE adherents also refer to their teachings as Islam, but recognize the term as an acronym ("I Self Lord And Master") used to describe their culture and way of life. (Pl.'s Ex. 27, at 3; Defs.' Ex. 5 ¶ 9.) The central significance of Islam is to "gain knowledge of yourself . . . [and] become a lord and master of your own judgments." (Tr. 94:13-16.)

3.      NGE teaches that the white man is the devil, genetically engineered by a black man named Yacob (referred to in the Judeo-Christian bible as Jacob) through a process called "grafting" whereby their skin tone was lightened. (Tr. 72:6-73:5, 75:11-12; Pl.'s Ex. 5, Enc. A, Answers ¶ 2 ("The Colored Man is the Caucasian (white man) or Yacob's grafted devil . . . ."); Pl.'s Ex. 5, Enc. D ¶¶ 28, 30-33; *see also* Pl.'s Ex. 23, Vol. 14.4, at 5 (differentiating Caucasians from "the **Original Man** who possess[es] . . . '**melanin**'").) Because of the grafting process, NGE texts teach that Caucasians are physically and mentally inferior to blacks:

> The mental power of a real devil is nothing in comparison with the original man. He only has six ounces of brain, while the original man has seven and one-half ounces of brain which are original. The devil has six ounces of brain. They are grafted brains.
>
> The devil's physical power is less than one-third that of the original man. The devil is weak bone, weak blood because he is grafted from the original, therefore, his mental and physical power is much weaker than the original man.

(Pl.'s Ex. 5, Enc. D ¶ 32.)

4.      Versatile testified that NGE identifies white people as the devil based on history:

> When we say that the white man is devil, I mean that is based on the history. That is based on the history of what white people have inflicted to us. . . . I mean, these are people who enslaved us; these are people who raped us. I mean, these are the people who, I mean, inflicted all type[s] of atrocities upon us. That is why we identify [them] as the devil.

(Tr. 75:11-19.) According to NGE texts, the devil tries to keep black people illiterate "[s]o that he can use them for a tool and, also, a slave. [The devil] keeps them blind to themselves so that he can master them. Illiterate means ignorant." (Pl.'s Ex. 5, Enc. B ¶ 7.) NGE texts also state that the devil cannot be reformed and must be taken "off the planet" (Pl.'s Ex. 5, Enc. D ¶ 34) or murdered "[b]ecause he is one hundred percent wicked and will not keep and obey the laws of Islam" (Pl.'s Ex. 5, Enc. B ¶ 10; *see also* Tr. 74:16-17). Versatile presented testimony suggesting that NGE adherents attempt to destroy or murder the evil nature of the devil, and not physically murder the devil. (Tr. 129:22-130:5, 155:18-21.) Caucasians may join NGE. (Tr. 91:16-18, 115:7-12; Pl.'s Ex. 21, Vol. 14.1, at 9 (letter from white NGE member in W. Va. prison).) However, Caucasians can never become "Gods" in the sense that black men are, but white NGE members are simply referred to as civilized people. (Tr. 74:24-75:5, 91:22-23, 116:7-9.) Versatile contends that NGE members are not "anti white" (Tr. 74:24) and testified that "Father Allah taught [that] the worst devil is the black devil" (Tr. 75:19-21).

5.      NGE adherents are also commonly known as "Five Percenters." (Pl.'s Ex. 1, Versatile Decl. ¶ 18.) This name derives from their classification of humanity into groups based on their attitude towards the proposition that black men literally are God:

> [The 85% are the] uncivilized people; poison animal eaters; slaves from mental death and power; people who do not know the living God or their origin in this world, and they worship that they know not what – who are easily led in the wrong direction, but hard to lead into the right direction.

15

[The 10% are the] rich; the slave makers of the poor, who teach the poor lies – to believe that the almighty, true and living God is a spook and cannot be seen by the physical eye. Otherwise known as the blood sucker of the poor.

[The 5% are] the poor, righteous teachers, who do not believe in the teaching of the 10%; and are all wise; and know who the living God is; and teach that the living God is the Son of man, the supreme being, the (black man) of Asia; and teach Freedom, Justice and Equality to all the human family of the planet Earth. Otherwise known as civilized people . . . .

(Pl.'s Ex. 5, Enc. D ¶¶ 14-16; *see also* Pl.'s Ex. 1, Versatile Decl. ¶ 18.) The 10% who mislead the 85% are the devils. (Pl.'s Ex. 5, Enc. D ¶¶ 9, 37.)

     6.    NGE adherents typically possess handwritten copies of what they call their foundational works (Tr. 55:20-56:4, 58:9-21, 61:24-62:24, 81:21-83:2; *see* Pl.'s Ex. 5, Encs. A-F ("120 Degrees"); Defs.' Ex. 4 ("Supreme Mathematics"); Defs.' Ex. 5 ("Supreme Alphabet")) and a personalized collection of commentaries and other relevant material (*see* Defs.' Ex. 6 ("Book of Knowledge")). Versatile testified: "[O]ur lessons are the foundation to our God and culture. Our lessons teach us about God, how we are to conduct oursel[ves], how we are to live in accord to the laws of Islam." (Tr. 48:13-16.)

     7.    The foundational works of NGE are embodied in two sets of short written passages. The first is the 120 Degrees, also referred to as the 120 Lessons, Book of Knowledge, or Book of Life. (Tr. 56:19-25, 89:6-8.) It incorporates the following passages: the Student Enrollment (Rules of Islam and Answers), the Lost Found Muslim Lesson No. 1, English Lesson Number C1, the Lost Found Muslim Lesson No. 2, Actual Facts, and Solar Facts. (Pl.'s Ex. 1, Versatile Decl. ¶ 19; Tr. 56:19-24.) In addition to these passages, the Book of Life constantly grows, as NGE members add messages, interpretations, and commentary on the lessons. (Tr. 57:4-9.) The Student Enrollment, the Lost Found Muslim Lesson No. 1, English Lesson Number

C1, and the Lost Found Muslim Lesson No. 2 explain the origin of the black man and why he is God; discuss how Yacob created the Caucasian race–the devils, the migration of the devils, and the destruction of the devils; and define the 85%, 10%, and 5%. (*See* Pl.'s Ex. 5, Encs. A-D.) The Actual Facts lists thirteen propositions about geography, and the Solar Facts lists distances from the Sun to each planet (including Pluto) in our solar system. (Pl.'s Ex. 5, Encs. E, F.)

8. The second set of works consists of the Supreme Mathematics and Supreme Alphabet, which are systems of numerology and cryptology and are referred to as the "National Lessons." (Pl.'s Ex. 1, Versatile Decl. ¶ 19; *see* Defs.' Exs. 4-5.) NGE members use the Supreme Mathematics and Supreme Alphabet to interpret their lessons. (Tr. 56:13-15; Pl.'s Ex. 1, Versatile Decl. ¶ 22.) The Supreme Mathematics imposes upon each of the digits 0-9 a corresponding meaning, accompanied by a definition or a lesson, and is used to uncover a deeper meaning when applied to numbers. (Defs.' Ex. 4.) For example, when applied to a date, the Supreme Mathematics yields a lesson for the day. (Tr. 59:12-16 ("To common society today is the 27th. To me and the principles that I live for, that means wisdom God [because "2" corresponds to wisdom and "7" corresponds to God under the Supreme Mathematics]. So the order of the day for me would be to express the wisdom of God.").) Similarly, the Supreme Alphabet assigns to every letter of the English language a word and a definition or deeper meaning. (Defs.' Ex. 5.) For example, the letter "N" stands for "Now/Nation/End," meaning "Now is the time to build our rightful Nation and put a [sic] End to the devil[']s nation." (Defs.' Ex. 5 ¶ 14.) "[NGE] members often speak or write using terms of Supreme Mathematics and Alphabets . . . ." (Pl.'s Ex. 1, Versatile Decl. ¶ 22.)

9.      NGE members also study *The Five Percenter*, NGE's national newspaper

produced by NGE's National Headquarters located at the Allah Youth Center in New York City.

(Pl.'s Ex. 1, Versatile Decl. ¶¶ 4, 9.) Versatile has subscribed to *The Five Percenter* since 1997.

(Pl.'s Ex. 1, Versatile Decl. ¶ 9.) NGE's National Office of Cultural Affairs also circulates

important lessons in bi-monthly statements to enhance NGE adherents' understanding. (Pl.'s Ex.

29, Enc. A; Tr. 77:20-78:9.)

10.     The Bible and Qur'an are secondary texts for NGE. (Tr. 87:12-16.) These texts

are not mandatory, and NGE adherents do not take the texts at face value, but instead interpret

the texts using the Supreme Mathematics. (Tr. 87:17-88:19.)

## B.      Metaphysical Ideas or Beliefs Encompassed by NGE

11.     NGE adherents "[do not] claim to be a religion [and do not] believe in a God that

exists outside of [them]selves." (Tr. 52:22-25; *see also* Tr. 69:3-4, 108:12, 153:23-25.) *The*

*Five Percenter* has published various articles affirming that NGE members do not label their

beliefs as a religion:

> Allah the Father is the Lord of all the worlds and it was he who born the
> Righteous Truth to [NGE], that "**WE ARE NOT A RELIGION**." Islam is not a
> religion, but it is a science that comes to take the Mystery out of religion.
> Religion is based on Faith and Belief, and belief is the absence of knowledge . . . .
> In religion there is a point where reasoning and logic ands [sic] and faith begins.
> When a religious person is confronted with a situation that he cannot explain he
> usually makes a big leap from logic to faith. . . . [A]nother word for religion is
> "faith". Faith is the substance of things hoped for-the evidence of things not
> seen! . . . [R]eligion is not binding upon the Gods and Earths nor has it ever been
> nor will it ever be.

(Defs.' Ex. 17, at 3.)

> According to religion men can never sati[s]fy their needs without help, and that
> help, according to religion, is not the mundane[ ]help of other men nor the help
> afforded by scientific knowledge, but Extra-Human Supernatural help.   "All

religions say in one way or another that man does not and cannot stand alone. He is vitally related with and even dependent on powers in Nature and Society external to himself". Islam is True Science. . . . Islam is the Blackman. The Blackman is God, whose proper name is ALLAH. The Father Allah said that WE ARE NOT A RELIGION. It is a dangerous thing to ADD TO or SUBTRACT FROM God's word.

(Defs.' Ex. 17, at 8; *see also* Defs.' Ex. 18, at 3 (rejecting lawsuits that use freedom of religion arguments to seek NGE recognition); Pl.'s Ex. 23, Vol. 14.4, at 3 ("Those who have chosen a religious path to God cannot discredit me for choosing the non religious Cultural path of my Father.").) NGE adherents refer to the external god or gods of other religions using the derogatory terms "mystery God" and "spook." (Pl.'s Ex. 5, Enc. D ¶ 10; Defs.' Ex. 17, at 4; Tr. 349:13-21; Pl.'s Ex. 22, Vol 14.3, at 11.)

12.     Versatile describes NGE as a "cultural pathway to God," consisting of his knowledge, wisdom, understanding, and "attendance of [his] faith," as well as the things he eats and the way he dresses. (Tr. 71:11-16.) Versatile, however, contends that while NGE does not specifically call itself a religion, NGE should be considered a religion "equivalent to any main stream religion" because NGE members have a belief in God (a black man with knowledge of self). (Pl.'s Ex. 1, Versatile Decl. ¶ 2; *see* Tr. 19:3-6.) Versatile also testified that he believes in a Supreme Being, the great force that created the universe, that lives and dwells within him. (Tr. 52:25-53:2, 69:7-9, 85:11-14.) One NGE member, testifying on Versatile's behalf, also indicated that NGE is a religion. (Tr. 154:17-22.) However, a NOI adherent, testifying on Versatile's behalf, described NOI as a religion, but NGE as a culture or a way of life. (Tr. 132:3-11.)

13.     As discussed above, NGE adherents use the term "Allah" as an acronym ("Arm Leg Leg Arm Head"), referring to the physical form of black men. (Pl.'s Ex. 1, Versatile Decl.

19

¶ 23; Tr. 84:1-9.) NOI, a recognized religion in VDOC, teaches that Allah is a deity who became incarnate in their own founder, Wallace Fard Muhammad. (Tr. 124:13-17.) NOI adherents pray to their founder. (Tr. 128:9-10.) NGE adherents, on the other hand, do not believe that either Clarence 13X or Wallace Fard Muhammad was spiritual or divine in some sense that other members of NGE are not. (*See* Tr. 111:22-112:1 (explaining that Clarence 13X is known as "Allah" because he "was the first example . . . to show us God was right among us in the flesh and not outside of us").) NGE adherents do not pray to their founder or to any other deity. (Tr. 95:16-17, 153:14-15, 155:7.) However, Versatile contends that Clarence 13X was divine. (Tr. 88:20-24.) It is unclear whether Versatile uses the term "divine" in the ordinary sense or as defined by the Supreme Alphabet to mean "anything that has not been mixed, tampered with or diluted." (Defs.' Ex. 5 ¶ 4.)

14.    As discussed above, NGE literature largely describes the creation, migration, and destruction of the white man or devil. (*See* Pl.'s Ex. 5, Encs. A-D.) NGE does not appear to have any teaching regarding an afterlife. (Tr. 86:8-87:10.)

C.    **NGE Beliefs as to an Ethical or Moral Code**

15.    Versatile describes the Supreme Mathematics as the "mores and principles of the Nation" and the Supreme Alphabet as the "language of the Nation." (Tr. 24:3-4, 9.) He refers to these texts as his "living Code of Ethics" (Pl.'s Ex. 1, Versatile Decl. ¶ 20) and "a guide of standards for [him] to live daily to express and show [his] godliness. Not as a religio[n], but as a cultural pathway" (Tr. 24:5-8). The documents espouse the basic tenets of family and black unity. (*See* Defs.' Ex. 4, ¶¶ 1-4 (describing the role of the black man, the black woman, and the black child); Defs.' Ex. 5, ¶¶ 6, 11, 17, 23, 26.) However, the Supreme Alphabet also suggests

20

that NGE adherents are free to decide their own code of personal morality within the private sphere. (*See* Defs.' Ex. 5 ("A. (Allah)–is the supreme being, soul controller of the universe."; "U (You/Universe)–You are the sole controller of your universe which is Sun, Moon, and the Star."); *see also* Pl.'s Ex. 23, Vol. 14.4, at 5 ("[E]ach man is in actuality, his own absolute law giver.").)

16. Versatile contends that NGE adherents "teach freedom, justice, and equality to all the human families of the Planet Earth." (Pl.'s Ex. 1, Versatile Decl. ¶ 17; *see also* Tr. 335:17-22.) Although these terms have universal ethical connotations, they bear different meanings for NGE adherents. For example, the Supreme Mathematics and Supreme Alphabet redefine "freedom" to mean "to be free of all negative thoughts so you may express your culture with no restrictions" (Defs.' Ex. 4 ¶ 4), "justice" to mean "see equally" (Defs.' Ex. 5 ¶ 10), and "equality" to mean "to deal equally with everything" (Defs.' Ex. 4 ¶ 6; *see also* Defs.' Ex. 5 ¶ 5). Thus, Versatile's position that NGE teaches freedom, justice, and equality to all human families must be evaluated in the context of all NGE teachings. NGE also teaches that Caucasians are a mentally and physically inferior race, are the devils, and must be taken off the planet. *See supra* ¶¶ 3-4.

17. The only concrete code of conduct in the record, contained within materials which Versatile identified as "somebody's Book of Knowledge" (Tr. 83:1-2), is "A Supreme Guidance for Righteous Conduct," which contains 29 rules by which NGE adherents should live (*see* Defs.' Ex. 6, Pt. III, at 11-13).[13] Many of these are rules of general application that forbid vices or crimes (*e.g.*, "No using ugly, indecent language"), prescribe positive conduct ("Be

---

[13] Because this document does not contain page numbers, the Court refers to the pages as numbered by CM/ECF.

cleanly dressed at all times"), and promote lofty aspirational goals ("Show by demonstration respect for self and others"). (Defs.' Ex. 6, Pt. III, at 11-13.) Other mandates, however, focus solely on the responsibility of NGE adherents to promote group cohesion and strength. For example, the final rule states: "Learn to put nothing before Allah's civilization, It is the only force and Power that could replace the Devil's civilization. The christians, and the muslims had their chance, now its GODS time to take the Devils off our planet." (Defs.' Ex. 6, Pt. III, at 13.) Versatile, however, contends this document is not a part of the 120 Degrees. (Tr. 355:9-18.)

### D. External Signs Suggesting NGE is a Religion

18. NGE maintains learning centers at its National Headquarters at the Allah Youth Center in New York City, where youth are recruited and taught the lessons. (Tr. 318:4-9; *see* Pl.'s Ex. 1, Versatile Decl. ¶ 4.) NGE members "conduct civilization classes, in which senior members educate newer members about the lessons, and how they can be applied." (Pl.'s Ex. 1, Versatile Decl. ¶ 3.) The senior members are referred to as "enlighteners," and the new members are required to learn one lesson before continuing on to the next lesson. (Tr. 67:2-14.)

19. NGE adherents hold "ciphers" in which they "come together and . . . expound upon the lessons or the teachings of Allah." (Tr. 79:6-8.) Versatile contends that "[w]hat church is to a Christian is what a cipher is to [NGE adherents]." (Tr. 79:10-11.) Versatile also testified that NGE adherents "gather monthly for 'Parliaments' and 'Rallies,' during which members make collective decisions and help one another learn their lessons." (Pl.'s Ex. 1, Versatile Decl. ¶ 3.)

20. NGE adherents observe four honorary days: (1) on February 22nd, NGE members take the day off from work, gather to celebrate the birthday of Clarence 13X and

reflect on his legacy, and fast during daylight hours; (2) on the weekend nearest June 13th, NGE memorializes the 1969 assassination of Clarence 13X through a two-day event to show and prove that his legacy lives on; (3) on the last Saturday of August, NGE members gather to socialize with their family and friends and give tribute to Clarence 13X; and, (4) on October 10th, NGE commemorates NGE's birth by reflecting on NGE's history and dressing in black and gold. (Pl.'s Ex. 3, Enc. A, at 6-9; Tr. 45:17-47:2.)

21.     NGE has a Universal Flag which "represents the original family of the universe." (Pl.'s Ex. 1, Versatile Decl. ¶ 10; *see* Pl.'s Ex. 6, Enc. A.)  The solid black five-pointed star symbolizes the black child, while the crescent moon stands for the black woman. (Pl.'s Ex. 6, Enc. A.)  The "7" on the flag is solid black and "symbolizes the Original Man, the True And Living God, the Supreme Being, Almighty God Allah." (Pl.'s Ex. 6, Enc. A.)  The placement of the "7" reflects the black man's dominance over the black woman and child and "shows the authority of ALLAH over the Planets and Stars and the proper order of the Universe." (Pl.'s Ex. 6, Enc. A.)  "The white background symbolizes the white clouds of deception that have drowned our people in a sea of ignorance, and the feeble attempts of the wicked to conceal the True And Living God which is The Son of Man!" (Pl.'s Ex. 6, Enc. A.)  Versatile asserts that the "Universal Flag is just as significant to [his] life, as the cross is to any Christian, or as important as the Star of David is to any Jewish [follower]." (Pl.'s Ex. 1, Versatile Decl. ¶ 10.)

22.     NGE adherents practice no rites equivalent to marriage, baptism, or other recognized practices. (Tr. 318:13-19.)

23.     NGE adherents do not eat pork or any pork by-product because "[i]t contains 99.9 percent of poisons, infection.  It is not a full product, it is a savage, it is a beast.  It is basically a

23

garbage can." (Tr. 95:24-96:2; *see also* Pl.'s Ex. 3, Enc. A, at 10.) NGE members are also prohibited from eating scavenging seafood and fish weighing over five pounds. (Tr. 96:20-21.) These are both applications of the larger teachings of Clarence 13X, who forbade consuming any food or drug that is "detrimental to . . . physical growth." (Tr. 96:9-97:9.)

24.     NGE has no central leader. (Tr. 317:2-14.) Clarence 13X taught that there was to be no leader after him. (Tr. 363:11-18.) NGE materials suggest that no leader exists because "[i]t is only the blind who need a leader. God is free and independent and stands on his own two feet!" (Defs.' Ex. 6, Pt. I, at 9.)

25.     Versatile and witnesses testifying on his behalf contend that NGE's foundational works are generally not handwritten and are published and distributed by NGE's National Office of Cultural Affairs. (Tr. 65:11, 67:18-22, 68:5-7, 112:19-25.) To support this contention, Versatile points to an advertisement in *The Five Percenter* stating, "FOR LESSONS CONTACT SEE ALLAH AT ALLAH SCHOOL . . . ." (Pl.'s Ex. 21, Vol. 14.2, at 10.)

26.     Versatile did not produce a published version of NGE's foundational works. Numerous witnesses testified that they had never encountered or seen a commercially available, standard publication of NGE material and that one was not available from the official NGE website or NGE's national headquarters. (Tr. 264:10-15, 317:16-25, 443:14-17, 462:4-463:24, 485:3-7.) Further, a subsequent article published in *The Five Percenter* suggests that NGE does not sell or distribute any standard lessons. (Defs.' Ex. 19, Vol. 15.4, at 10.)

### IV. Analysis: NGE is not a Religion for the Purposes of RLUIPA

For the reasons set forth below and based on the record before the Court, the Court concludes that Versatile has failed to demonstrate that NGE is a religion for RLUIPA purposes.

24

## A.    Comprehensive, Ultimate Ideas

"[A] religion must consist of something more than a number of isolated, unconnected ideas." *Africa*, 662 F.2d at 1035. Religious beliefs generally constitute a cohesive system addressing "'fundamental and ultimate questions having to do with deep and imponderable matters.'" *Meyers*, 95 F.3d at 1483 (*quoting Africa,* 662 F.2d at 1032). These "fundamental questions answered by most religions," *Quaintance*, 471 F. Supp. 2d at 1158, address "life and creation, a fear of the unknown, [and] the pain of loss," as well as "an individual's existence, his or her place in the universe, . . . and the origin, structure, and space-time relationships of the universe." *Id.* at 1157. Comprehensive and ultimate ideas "include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Meyers*, 95 F.3d at 1483. Ideas about these imponderables "address[] purpose in relationship to the spiritual or intangible world," not merely a "relatively simplistic purpose confined to the physical world." *Quaintance*, 471 F. Supp. 2d at 1157.

Based on the record before this Court, NGE's fundamental writings largely describe black men as the founders and the rulers of society, while describing the white race to be a wicked and inferior race created through genetic engineering. This focus on answering the historical or cultural questions about the NGE movement indicates that NGE is more of a social or cultural movement, rather than a religious movement. NGE's core texts also focus on the need to unite the black family, "murder" the devil, and overcome racial oppression. This "monofaceted" concern with race is not a comprehensive system of beliefs about an ultimate concern. *Quaintance*, 471 F. Supp. 2d at 1162.

25

NGE may have a system of specific rules and attitudes that cover many or most aspects of life. While these tenets are partly derived from the positive and commendable idea that a need exists for a strong, unified black community, these codes of conduct nevertheless fail to comprise a comprehensive system of beliefs because they derive solely from the monofaceted world view of NGE. *See Conner v. Tilton*, No. C07-4965 MMC, 2009 WL 4642392, at *12 (N.D. Cal. Dec. 2, 2009) (concluding that comprehensive quality was absent where, "while plaintiff's evidence shows that Creativity's doctrines address a wide range of concerns, the evidence also shows that the essence of Creativity is confined to 'one question or one moral teaching' . . . 'What is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin'"). No ultimate motivation is apparent other than a self-interested desire to better one's self and community, and these secular beliefs are neither ultimate nor comprehensive in nature. *See Quaintance*, 471 F. Supp. 2d at 1171 ("To the minimal extent any of Defendants' beliefs are 'religious,' these beliefs appear to be derived entirely out of their secular beliefs."); *United States v. Meyers*, 906 F. Supp. 1494, 1508 (D. Wyo. 1995) ("Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes in so deeply that he has transformed them into a 'religion.'").

Based on the evidence presented at the evidentiary hearing, Versatile has failed to demonstrate that NGE's belief system cohesively addresses fundamental and ultimate issues about deep and imponderable matters.

**B.    Metaphysical Beliefs**

Metaphysical beliefs "address a reality which transcends the physical and immediately apparent world." *Meyers*, 95 F.3d at 1483. This reality often includes "another dimension,

place, mode, or temporality [that is] often . . . inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities." *Id.* Metaphysical beliefs transcend mere physical laws that explain natural phenomena. *Cf. Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 738 (M.D. Pa. 2005) (explaining that, for the purposes of the Establishment Clause, Intelligent Design is religious in nature because it goes beyond "testable, natural explanations"); *McLean v. Ark. Bd. of Educ.*, 529 F. Supp. 1255, 1267 (E.D. Ark. 1982) (explaining that creation science is religious "because it depends upon a supernatural intervention which is not guided by natural law").

NGE adherents use the term "God," but it refers literally to black men. Instead of carrying a metaphysical connotation, the term "God," as used by NGE members, appears to denote the superiority of black men over other races. Similarly, the terms "Allah" and "Islam" have literal, not metaphysical, meanings for NGE adherents. *See supra* ¶ 2.

The record before this Court establishes that NGE adherents do not believe in a God that exists outside of themselves and refer to the external god or gods of other religions using the derogatory terms "mystery God" and "spook." They teach that belief in the impossibilities and a mystery god, as preached by the 10%, keep the 85% weak and servile. NGE adherents do not pray to any entity, including their founder. Finally, NGE's national newspaper publishes articles stating that NGE is not a religion and differentiating their beliefs from religions that believe, hope, and have faith in the mysterious or supernatural. NGE adherents instead refer to their beliefs as a way of life or a culture.

Versatile, on the other hand, contends that he believes in a Supreme Being that created the universe, but simply believes that it dwells within him. Versatile asserts that NGE's founder

27

was divine. Versatile, also in contravention to NGE teachings as established on this record, contends NGE should be given religious recognition.

The Court finds that Versatile's professions of belief in any transcendental or divine force diverge from the teachings of NGE as otherwise placed on this record. Versatile's beliefs cannot be a sincere product of the tenets of NGE faith as to which this Court has received evidence. At best, the record contains conflicting and equivocal evidence as to whether NGE incorporates any metaphysical ideas, and thus, Versatile has failed to meet his burden of satisfying this inquiry.

### C. Ethical System

The sort of ethical system contemplated by religion "has a religious, as opposed to secular or philosophical, connotation." *Quaintance*, 471 F. Supp. 2d at 1161. These precepts are linked to ultimate concerns that are "more than intellectual," and generally "a believer would categorically disregard elementary self-interest in preference to transgressing its tenets." *Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981) (internal quotations omitted); *see also Meyers*, 95 F.3d at 1483 (stating that ethics often "require the believer to abnegate elemental self-interest").

Although Versatile contends that NGE teaches freedom, justice, and equality to all human families, these terms have different connotations for an NGE adherent. For example, for an NGE adherent "teaching freedom" appears to mean teaching NGE beliefs so that a person can become civilized and express the NGE culture. *See supra* ¶ 16. Versatile's assertion that NGE teaches freedom, justice, and equality as commonly understood is undermined by NGE teachings that suggest Caucasians are mentally and physically inferior, are devils, and must be taken "off the planet." *See supra* ¶¶ 3-4.

Aside from the basic tenets of family and black unity, there appears to be no moral component to NGE. Instead, adherents appear free to decide their own code of personal morality within the private sphere. NGE's teachings lack the rigidity and universal application of a religious ethical system. *See Jacques*, 569 F. Supp. at 734 ("Self-determination of one's beliefs on an individual basis can scarcely be considered a religion.").

Although the document entitled "A Supreme Guidance for Righteous Conduct" contains what could be considered an ethical or moral code, Versatile asserts that this document is not a part of the 120 Degrees. Furthermore, even this document suggests that self-interest and self-preservation should be the ultimate goal for NGE adherents. Any values espoused appear to be applicable only to the 5% and do not have a universal application. Based on the record before this Court, Versatile has failed to establish the presence of an ethical or moral code within NGE's belief system.

### D.    External Signs and Accoutrements of Religions

The final factor, accoutrements of religions, is determined "[b]y analogy to many of the established or recognized religions" which include "external signs" of religious belief. *Meyers*, 95 F.3d at 1483. These include the following subfactors: (1) a divine founder or prophet; (2) important writings; (3) gathering places; (4) keepers of knowledge; (5) ceremonies and rituals "imbued with transcendent significance;" (6) a structure or organization "of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc.;" (7) holidays celebrating sacred or holy days; (8) dietary restrictions or fasting days; (9) appearance and clothing; and, (10) propagation and proselytizing. *Id.* at 1483-84.

Even assessing whether the subfactors regarding accoutrements of religion are "minimally satisfied," *Meyers*, 95 F.3d at 1484, only five are shown to exist in this case. The Court heard testimony that NGE has important writings and texts (although it appears that these documents are largely handwritten and fluid), maintains gathering places at the Allah Youth Center in New York City, recognizes four honorary days (although NGE adherents do not appear to celebrate anything holy or sacred on these days), establishes dietary restrictions (although Versatile did not provide a religious explanation for such restrictions), and recruits and teaches new members NGE beliefs at the Allah Youth Center.

Five other subfactors are absent from NGE's belief system. First, NGE does not recognize a divine founder or prophet. Despite Versatile's testimony to the contrary, the vast majority of the evidence before this Court suggests that Clarence 13X is not recognized as divine in any supernatural sense. Aside from being the founder of NGE, he is considered no different than any other black man.

Second and third, no evidence before the Court suggests that NGE maintains a structure or organization of leaders or has any keepers of knowledge. No definitive "hierarchy" of believers or ultimately authoritative leader exists. This lack of a hierarchy, coupled with Versatile's failure to identify and explain a universal and consistent body of NGE teachings, suggests that NGE does not have any "Keepers of Knowledge" equivalent to "clergy, ministers, priests, reverends, monks, shamans, teachers, or sages." *Meyers*, 95 F.3d at 1483. Indeed, these titles lack meaning in the NGE context because each adherent is his own keeper of a body of self-selected knowledge.

Fourth, Versatile has presented no evidence of NGE ceremonies or rituals which are "imbued with transcendent significance." *Id.* at 1483. No evidence indicates that NGE has any clergy "with authority to marry and bury." *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969). No evidence suggests that NGE has any counterpart to communion, baptism, or ritual washings practiced in other religions. This record suggests that NGE's Universal Flag, which Versatile argues should be considered a "holy" object, symbolizes the black man's dominance and superiority over everything else. Given this symbolism, the Court cannot find that Versatile has even minimally satisfied establishing that the flag carries transcendent significance rather than serving as an icon for a social or cultural movement.

Finally, aside from Versatile's testimony that NGE adherents wear gold and black during one of the honorary days, no other evidence indicates that NGE mandates a specific physical appearance or dress.

On the whole, the record before the Court at best contains conflicting evidence as to whether sufficient external signs of religiosity exist within NGE's belief system. The Court therefore weighs the final factor as to external signs and accoutrements of religions in favor of neither party. Moreover, even a strong showing that NGE externally resembles a religion would not alter the Court's analysis because, based on the record before the Court, the other factors so clearly weigh against affording religious protection to NGE.

E.    **Conclusion**

Versatile has failed to demonstrate the factors articulated in *Meyers* and *Africa*. Based on the record before this Court, Versatile has failed to demonstrate, even by the preponderance of the evidence, that NGE contains a unifying comprehensive set of beliefs about ultimate matters,

31

includes metaphysical beliefs, upholds a universal moral or ethical code, or possesses traditional indicia of religiosity. The evidence presented by the parties thus demonstrates that NGE should be distinguished from those systems of belief protected by RLUIPA. It is therefore RECOMMENDED that Claims One and Two be DISMISSED.

## V. Findings of Fact Relevant to VDOC Decisionmaking

Even if the Court were to find or assume that NGE is a religion protected by RLUIPA, Versatile's claims fail if Versatile cannot demonstrate that the challenged procedures substantially burdened his religion or if VDOC can demonstrate that the challenged procedures are the least restrictive means to further compelling interests. Accordingly, based on the evidence presented at the evidentiary hearing, the Court makes the following findings of facts regarding VDOC decisionmaking.

### A. VDOC Has Labeled NGE as a Security Threat Group and a Gang

27. By maintaining a large, identifiable group, gangs can use intimidation and fear to control prisons, recruit members, and gain power. (Tr. 370:4-371:8, 424:17-425:13.) Visibility is thus important to gangs. (Tr. 425:18-23.)

28. Gary Clore,[14] the manager of VDOC's Gang Management Unit, testified that in the early 1990s, a group of about 150 to 200 NGE adherents existed at Powhatan Correctional Facility. (Tr. 372:2-13, 374:21-25.) During group meetings, NGE adherents taught their lessons and engaged in militant training activities. (Tr. 372:5-373:7.)

---

[14] Clore testified as an expert in gang activity in VDOC.

29.     Clore and Michael Duke,[15] a gang specialist with VDOC's Gang Management Unit, testified that enlighteners, or senior NGE members, would recruit new members and teach them the lessons. (Tr. 380:15-381:12, 445:5-446:1, *see also* Tr. 67:2-14.) They have witnessed senior NGE members physically assault newer NGE members as punishment for their inability to properly recite the lessons. (Tr. 380:15-381:12, 445:5-446:1.)

30.     Defendants stipulate that many incidents and disturbances occur within VDOC that are committed by persons of different religions or belief systems. (Tr. 43:12-14.)

31.     Clore and Duke testified that NGE members use a hand signal, certain greetings, and the Universal Flag to signify membership, increase visibility, and intimidate others. (Tr. 369:22-370:24, 382:22-383:6, 427:1-2.) According to Clore and Duke, NGE members have used the Supreme Alphabet, the Supreme Mathematics, or other codes to "talk around security staff or non Five Percenters in a coded manner." (Tr. 379:20-21; *see also* Tr. 383:1-16, 456:3-9; Defs.' Ex. 14.) While Versatile and witnesses testifying on his behalf admit that NGE members often communicate using the Supreme Mathematics and Supreme Alphabet, he claims this does not pose a security threat because "anyone can easily get them an[d] they can be decipher[ed] with ease by the VDOC officials or anyone who ha[s] a copy of them." (Pl.'s Ex. 1, Versatile Decl. ¶ 22; Tr. 136:17-19.)

32.     Clore and Duke testified that they have come across Five Percenters who are also members of other gangs, including the Bloods, Crips, and Gangster Disciples. (Tr. 387:13-18,

---

[15] Duke testified as an expert in gangs and Five Percenters in VDOC. In Versatile's revised proposed findings of facts and conclusions of law, Versatile appears to contest Clore's and Duke's expert designations. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 26.) To the extent this filing could be construed as an objection to Clore and Duke testifying as expert witnesses, the Court overrules the objection as untimely and waived. *See Parodi*, 703 F.2d at 783; *DiPaola*, 581 F.2d at 1113.

454:17-23.) Documentation suggests that gangs have attempted to recruit NGE members and that NGE has encouraged its members to recruit gang members. (*See* Defs.' Ex. 10 (recounting the New Black Panther Party's national unity efforts with NGE and other gangs); Defs.' Ex. 12 ("**Bloods** will become Gods as soon as they are given the basic awareness to fight **for** their own people. . . .").) Versatile, on the other hand, contends NGE does not recruit members, including gang members. (Pl.'s Ex. 1, Versatile Decl. ¶ 22.)

33.     Due to the increase in gang activity within VDOC in the 1990s, VDOC established a Security Threat Group Committee to identify gangs and gang members, track gang activities, and share information with other law enforcement agencies. (Tr. 533:1-534:24.) By 1996, VDOC had identified NGE as a security threat group. (Tr. 548:24-549:7.)

34.     On July 23, 1996, Defendant Gene Johnson, then-Deputy Director of VDOC, issued a memorandum prohibiting the assembly of Five Percenters:

> Please be advised that "Five Percent" groups should not be allowed to meet in any [VDOC] facility. Review of information about this group indicates that they are non-religious in nature, and that these groups consider their beliefs to be a "way of life" rather than a religion. . . .
>
> Take note that these groups may attempt to meet covertly, and that some members may present a threat to the orderly and secure operation of the institution. . . .

(Defs.' Ex. 7; *see also* Pl.'s Ex. 1, Versatile Decl. ¶ 5.) Johnson instituted this policy because Five Percenter disturbances had increased in prisons in Virginia and in other states. (Tr. 529:8-530:15.) After VDOC implemented the new policy, NGE groups began to splinter and problems caused by Five Percenter groups significantly reduced. (Tr. 378:3-6, 530:17-23.)

35.     At some point after 2001, the Security Threat Group Committee evolved into the Gang Management Unit (Tr. 533:15-534:11), and VDOC adopted a zero tolerance policy for

gang activity, including recruiting, unauthorized assembly, assaults, disorderly conduct, and any other conduct "that would disrupt the safe security and orderly operation of [VDOC] facilities" (Tr. 368:13-15). VDOC defines a gang, previously identified as a security threat group, as:

> A group of individuals who: (a) possess common characteristics that distinguish them from other offenders or groups of offenders and who, as an entity, pose a threat to the safety and security of staff, the facility, or other offenders or the community; (b) have a common distinctive goal, symbolism or philosophy; (c) possess identifiable skills or resources, or engage in unauthorized/illegal activities.

(Defs.' Ex. 16, VDOC Operating Procedure ("VDOC OP") 803.2(III); *see also* Tr. 369:1-9; Va. Code Ann. § 18.2-46.1.) VDOC has classified NGE as a gang. (Tr. 536:24-537:2.) Versatile contests this classification, stating that NGE is not a gang. (Tr. 19:24; *see also* Pl.'s Ex. 27.)

36. According to VDOC, approximately 8,000 VDOC inmates are known gang members, of which 900 are Five Percenters. (Tr. 391:2-22, 464:20-24.)

## B. Findings Relevant to VDOC's Review of NGE Publications

### 1. VDOC Operating Procedure Regarding Publication Disapproval

37. To "maintain security, discipline, and good order" in VDOC facilities, VDOC reviews all incoming publications. (Defs.' Ex. 16, VDOC OP 803.2(V)(D) (effective Aug. 1, 2007).)[16] "Offenders are prohibited from receiving publications that promote violence, disorder or the violation of state or federal law or any material containing sexually explicit acts . . . ." (Defs.' Ex. 16, VDOC OP 803.2(V)(C).)

---

[16] The Court notes that VDOC Operating Procedure 803.2 relating to incoming publications has since been amended with an effective date of November 1, 2010. These amendments were largely structural and were not substantive. Thus, the following findings of facts and conclusions of law apply equally to the amended VDOC Operating Procedure 803.2.

38. VDOC regulations provide specific criteria for publication disapproval. A publication should be disapproved for receipt and possession by inmates "if the publication can be reasonably documented to contain" (Defs.' Ex. 16, VDOC OP 803.2(V)(L)):

7. Material that promotes or advocates violence, disorder, insurrection or terrorist activities against individuals, groups, organizations, the government, or any of its institutions

. . . .

12. Material whose content could be detrimental to the security, good order, discipline of the facility, or offender rehabilitative efforts or the safety or health of offenders, staff, or others

13. Material that depicts, describes, or promotes gang signs, language, clothing, jewelry, codes or paraphernalia, gang participation, or other gang-related activity or association

14. Material, documents or photographs that depict, describe or suggest the use of violence, weapons, illegal drugs, or other activities that counter the stated goal of rehabilitation within the [V]DOC

15. Material written in code or written in a foreign (non-English) language (unless obtained from an approved vendor . . . )

(Defs.' Ex. 16, VDOC OP 803.2(V)(L).) Thus, no matter what group, organization, or religion a publication might be associated with, VDOC applies these specific criteria to each publication to determine whether it is appropriate for introduction into VDOC facilities. (Tr. 224:11-16.)

39. VDOC's Publication Review Committee ("PRC") meets at least quarterly (Defs.' Ex. 16, 803.2(V)(H); Tr. 501:10-16) and reviews all "publications submitted from [V]DOC facilities to determine if they violate [these specific criteria] and are therefore not appropriate for possession by an offender in a [V]DOC facility" (Defs.' Ex. 16, VDOC OP 803.2(III); see Tr. 217:3-14). Any publication disapproved by the PRC is placed on the Disapproved Publication Log, which is distributed to all VDOC facilities. (Defs.' Ex. 16, VDOC OP 803.2(III); Tr.

36

212:7-11.) If a publication is disapproved, it is restricted across all VDOC facilities. (Tr. 223:20-224:2.) The PRC "should notify the publisher of the Committee's decision to disapprove the publication." (Defs.' Ex. 16, VDOC OP 803.2(V)(H)(3).)

40.     If a publication has not yet been approved or disapproved by the PRC, each VDOC facility must review the publication, applying the specific criteria, to determine whether it is appropriate for possession by an inmate. (Defs.' Ex. 16, VDOC OP 803.2(V)(F), (G); Tr. 216:21-24, 501:6-8.) If a facility determines it is not appropriate for inmate receipt, the publication must be forwarded to the PRC for review. (Defs.' Ex. 16, VDOC OP 803.2(V)(F), (G); Tr. 216:24-217:3.)

41.     Each edition or issue of every publication must be individually reviewed. (Defs.' Ex. 16, VOC OP 803.2(V)(E)(6); Tr. 217:14-17, 225:7-10.)

### 2.     The Disapproval of NGE Publications

42.     The PRC has reviewed NGE lessons and numerous issues of *The Five Percenter* and has placed them on the Disapproved Publication Log as violating one or more of the specific criteria and as containing material "which could be detrimental to institutional order, security and/or the rehabilitation of inmates." (Pl.'s Ex. 4, Enc. A; *see* Pl.'s Ex. 1, Versatile Decl. ¶ 19.)[17]

---

[17] At the evidentiary hearing, Versatile and a NOI member both testified that NOI members study and possess the 120 Degrees within VDOC. (Pl.'s Ex. 1, Versatile Decl. ¶ 19; Tr. 120:9-121:14.) VDOC officials, however, testified that NOI members may not possess the 120 Degrees (*see, e.g.*, Tr. 290:20-291:2), and the Disapproved Publication Log prohibits the possession of the Book of Lessons Issued by Elijah Muhammad, NOI's founder. (Pl.'s Ex. 4, Enc. A.) Similarly, the Disapproved Publication Log prohibits the possession of various issues of *The Final Call*, NOI's newspaper, even though NOI is a recognized religion within VDOC. (Pl.'s Ex. 4, Enc. A; Tr. 133:24-134:1.) Further, if a publication is disapproved, it is restricted across all VDOC facilities and prohibited among all groups. (Tr. 223:20-224:2.) Based on this evidence, the Court finds that possession of the 120 Degrees by any inmate within VDOC, including NOI members, violates VDOC regulations.

VDOC has determined that the racially inflammatory rhetoric of NGE materials is a general threat to institutional security. (Tr. 506:17-507:8; *see, e.g.*, Pl.'s Ex. 21, Vol. 14.1, at 2 (encouraging NGE members to fight back against the devils and rebel); Pl.'s Ex. 23, Vol 14.5, at 8 (referring to the Blackman as God and the Caucasian man as the devil).) VDOC has notified the publisher of each disapproved NGE publication, specifying the page numbers that violate VDOC Operating Procedure and often specifying the specific criteria violated. (Pl.'s Ex. 25, Enc. A.)

43.     On June 23, 2004, the PRC denied an issue of *The Five Percenter*, Vol. 9.8, because it "[d]epict[ed] lynchings that could cause violence/racial unrest." (Pl.'s Ex. 4, Enc. B, at 8.)

44.     In March of 2006, the Security Threat Group Subcommittee ("STGS") of the PRC was formed and all issues of *The Five Percenter* were referred to the STGS for review. (Pl.'s Ex. 4, Encs. B, D; Tr. 409:15-21.) Between March 2006 and March 2007, the STGS disapproved Volumes 9.10, 9.11, 10.1, 10.2, 10.3, 10.5, 10.6, 10.7, 10.8, 10.9, 10.11, 10.12, 11.1, 11.2, 11.3, 11.4, 11.5, 11.6, 11.7, 11.9, 11.10, 11.12, and 12.1 of *The Five Percenter* as violative of specific criteria. (Pl.'s Ex. 4, Enc. B, at 8-9; *see* Pl.'s Ex. 25, Enc. A, at 2-3.) In making this determination, the STGS looked at each issue individually and did not disapprove issues simply because they were related to NGE. (Tr. 410:7-8.) The majority of these volumes were disapproved as violative of Criteria 13 (containing gang-related material) because they featured the Universal Flag and photographs of individuals displaying hand signs, both of which are considered gang material by VDOC. (Pl.'s Ex. 4, Enc. B, at 8-9; Tr. 429:6-9; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(13).) However, many volumes were also disapproved as violative of

Criteria 7 (promoting violence or disorder) and Criteria 12 (detrimental to security and rehabilitative efforts) due to articles that, according to VDOC, referred to Caucasians as the devil, taught readers how to write in code, and contained other "inflammatory seeds of hate that [do not] fit in with the environment where [VDOC is] forcing all cultures and subcultures to live in close quarters." (Tr. 429:11-14; *see* Pl.'s Ex. 4, Enc. B, at 8-9; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(7), (12).)

45.     In March of 2007, the PRC re-assumed its role as reviewer of *The Five Percenter* and has disapproved every issue of *The Five Percenter* from Volume 12.2 through Volume 15.3. (Pl.'s Ex. 4, Enc. B, at 9-10.) These volumes have been disapproved as containing material violative of Criteria 7 (promoting violence or disorder), Criteria 12 (detrimental to security and rehabilitative efforts), and/or Criteria 13 (containing gang-related material). (Pl.'s Ex. 4, Enc. B, at 9-10; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(7), (12), (13); Tr. 502:22-503:11.) One volume was also disapproved as containing material violative of Criteria 14 (depicting violence, weapons, or illegal drugs). (Pl.'s Ex. 4, Enc. B, at 10; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(14).)

46.     Versatile contends that VDOC has implemented a "Blanket Ban" on *The Five Percenter* since August 2006. (Pl.'s Ex. 1, Versatile Decl. ¶ 9; Tr. 28:11-18.) VDOC employees, however, testified that no blanket ban on *The Five Percenter* has been implemented, and instead each issue is reviewed separately. (Tr. 225:3-10, 500:23-25.) Defendants, however, could not offer a definite explanation as to why a majority of issues of *The Five Percenter* starting with Volume 9.8 were disapproved, while previous volumes were approved. Defendants offered the amendment of Virginia gang laws, the addition of Criteria 13 (prohibiting gang-related material) to VDOC Operating Procedure 803.2, and the creation of the Gang

Management Unit and adoption of the zero tolerance policy as possible explanations for the recent and frequent disapproval of *The Five Percenter*. (Tr. 430:14-431:1, 526:8-17, 565:15-24.)

### 3. Findings Relevant to Whether Disapproval Is the Least Restrictive Means

47.     Roughly 32,000 inmates are detained in forty facilities within VDOC. (Tr. 538:14-20.)

48.     Since 2002, VDOC has endured $160 million in budget cuts and has lost 2,295 positions. (Tr. 528:14-17, 540:2-6.) In 2010, VDOC was placed under a hiring freeze and is operating under a considerable amount of vacancies. (Tr. 540:19-22.)

49.     VDOC regulations prohibit the redaction of publications. (Defs.' Ex. 16, VDOC OP 803.2(V)(E)(5) ("[P]ublications that have been altered (pages or pictures removed, blotted out, etc.), regardless of the source, are not authorized."); Defs.' Ex. 16, VDOC OP 803.2(V)(E)(7) ("When a portion of a publication is disapproved, the entire publication will be disapproved. There will be no attempt to remove or censor the disapproved material."); Tr. 509:13-17.) Redaction would require a tremendous amount of resources, and VDOC adopted the zero tolerance policy instead. (Tr. 392:10-24, 509:21-24.) VDOC contends it does not have the time, staff, or money it would take to go through the magazines, newspapers, books, and other writing materials and redact violative material. (Tr. 392:10-24, 538:8-12.)

50.     VDOC does not place a copy of NGE lessons or *The Five Percenter* in VDOC libraries because VDOC contends the documents often disappear which could result in unfettered access. (Tr. 544:1-15.) VDOC libraries are not staffed by VDOC employees, and VDOC does not have the manpower to staff libraries with security officers to ensure that theft does not occur. (Tr. 544:1-8.)

51. Segregating NGE adherents to allow possession of their lessons is not feasible because VDOC does not have the capacity in segregation to house the 900 identified NGE members within VDOC. (Tr. 541:3-10.)

### C. Findings Relevant to the VDOC's Processing of Versatile's Request for Religious Recognition

#### 1. VDOC Operating Procedure Regarding Requests for Religious Recognition

52. At the time Versatile submitted his request for religious recognition of NGE, requests for new religious programs or groups were governed by VDOC Operating Procedure 841.3. (Pl.'s Ex. 2, VDOC OP 841.3 (effective Apr. 1, 2007).) "This operating procedure establishes protocols to provide reasonable opportunities for incarcerated offenders to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources." (Pl.'s Ex. 2, VDOC OP 841.3(I).)

53. The religious recognition process requires the offender to submit an application and all supporting documentation to the facility, and the facility must then forward completed applications to the Faith Review Committee ("FRC"), along with a recommendation as to whether a request should be approved or disapproved:

1. Offender requests for new religious groups or activities not previously or currently offered at a facility shall be submitted on a *Request for Recognition of Religious Group*, (see Attachment #3) to the Facility Unit Head or designee who shall be a [V]DOC employee. Each request shall be as complete and well documented as possible.

2. The Facility Unit Head shall review the *Request for Recognition of Religious Group* and, if complete, attach a *Routing Slip for Recognition of Religious Groups* (see Attachment #4) indicating recommendation to approve or disapprove the *Request for Recognition of Religious Group*.

3.    The Facility Unit Head will refer the request and supporting documentation through the Regional Director (Assistant Director for Community Corrections Facilities) to the *Faith Review Committee* for recommendation to the Deputy Director.

4.    The Deputy Director shall make the final decision as to whether a proposed religious group will meet based on information presented.

(Pl.'s Ex. 2, VDOC OP 841.3(IV)(C); Tr. 178:24-179:3.) Facilities may, however, restrict or deny religious activities under certain circumstances: "Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources." (Pl.'s Ex. 2, VDOC OP 841.3(IV)(D)(1).)

54.    The FRC is "[a] panel of representative [VDOC] staff who serve in an advisory and decision making capacity regarding religious accommodation as it relates to, and impacts on, security and legitimate penological interests of [V]DOC." (Pl.'s Ex. 2, VDOC OP 841.3(III); *see* Tr. 257:17-19.) Issues before the FRC are placed on a docket and referred to the religious advisor who researches the issue and reports back to the six-member committee. (Tr. 257:21-25, 265:11-12.) The FRC convenes every four months and makes a recommendation to the Deputy Director about issues on its docket. (Pl.'s Ex. 2, VDOC OP 841.3(IV)(C)(3); Tr. 257:21-258:1, 286:23-24.) The FRC usually decides by reaching a consensus rather than by taking a vote. (Tr. 276:17-21.)

### 2.    The Southampton Correctional Center Request for Religious Recognition of NGE

55.    In 2007, an inmate incarcerated at Southampton Correctional Center submitted a request for religious recognition of NGE ("the SCC request") which was referred to the FRC. (Tr. 324:15-18.)

56.     John Meyers,[18] an ordained clergyman and Vice President of Chaplain Service Prison Ministry of Virginia,[19] was the religious advisor at the time of the SCC request. (Tr. 257:21-23, 293:22-23, 296:13-21.) As religious advisor, Meyers "advocate[s] for religious freedom and rights and balance[s] those with the needs of corrections." (Tr. 295:21-23.)

57.     In recommending whether a belief system should be given religious recognition within VDOC, Meyers evaluates the belief system looking at the following factors: (1) whether the belief system includes spiritual or metaphysical beliefs that "permeate[] reality and give[] a larger meaning to life" (Tr. 298:4-5); (2) whether an ethical or moral system applicable to humanity as a whole exists within the belief system (Tr. 298:15-22); (3) the comprehensiveness of the belief system (Tr. 299:8-18); and, (4) the history of the belief system, such as its founder, leaders, structure, houses of worship, rituals or worship services, prescribed prayers or meditation, and authoritative scriptures (Tr. 300:5-18).

58.     In considering the SCC request, Meyers reviewed NGE lessons, including the Supreme Alphabet, the Supreme Mathematics, and the 120 Degrees. (Tr. 301:4-9.) He also relied on his own expertise and performed internet research on NGE. (Tr. 303:21-304:6.) Meyers attempted to find contact information for local NGE leaders in the community, but found none. (Tr. 303:21-25.)

59.     Meyers determined that the facts before him regarding NGE suggested that NGE should not receive religious recognition. Meyers determined that NGE does not espouse any

---

[18] Meyers did not testify as an expert witness. Accordingly, Meyers's reasoning and conclusions are relevant only insofar as it establishes the procedures by which VDOC determined that NGE would not be recognized as a religion.

[19] Chaplain Service Prison Ministry of Virginia is an inter-denomination agency independent from VDOC. (Tr. 293:21-25, 294:4-6.)

spiritual or metaphysical beliefs (Tr. 304:15-308:3), that any ethical or moral code espoused by

NGE applies only to the five percent and not to humanity as a whole (Tr. 313:7-314:22, 335:13-

16), that NGE has a narrow focus on overcoming racial oppression (Tr. 312:1-11, 316:10-12),

and that the history of NGE suggests it is a cultural or ethnic movement rather than a religion

(Tr. 326:14-22). Meyers additionally found NGE's beliefs to be racist, antisocial, and

religiously intolerant and that such beliefs would detract from a therapeutic prison

environment.[20] (Tr. 320:16-321:15.)

60.     On October 31, 2007, the FRC determined that NGE "presented a significant

security risk" in the prison setting and ultimately recommended that the Deputy Director deny

the SCC request. (Tr. 261:24-25; see Pl.'s Ex. 11, Enc. A; Tr. 168:2-22.) The Deputy Director

accepted the FRC's recommendation and denied the SCC request. (Tr. 168:2-12.)

61.     In 2008, the FRC conducted subsequent reviews of NGE and again recommended

that NGE not be recognized as a religion in VDOC. (Tr. 258:8-16.)

62.     Although Meyers admits the information in Versatile's request for recognition

would have been helpful to his review, no evidence suggests that the information in Versatile's

request would have resulted in a different recommendation from Meyers or the FRC. (See Tr.

324:23-25.)

### 3.     Versatile's Request for Religious Recognition of NGE

63.     On December 4, 2007, about a month after the FRC denied the SCC request,

Versatile submitted a request for VDOC recognition of NGE as a religion. (Pl.'s Ex. 3, Enc. A;

Pl.'s Ex. 1, Versatile Decl. ¶ 12.)

---

[20] The Court did not weigh this factor in determining whether NGE was a religion under
RLUIPA.

64.     On January 22, 2008, after receiving no response from VDOC to his request,

Versatile filed an informal complaint. (Pl.'s Ex. 3, Enc. B; Pl.'s Ex. 1, Versatile Decl. ¶ 13.) In

a February 9, 2008 response to Versatile's informal complaint, VDOC stated that NGE is not

recognized as a religion. (Pl.'s Ex. 3, Enc. B; Pl.'s Ex. 1, Versatile Decl. ¶ 13.)

65.     On February 10, 2008, Versatile filed a regular grievance challenging the denial

of NGE religious recognition and contending that VDOC Operating Procedure had been violated

because Defendant Kelly did not attach a routing slip to his application and forward it the FRC.

(Pl.'s Ex. 3, Enc. C; Pl.'s Ex. 1, Versatile Decl. ¶ 14.) On March 4, 2008, Defendant Kelly

found Versatile's formal grievance to be unfounded because the FRC had determined that

VDOC did not recognize NGE as a religion in October 2007. (Pl.'s Ex. 3, Enc. C; Pl.'s Ex. 1,

Versatile Decl. ¶ 14; Tr. 177:16-20.)

66.     Versatile appealed Defendant Kelly's decision on March 7, 2008 to Defendant

Robinson, the Regional Director, again challenging the denial of NGE religious recognition and

contending that VDOC Operating Procedure had been violated because his request had not been

forwarded to the FRC. (Pl.'s Ex. 3, Enc. D; Pl.'s Ex. 1, Versatile Decl. ¶ 15.) Defendant

Robinson agreed that Versatile's grievance was unfounded and informed Versatile that his

administrative remedies had been exhausted. (Pl.'s Ex. 3, Enc. D; Pl.'s Ex. 1, Versatile Decl.

¶ 15; Tr. 237:14-18.)

67.     In rendering his decision on Versatile's appeal, Defendant Robinson did not

consider the issue of Defendant Kelly's failure to affix a routing slip to the application and

forward it to the FRC because his staff had not brought the matter to his attention. (Tr. 246:11-

15.) Defendant Robinson, however, testified he would not have considered that issue anyway

because VDOC policy requires that each grievance and appeal raise only one issue, and Defendant Robinson stated the issue ascribed to Versatile's grievance and appeal was the denial of religious recognition to NGE and not a violation of VDOC Operating Procedure. (Tr. 252:20-253:22.) Defendant Robinson further testified that, even had he considered the procedural violation issue as well, his decision on the appeal would not have changed. (Tr. 248:6-23.)

68.    Versatile contends that Defendant Kelly violated the mandatory, nondiscretionary language in VDOC Operating Procedure 841.3(IV)(C) by failing to forward his request for religious recognition to the FRC. (Pl.'s Ex. 1, Versatile Decl. ¶ 14; *see* Pl.'s Ex. 2, VDOC OP 841.3(IV)(C).)

69.    VDOC officials, however, contend that the relevant regulations allow for discretion to refuse to process duplicative requests, notwithstanding the mandatory language, in part because the regulations had already been satisfied. Because the FRC had denied the SCC request for NGE religious recognition less than two months earlier, Defendant Kelly contends that VDOC Operating Procedure 841.3(IV)(D)(1) gave her the discretion to preserve resources and deny Versatile's request without forwarding it to the FRC. (Tr. 179:4-180:19, 184:7-185:4; *see* Pl.'s Ex. 2, VDOC OP 841.3(IV)(D)(1) ("Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources.").) VDOC officials testified that administrators must have discretion "in the day-to-day activities of management" so that VDOC does not have to continually address a single "issue over and over and over repeatedly." (Tr. 238:1, 12-13; *see also* Tr. 562:16-22.)

70.     However, VDOC officials recognized that at some point an issue would need to be reconsidered if different facts and circumstances are present. (Tr. 251:5-21.) Further, Louis Cei, the Chairman of the FRC, testified that if the FRC had denied a specific group religious recognition in the previous four to eight months and no new information was presented in a new request from the same group, it would not be cost-beneficial or practical for the FRC to conduct another review. (Tr. 287:3-8.)

## VI.  Versatile's Blanket Ban Claim (Claim One)

**A.     Standard of Review**

Government officials impose a substantial burden on the free exercise of religion by "'put[ting] substantial pressure on an adherent to modify his [or her] behavior and to violate his [or her] beliefs.'" *Lovelace*, 472 F.3d at 187 (*quoting Thomas*, 450 U.S. at 718). Any substantial burden on the exercise of religion must represent "the least restrictive means of furthering a compelling governmental interest." *Id.* at 189. Defendants bear the burden of "providing an explanation for the [challenged] policy's restrictions" that demonstrates its validity, and courts are not to provide such an explanation on their behalf. *Id.* at 190. Defendants cannot satisfy the burden of persuasion with conclusory statements that do not explain why less restrictive policies would not suffice. *Smith v. Ozmint*, 578 F.3d 246, 252 (4th Cir. 2009); *see also Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 989 (8th Cir. 2004) ("The threat of racial violence is of course a valid security concern, but to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation of [an inmate's] request."). Nevertheless, courts should afford "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and

discipline, consistent with consideration of costs and limited resources," in assessing any proffered explanation. *Murphy*, 372 F.3d at 988 (*quoting* S. Rep. 103-111, at 10 (1993)).

"To meet its burden to show a compelling interest, [Defendants'] 'first job' is 'to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs.'" *Smith*, 578 F.3d at 252 (*quoting Lovelace*, 472 F.3d at 190). Generally, "[p]rison safety and security are compelling government interests." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009) (*citing Fegans v. Norris*, 537 F.3d 897, 906 (8th Cir. 2008)). Nevertheless, "[e]ven in light of the substantial deference given to prison authorities, the mere assertion of security . . . is not, by itself, enough for [Defendants] to satisfy the compelling governmental interest requirement." *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007). Officials "must do more than speculate that the accommodation of a religious practice will lead to safety and security problems." *Hummel v. Donahue*, No. 1:07cv1452, 2008 WL 2518268, at *4 (S.D. Ind. June 19, 2008) (citing cases). Rather, prison officials must supply adequate record evidence that the particular security concerns that prompted the policy are compelling and are advanced by their policy. *See Smith*, 578 F.3d at 252 (concluding prison officials failed to provide adequate evidentiary support for their assertion that their security concerns constituted a compelling governmental interest); *Lovelace*, 472 F.3d at 190-91 (same).

**B.      Analysis**

**1.      Defendants Have Demonstrated a Compelling Interest in Preventing the Security Risks Posed by Unrestricted Access to NGE Materials**

VDOC has demonstrated a compelling interest in preventing security risks posed by unrestricted access to NGE materials which promote racial and religious animosity, incite violence, or encourage gang activity.

48

NGE tenets constitute a system describing the inherent superiority of black men. *See supra* ¶¶ 1-4. "It is undisputed that permitting a religious group that advocates racial purity to exist in the prison setting would create a perception among . . . inmates, staff, visitors and members of the public that defendants endorse these repugnant beliefs."[21] *Wood v. Me. Dep't of Corr.*, No. 1:06cv156, 2007 WL 3237789, at *3 (D. Me. Oct. 25, 2007) (*quoting Lindell v. Casperson*, 360 F. Supp. 2d 932, 955 (W.D. Wis. 2005)); *see also Self-Allah v. Annucci*, No. 97-CV-607(H), 1999 WL 299310, at *10 (W.D.N.Y. Mar. 25, 1999) (denying First Amendment challenge to blanket ban of NGE materials as "reasonable response to a perceived threat to prison security").[22] Thus, VDOC has a compelling interest in preventing security risks posed by the permeation of materials that promote racial supremacy or incite racial animosity. *See Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003).

Additionally, many of the passages may be interpreted to promote violence and could be construed as derogatory toward other religions. *See supra* ¶ 4 (discussing passages instructing

---

[21] Versatile's general averments that NGE is not racist do not alter the Court's decision. Where, as here, the *specific* materials "promote[ racial] supremacy and encourage[] contempt and denigration of other races" and religions, an assertion that the religion or belief system "*generally* . . . does not encourage racist or violent behavior" is irrelevant to whether officials may ban the offensive materials. *Wood v. Me. Dep't of Corr.*, No. 1:06cv156, 2008 WL 2222037, at *2 (D. Me. May 22, 2008).

[22] Versatile appears to argue that preventing access to materials that promote racial supremacy cannot be a compelling interest. In support of this argument, Versatile points to VDOC's grant of religious recognition to Odinism even though he contends Odinism is a white supremacist group. The Court, however, cannot make the finding that Odinism is a white supremacist group based on Versatile's conclusory allegations.
The record before the Court also countermands such a finding. Meyers testified that Odinism was approved as a religion because the belief system met Meyers's four-part test, *see supra* ¶ 57, and "[i]t is not a central tenet of the faith group that any particular race is inferior to others or needs to be wiped off the face of the earth" (Tr. 333:9-12). VDOC officials also testified that the PRC has disapproved certain Odin publications based upon white supremacist teachings. (Tr. 513:18-23.)

NGE members to murder the white devils or take them "off the planet"); ¶ 11. Even the possibility that these passages could be interpreted as an incitement to violence poses a risk to security. Defendants present uncontradicted evidence that they could not both allow NGE texts into VDOC and restrict access to the materials to sincere NGE adherents. *See supra* ¶ 51. The dissemination of some passages throughout VDOC could harm institutional security.

The Court makes no finding that Versatile himself has ever used the Supreme Mathematics or Supreme Alphabet to commit any offense at VDOC. Nevertheless, Versatile and his own witness testified that NGE adherents use the Supreme Mathematics and Supreme Alphabet to communicate, both orally and in writing. *See supra* ¶ 31. Defendants also presented evidence that NGE members have used the Supreme Mathematics and Supreme Alphabet, as well as other codes, to communicate with each other and talk around correctional officers. *See id.* Although Versatile contends that NGE members do not speak code in a deceptive way and that the code could easily be deciphered, coded messages between prisoners present an obvious threat to prison security.

VDOC has also presented uncontroverted evidence that NGE members have common identifiers and goals, communicate using the Supreme Mathematics and Supreme Alphabet, and have engaged in unauthorized activities within VDOC, including, in the past, assaults of new members who could not adequately repeat their lessons. *See supra* ¶¶ 27-36. Based on this evidence and VDOC Operating Procedures, VDOC has classified NGE as a gang and has prohibited the display of gang signs or symbols. No evidence suggests that this classification is arbitrary or unreasonable. While the Defendants have not made any strong showing that NGE adherents are currently disrupting VDOC facilities, they are not legally obligated to wait until

the "ever-present potential for violent confrontation and conflagration" has actually manifested. *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977)); *see also Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008). VDOC officials may act to "forestall such a threat, and they must be permitted to act before . . . the eve of a riot." *Jones*, 433 U.S. at 132-33. VDOC has a compelling interest in restricting gang activity and visibility, including restricting material promoting gang activity or displaying gang symbols.

### 2. Defendants Have Implemented the Least Restrictive Means in Furtherance of Their Compelling Interests

Prison officials generally must demonstrate they considered and rejected the efficacy of less restrictive measures before adopting the challenged practice. *Washington*, 497 F.3d at 284; *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 (1st Cir. 2007); *Murphy*, 372 F.3d at 989; *see also Smith*, 578 F.3d at 254 (vacating grant of summary judgment where prison officials failed to demonstrate why forcible shaving, rather than some lesser restriction, was necessary to enforce grooming policy). The Court concludes that VDOC has implemented the least restrictive means through its adoption and application of the operating procedure related to publication approval.

The Court first notes that, despite Versatile's contention otherwise, no blanket ban on NGE publications exists. Instead, VDOC has implemented an individualized review process under which time, effort, and resources are expended on reviewing each publication, including every individual volume or issue of the publication, to determine whether the material may be allowed within VDOC without jeopardizing the security, discipline, and good order of its facilities. VDOC regulations also list specific criteria under which publications should be denied and require that the PRC notify the publisher when a publication is disapproved. Based on these regulations, VDOC has disapproved numerous NGE publications due to the presence of material

that VDOC has determined could be detrimental to institutional order, security, and the rehabilitation of inmates.[23]

Given the pervasive racist content and potential for misuse, redaction of NGE's foundational lessons and mandatory texts would not promote prison security unless almost all of the materials were redacted. Redaction of NGE publications is also not feasible as a least restrictive means. VDOC has suffered budget cuts and hiring freezes that make it difficult to hire new security personnel. Given the number of inmates housed within VDOC, including the number of identified NGE members, VDOC lacks the resources to implement the redaction of objectionable material from NGE's foundational lessons or *The Five Percenter*.[24] VDOC has also considered other alternatives but has demonstrated that segregation of NGE adherents is not feasible and that placing disapproved NGE materials in VDOC libraries would not sufficiently alleviate VDOC's security concerns.

---

[23] The Court is not unsympathetic to Versatile's indignation over Defendants' disapproval of every issue of *The Five Percenter* since August 2006. However, the Court notes that VDOC has notified the publisher of *The Five Percenter* regarding each disapproval, specifying the page numbers that violate VDOC regulations and often specifying the reason for the disapproval. *See supra* ¶ 42. VDOC has thus given the publisher the opportunity to modify *The Five Percenter* in a manner that would alleviate VDOC's concerns.

[24] Even the *Marria* court, which granted relief, merely required the New York Department of Corrections to hold a hearing to make findings to determine whether redaction was possible because of the lack of response to the plaintiff's suggested less restrictive means. 2003 WL 21782633, at *20. The *Marria* court ultimately accepted a settlement whereby the New York Department of Corrections agreed to make available at each institution a redacted copy of each issue of *The Five Percenter*. 2004 WL 1724984, at *1 n.3 (S.D.N.Y. July 30, 2004). However, "Courts have repeatedly recognized that 'evidence of policies at one prison is not conclusive proof that the same policies would work at another institution.'" *Fowler*, 534 F.3d at 941 (*quoting Spratt*, 482 F.3d at 42). VDOC is not stripped of its discretion in deciding and implementing policy simply because the New York Department of Corrections has adopted another policy. *Id.* Moreover, this Court has no mechanism to mirror the negotiated outcome in the *Marria* case.

Based on the record before the Court, it is RECOMMENDED that the Court finds VDOC regulations regarding publication approval to constitute the least restrictive means of furthering VDOC's compelling interest in security. Therefore, it is RECOMMENDED that Claim One be DISMISSED.

## VII. Versatile's Routing Slip Claim (Claim Two)

In Claim Two, Versatile asserts that Defendants Kelly and Robinson violated Versatile's rights under RLUIPA by failing to refer his request to have NGE recognized as a religion to the FRC, in violation of VDOC regulations. Because of this failure, Versatile contends that he is unable to freely exercise his NGE beliefs.

To the extent Versatile complains about VDOC's failure to follow procedure, Versatile is not entitled to relief under § 1983 or RLUIPA. Even assuming a violation of VDOC Operating Procedure occurred, that does not necessarily implicate federal due process rights. *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990); *Coward v. Jabe*, No. 1:10cv147, 2011 WL 1827358, at *4 n.2 (E.D. Va. May 11, 2011) ("To the extent that [plaintiff] alleges that defendants failed to follow proper VDOC procedures . . . , he fails to state a claim of constitutional dimension."). Versatile has failed to establish that he was denied any right guaranteed by federal law by VDOC's failure to follow its operating procedure. Further, nothing under RLUIPA mandates the right to state procedural requirements. *See Fegans*, 537 F.3d at 907 (stating that RLUIPA does not "call[] for the federal courts to impose procedural requirements" on prisons).

Claim Two also fails to the extent Versatile argues that the failure to forward his request to the FRC resulted in a substantive RLUIPA violation. As discussed above, to demonstrate a

RLUIPA violation, Versatile bears the initial burden of showing that the challenged practice substantially burdens an exercise of religion, which he has not done. Moreover, even assuming that a violation of VDOC procedure occurred, Versatile has not demonstrated that he was harmed. The uncontradicted evidence establishes that the FRC had denied a similar request for NGE religious recognition less than two months prior to Versatile's request for NGE recognition. Further, the Chairman of the FRC testified that after rendering a decision on a particular group, duplicative requests for religious recognition would not be considered for four to eight months. Even if Defendant Kelly had processed Versatile's application correctly, the FRC would not have considered it based on the timing of Versatile's duplicative request.

Even if the FRC would have considered Versatile's request, Versatile has not established that the FRC would have recommended that NGE be recognized as a religion based on his application. Although Meyers testified that information in Versatile's request would have been helpful in making a determination, no evidence suggests that any information in Versatile's request would have altered the FRC's recommendation that NGE not be recognized as a religion. Indeed, the record shows that the FRC again denied NGE religious recognition after Versatile submitted his request. Thus, Versatile has failed to demonstrate that Defendant Kelly's actions, and Defendant Robinson's subsequent ratification of those actions, were the proximate cause of any infringement of Versatile's religious liberty.

Regardless, during the evidentiary hearing, all the appropriate individuals looked over Versatile's request, considered whether NGE should be granted religious recognition, and opined that NGE should not be recognized as a religion within VDOC. Versatile has received full and fair process and has not demonstrated any harm under Claim Two. It is therefore RECOMMENDED that Claim Two be DISMISSED.

## VIII. Conclusion

For the reasons stated above and based on the record presented in this case, it is

RECOMMENDED that the Court DISMISS Claims One and Two based on Versatile's failure to

demonstrate by a preponderance of the evidence that NGE is a religion which triggers RLUIPA's

protections. Further, even if the Court were to assume that NGE is a religion, it is

RECOMMENDED that Claim One be DISMISSED because Defendants have demonstrated that

the challenged procedures are the least restrictive means of furthering VDOC's compelling

interest in prison security and that Claim Two be DISMISSED because Versatile has failed to

demonstrate that any failure to follow VDOC procedure caused any infringement of Versatile's

religious liberty. Accordingly, it is RECOMMENDED that Versatile's § 1983 action be

DISMISSED WITH PREJUDICE.

Versatile is ADVISED that he may file specific written objections to the Report and

Recommendation within fourteen (14) days of the date of entry hereof. Any document

submitted must comply with the following directives:

1.  Each objection must be clearly labeled and sequentially numbered. Each objection must be labeled with the corresponding heading from the Report and Recommendation.

2.  Each paragraph must be sequentially numbered.

3.  Each objection must cite with specificity, and include quotations to, the Report and Recommendation.

4.  Each objection must clearly identify the legal or factual deficiency in the Report and Recommendation. Each objection must include legal or factual support for the claims therein.

Failure to file specific objections in a timely manner to the Report and Recommendation may

result in the entry of an Order dismissing the Complaint. *See* Fed. R. Civ. P. 72(b). It may also

preclude further review or appeal from such judgment. *See Wright v. Collins*, 766 F.2d 841, 845 (4th Cir. 1985) (noting the general rule that "a party who fails to object to a magistrate's report is barred from appealing the judgment of a district court adopting the magistrate's findings").

The Clerk is directed to send a copy of the Report and Recommendation to Versatile, counsel of record, and to the Honorable Henry E. Hudson.

/s/

M. Hannah Lauck
United States Magistrate Judge

Date: June 22, 2011
Richmond, Virginia