IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

OCT 2 7 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

LORD VERSATILE,               )
                              )
        Petitioner,           )
                              )
v.                            )          Civil Action No. **3:09CV120**
                              )
GENE JOHNSON, *et al.*,       )
                              )
        Respondents.          )

## MEMORANDUM OPINION
### (Adopting Report and Recommendation)

This is an action for injunctive relief arising under the Religious Land Use and

Institutionalized Persons Act (RLUIPA).  It is presently before the Court on the Report &

Recommendation (R&R) of the Magistrate Judge and Plaintiff's objections thereto.  For

the reasons that follow, this Court will adopt the R&R.  Accordingly, Plaintiff's action

will be dismissed with prejudice.

### BACKGROUND

Plaintiff Lord Versatile ("Versatile") is a Virginia inmate proceeding *pro se* and *in

forma pauperis*.[1]  In his Complaint, he alleges that Defendants Gene Johnson, John Jabe,

---

[1]Versatile did not request a court-appointed attorney in this case.  Versatile, also known
as Venson Leon Coward, has proceeded *pro se* in numerous civil actions against the Virginia
Department of Corrections.  *E.g.*, *Versatile v. Johnson*, No. 3:07cv65 (E.D. Va. filed Jan. 31,
2007); *Versatile v. Vaughan*, No. 3:05cv768 (E.D. Va. filed Nov. 8, 2005); *Coward v. Angelone*,
No. 3:02cv281 (E.D. Va. filed Apr. 30, 2002); *Coward v. Garraghty*, No. 3:02cv87 (E.D. Va.
filed Feb. 15, 2002); *Versatile v. Garraghty*, No. 3:01cv122 (E.D. Va. filed Mar. 2, 2001);
*Coward v. Angelone*, No. 3:00cv240 (E.D. Va. filed Apr. 13, 2000); *Versatile v. Angelone*, No.
3:99cv781 (E.D. Va. filed Nov. 26, 1999); *Coward v. Angelone*, No. 3:98cv283 (E.D. Va. filed
May 11, 1998); *Coward v. Macklin*, No. 3:92cv536 (E.D. Va. filed Aug. 17, 1992).

Benjamin A. Wright, W.D. Jennings, Loretta Kelly, and A. David Robinson,[2] in their

capacities as employees of the Virginia Department of Corrections ("VDOC"), unlawfully

impeded an exercise of Versatile's religion, the Nation of Gods and Earths ("NGE"), by

banning NGE texts and periodicals, and by violating VDOC regulations governing the

processing of requests for religious recognition. Defendants contend that Versatile's

beliefs are not religious in nature, and that denying Versatile access to the contested

materials is the least restrictive means of furthering their compelling interest in

institutional safety. Defendants also claim that Versatile's request for religious

recognition was properly processed in accordance with VDOC policies.

## I. PROCEDURAL HISTORY

The Honorable M. Hannah Lauck, United States Magistrate Judge, held an

evidentiary hearing and issued an R&R proposing the following findings:

### I. Factual and Procedural History
#### A.    Summary of Allegations and Claims Asserted

On February 27, 2009, Versatile filed this civil action, raising the following claims:

Claim One    Defendants Johnson, Jabe, Wright, and Jennings violated Versatile's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[3] by imposing

---

[2] Gene Johnson is the former Director of VDOC. John Jabe is the Deputy Director of Operations for VDOC. Benjamin A. Wright is the former Chairman of the VDOC Publication Review Board. W.D. Jennings is also the former Chairman of the VDOC Publication Review Board. Loretta Kelly is the Warden of Sussex I State Prison ("Sussex I"). A. David Robinson is the Central Regional Director of VDOC.

[3] 42 U.S.C. § 2000cc-1(a)(l)-(2).

2

a "blanket ban" on NGE publications, including the newspaper, *The Five Percenter*. (Compl. ¶ 11.)

Claim Two   Defendants Kelly and Robinson violated Versatile's rights under RLUIPA when they failed to comply with VDOC regulations requiring them to process Versatile's request that NGE be recognized as a religion at Sussex I. (Compl. ¶ 12.)

(*See* Dec. 31, 2009 Mem. Op. 1, *as amended by* Jan. 21, 2010 Mem. Order.) Versatile sought damages and injunctive relief.

In Claim One ("the Blanket Ban Claim"), Versatile alleges that, as a member of NGE, he is required to study the following documents: the 120 Degrees, the Supreme Mathematics, the Supreme Alphabet, NGE monthly national statements, and NGE's national newspaper, *The Five Percenter*. However, since 1996, VDOC has classified NGE as a Security Threat Group or gang rather than a religion. Beginning in August 2006, after conducting a review of each issue when it entered the VDOC system, VDOC disapproved every issue of *The Five Percenter*. VDOC also prohibits possession of the other works that members of NGE must study in the exercise of their beliefs.

Versatile contends that possession of NGE materials constitutes a protected exercise of religion, and that the content of the materials does not pose a serious enough threat to justify Defendants' so-called "blanket ban." Defendants, on the other hand, contend that NGE is not a "religion" for purposes of RLUIPA. Second, Defendants argue that they have not implemented a "blanket ban," but rather a narrowly tailored review process consistent with RLUIPA that targets only material harmful to institutional security.

Claim Two ("the Routing Slip Claim") arises from Versatile's submission in December 2007 of a request that VDOC recognize NGE as a religion. Defendant Kelly, the warden at Sussex I where Versatile was incarcerated, did not forward the request on to the Faith Review Committee, which would be the appropriate committee to consider such a request. In response to Versatile's subsequent grievance, Defendant Kelly explained that the committee had, just months earlier, rejected an application for NGE recognition from an inmate at Southampton Correctional Center. Defendant Kelly's decision was affirmed at the highest levels, and Versatile's grievance was deemed unfounded.

Versatile alleges that Defendant Kelly violated VDOC regulations and burdened the exercise of his religious beliefs without justification by failing

to attach a routing slip to his request for religious recognition and to forward his completed request to the FRC. Defendants dispute whether Kelly violated VDOC regulations and argue that her failure to act did not result in any harm.

## B.   Procedural History

In August 2009, the parties filed cross-motions for summary judgment. By Memorandum Opinion and Order dated December 31, 2009, the Court denied Versatile's motion for summary judgment in its entirety. The Court denied in part Defendants' motion for summary judgment. As to Claim One, the Court found that Defendants had failed to demonstrate the absence of any genuine issue of material fact as to whether NGE is a religion for purposes of RLUIPA and, by simply citing to security concerns, failed to adequately demonstrate they had chosen the least restrictive means to further a compelling interest. As to Claim Two, the Court denied summary judgment in favor of Defendants because of their failure to address the factual basis of the claim. The Court, however, granted in part Defendants' motion for summary judgment with respect to Versatile's claims for monetary damages and dismissed Versatile's request for monetary damages against Defendants. The Court then referred this matter to the undersigned Magistrate Judge for such further proceedings as necessary.

On February 4, 2010, the Court, noting the need to develop a record beyond the submissions before it, ordered an evidentiary hearing. On May 27, June 1, and June 2, 2010, the Court held an evidentiary hearing to resolve the parties' claims and defenses. The parties have submitted revised proposed findings of facts and conclusions of law. (Docket Nos. 95, 98.) Based on the testimony heard and exhibits submitted at the evidentiary hearing, the Court makes the following findings of fact and conclusions of law.[4]

## C.   Remaining Evidentiary Issues

The Court now resolves the remaining evidentiary issues that arose during the evidentiary hearing itself or via post-hearing briefing.

During the evidentiary hearing, Defendants offered Defendants' Exhibit 22, consisting of three enclosures relating to security classifications within VDOC, for *in camera* review and admission into evidence. (Tr. 7:1-5, 233:11-

---

[4] The Court notes that both parties have presented evidence and argument about issues beyond those referred for resolution. The lawfulness of VDOC's restrictions on NGE adherents' group study, fasting, and observing honor days does not fall within the scope of the District Court's referral and need not be addressed to decide Claims One and Two. The Court considers this evidence only as it relates to the determination as to whether NGE is a religion which triggers the protections of RLUIPA.

4

234:4.) The Court reserved ruling on the admissibility of Defendants' Exhibit 22. (Tr. 234:1-4.) Approximately a month and a half after the evidentiary hearing, Defendants submitted under seal two supplemental affidavits from VDOC officials to authenticate and supplement Defendants' Exhibit 22. (Defs.' Resp. to Court Order 1.) (Docket No. 96.) Versatile objects to the admission of these supplemental affidavits, contending that they are untimely and constitute inadmissible hearsay. (Pl.'s Objection to Supp'l Affs. of Gene Johnson & Gary Clore 3.) (Docket No. 100.) The Court finds that these supplemental affidavits constitute hearsay under Federal Rule of Evidence 802 and that no exception to the hearsay rule applies to allow their admission. Therefore, the Court excludes the supplemental affidavits as inadmissible hearsay. Defendants' Exhibit 22 has not been properly authenticated in the absence of these supplemental affidavits, and thus, the Court excludes Defendants' Exhibit 22.

Versatile has also raised numerous objections within his revised proposed findings of facts and conclusions of law. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 41-44.) (Docket No. 98.) Three of these objections are general in nature, untimely, and lack specificity. For example, Versatile objects to all leading questions and subsequent answers, all hearsay statements made by Michael Duke, a witness called by VDOC, and to all mischaracterizations of NGE by Defendants. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 41, 44.) A ruling on evidence should be made "at the time the evidence is offered." *DiPaola v. Riddle*, 581 F.2d 1111, 1113 (4th Cir. 1978). Failure to make a timely and specific objection serves as a waiver to complain against the admission of evidence. *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983); Fed. R. Evid. 103(a)(1) (requiring a "timely objection . . . stating the specific ground of objection"). The Court overrules these objections due to the untimeliness and the lack of specificity.

Versatile also objects to specific testimony from VDOC Official Gary Clore,[5] and to five of Defendants' exhibits even though these exhibits have already been admitted into evidence. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 42-44.) As to Clore's testimony and the majority of the contested exhibits, Versatile attempts to re-raise objections that the Court has already

---

[5] Specifically, Versatile objects on the basis of speculation to Clore's testimony regarding an NGE member's assault on a white inmate. The Court notes that it has given no weight to Clore's testimony regarding this assault and does not rely on that testimony in forming its conclusions of law.

overruled.[6]   Other exhibits were admitted without any objection from Versatile, and Versatile now attempts to raise objections to their admission. The Court overrules these objections to the extent Versatile merely re-raises objections the Court has already considered.  To the extent Versatile raises new objections, the Court overrules them as untimely and waived. *See Parodi*, 703 F.2d at 783; *DiPaola*, 581 F.2d at 1113 ("A party should not be permitted to stand silently by and later to contest the admissibility of crucial evidence only after the fact finding has gone against him.").

## II.  Applicable Law
### A.    Standard of Review for RLUIPA Claims

RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States.[7]   *See Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006). RLUIPA prohibits prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."[8]   42 U.S.C. § 2000cc-1(a)(1)-(2). Furthermore, "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).  A plaintiff bears the initial burden of showing by a preponderance of the evidence[9] the following:  (1) he

---

[6] For example, at the evidentiary hearing, Versatile was shown Defendants' Exhibit 6, and Versatile identified it as "somebody's Book of Knowledge." (Tr. 83:1-2.)  Versatile later objected during the evidentiary hearing, contesting the authentication of Defendants' Exhibit 6. (Tr. 302:6-23.)  The Court overruled Versatile's objection and admitted Defendants' Exhibit 6 into evidence. (Tr. 303:6-7, 443:25-444:2.)  Versatile now re-raises his objection, contending that Defendants' Exhibit 6 has not been properly authenticated.

[7] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[8] By comparison, in the prison context, the First Amendment prohibits only restrictions on religious exercise that are not "reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89 (1987).

[9] Given RLUIPA's silence on the standard of proof required, the Court applies the "usual preponderance of the evidence rule applicable to civil cases." *Ramsey v. United Mine Workers of Am.,* 401 U.S. 302, 306 (1971); *see also Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 225-26 (4th Cir. 2002); *Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir. 1988).  It appears, from a review of RLUIPA decisions, that other district courts have applied the

or she seeks to engage in an exercise of religion; and, (2) the challenged practice substantially burdens that exercise. 42 U.S.C. § 2000cc-2(b). Once a plaintiff establishes a prima facie case, the defendants bear the burden of persuasion on whether their practice is the least restrictive means of furthering a compelling governmental interest. *Lovelace*, 472 F.3d at 185 (*citing* 42 U.S.C. § 2000cc-1(a)).

As with the Free Exercise clause, RLUIPA applies only to beliefs that are sincerely held and that are religious in nature.[10] *See, e.g., Blount v. Fleming*, No. 7:04cv00429, 2006 WL 1805853, at *12 (W.D. Va. June 29, 2006) (explaining that generally "a statutory violation under RLUIPA involves the same threshold issues as invoked by the Free Exercise Clause"); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713 (1981) (explaining that "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause"). "[T]here is, surprisingly, no controlling circuit precedent on the question whether [NGE] is a religion." *Harrison v. Watts*, 609 F. Supp. 2d 561, 573 (E.D. Va. 2009). Thus, to fully resolve Versatile's claims, this Court first determines whether or not Versatile has demonstrated that NGE is a religion which triggers RLUIPA's protections.

## B.   Test for Determining Whether a Belief System is Religious in Nature

### 1.   General Considerations

"Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the

---

preponderance of the evidence standard as well. *See, e.g., Fletcher v. Whorton*, No. 2:06-CV-818-PMP-GWF, 2010 WL 2559882, at *3 (D. Nev. Mar. 22, 2010); *Reischauer v. Jones*, No. 2:06cv149, 2009 WL 232625, at *8 (W.D. Mich. Jan. 29, 2009); *Thompson v. Quarterman*, No. V-01-01, 2007 WL 2900564, at *3 (S.D. Tex. Sept. 30, 2007); *Men of Destiny Ministries, Inc. v. Osceola Cnty.*, No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321, at *3 (M.D. Fla. Nov. 6, 2006); *Acoolla v. Angelone*, No. 7:01cv1008, 2006 WL 2548207, at *8 (W.D. Va. Sept. 1, 2006); *Toles v. Young*, No. 7:00cv210, 2002 WL 32591568, at *9 (W.D. Va. Mar. 6, 2002).

[10] Congress enacted RLUIPA, relying on the Spending Clause, after the Supreme Court of the United States in *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), invalidated the Religious Freedom Restoration Act ("RFRA"), which relied on the Fourteenth Amendment, as applied to the states. *See Cutter v. Wilkinson*, 544 U.S. 709, 714-15 (2005) (tracing the history of congressional attempts to increase protection for exercises of religion). RFRA still governs exercises of religion in federal prisons, and because the statutes are similar, it is appropriate to rely on cases interpreting RFRA in analyzing RLUIPA claims. *See, e.g., United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006); *United States v. Winddancer*, 435 F. Supp. 2d 687, 692 (M.D. Tenn. 2006).

7

very concept of ordered liberty precludes allowing every person to make his [or her] own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (footnote omitted). This is especially true in the context of prison administration, where "[i]n the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life." *Green v. Tudor*, 685 F. Supp. 2d 678, 696 n.8 (W.D. Mich. 2010) (*citing Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996)); *see also* S. Rep. No. 103-111, at 10 (announcing, in the course of the debate on RFRA, expectations that courts would continue to weed out such "masquerade[s] designed to obtain [legal] protection"). "A religion need not be based on a belief in the existence of a supreme being (or beings, for polytheistic faiths), nor must it be a mainstream faith." *Kaufman v. McCaughtry*, 419 F. 3d 678, 681 (7th Cir. 2005) (internal citations omitted). Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714. A system of religious beliefs, however, "is distinct from a 'way of life,' even if that way of life is inspired by philosophical beliefs or other secular concerns." *Kaufman*, 419 F.3d at 681 (*citing Yoder*, 406 U.S. at 215-16.)

Determining whether a system of beliefs is religious in nature is "particularly difficult when the asserted belief is a new or exotic one outside the mainstream of traditional, clearly established, religious beliefs held and practiced." *Doswell v. Smith*, No. 94-6780, 1998 WL 110161, at *3 (4th Cir. Mar. 13, 1998) (*citing Africa v. Pennsylvania*, 662 F.2d 1025, 1032-33 (3d Cir. 1981)). The United States Court of Appeals for the Fourth Circuit has explained that courts must "'avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs.'" *Doswell*, at *3 (*quoting Africa*, 662 F.2d 1031). Lower courts should rely on "objective criter[ia]" to determine whether the belief system "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer v. Landon*, 799 F.2d 929, 932, 931 (4th Cir. 1986) (*quoting United States v. Seeger*, 380 U.S. 163, 166 (1964)).

## 2.   The *Africa* and *Meyers* Tests

As have other circuits, the Fourth Circuit and the Eastern District of Virginia have cited with approval the seminal United States Court of Appeals for the Third Circuit case describing several "useful indicia" to evaluate whether beliefs are religious rather than secular. *Africa*, 662 F.2d at 1032 (*cited in Doswell*, 1998 WL 110161, at *3; *Dettmer*, 799 F.2d at 931;

*Harrison*, 609 F. Supp. 2d at 566); *see also Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000); *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229-30 (9th Cir. 1996). As a threshold inquiry under the *Africa* test, the plaintiff must first demonstrate that his or her beliefs are "'truly held.'" *Africa*, 662 F.2d 1031 (*quoting Seeger*, 380 U.S. at 185). The *Africa* court then applied a three-part test to determine whether a belief system was religious in nature:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.* at 1032. The *Africa* court did not intend these criteria to constitute a rigid test and instead emphasized that "'[f]lexibility and careful consideration of each belief system are needed.'" *Id.* at 1032 n.13 (*quoting Malnak v. Yogi*, 592 F.2d 197, 210 (3d Cir. 1979) (Adams, J., concurring)) (alteration in original). The United States Court of Appeals for the Tenth Circuit has adopted the *Africa* test in modified form. *See United States v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996). In analyzing a claim brought pursuant to RFRA, in which no dispute existed that the plaintiff held his beliefs sincerely, the *Meyers* court applied the following five-part test, essentially adding two factors to the *Africa* three-part test, to determine whether the belief system at issue was religious in nature:

> (1) *Ultimate Ideas*: Religious beliefs often address fundamental questions about life, purpose, and death. . . .
>
> (2) *Metaphysical Beliefs*: Religious beliefs often are "metaphysical," that is, they address a reality which transcends the physical and immediately apparent world. . . .
>
> (3) *Moral or Ethical System*: Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical. . . . "
>
> (4) *Comprehensiveness of Beliefs*: Another hallmark of "religious" ideas is that they are comprehensive[, forming] an overreaching array of beliefs that coalesce to provide the

9

believer with answers to many, if not most, of the problems and concerns that confront humans. . . . [and,]

(5) *Accoutrements of Religion*:  By analogy to many of the established or recognized religions, [these may include] the presence of [] external signs [such as a] Founder, Prophet or Teacher. . . . Important Writings. . . . Gathering Places. . . . Ceremonies and Rituals. . . . Holidays. . . . [and/or] Diet or Fasting. . . .

*Id.* at 1483-84.  The *Meyers* court determined that the belief system at issue "more accurately espouse[d] a philosophy and/or way of life rather than a 'religion.'"  *Id.* at 1484.[11]

---

[11]  Aside from the *Africa* and *Meyers* tests, the Court recognizes that the United States Court of Appeals for the Second Circuit employs a test which appears to place a more subjective emphasis on the sincerity of the belief at issue.  Unlike the *Africa* and *Meyers* tests, the Second Circuit appears to focus on the adherent's state of mind not just as a threshold inquiry, but also when assessing whether a belief is religious in nature, adopting "a highly 'subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system.'"  *United States v. Manneh*, 645 F. Supp. 2d 98, 108 (E.D.N.Y. 2009) (*quoting Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).  The Second Circuit and courts within it have "cited with approval the definition of religion espoused by philosopher William James - 'the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine.'"  *Marria v. Broaddus*, No. 97 Civ.8297 NRB, 2003 WL 21782633, at *7 (S.D.N.Y. July 31, 2003) (*quoting LeFevre*, 745 F.2d at 158).  Other courts have applied what they call an "objective, case-neutral" anthropological definition of religion that "parallels William James' definition."  *Hardaway v. Haggerty*, No. 2:05cv70362, 2009 WL 6093273, at *7 & n.7 (E.D. Mich. Aug. 17, 2009), *adopted in relevant part*, 2010 WL 1131446 (E.D. Mich. Mar. 22, 2010).
The Court mentions these alternate means to assess whether a belief is religious in nature because the district courts that have found NGE to be a religion have employed the Jamesian or anthropological evaluative tests when making their determinations.  *Hardaway*, 2009 WL 6093273, at *7; *Marria*, 2003 WL 21782633, at *11-12.  Importantly, in applying the Jamesian or anthropological evaluative tests and in making their determinations that NGE is religious in nature, these courts relied on expert testimony, including testimony from expert cultural anthropologists.  *Hardaway*, 2009 WL 6093273, at *3, 7; *Marria*, 2003 WL 21782633, at *3, 9 n.18, 11.  As discussed below, the record before this Court does not contain any detailed anthropological expert and extensive outside community evidence that the *Marria* and *Hardaway* courts evaluated when reviewing their records.  As such, their construct of review not only is not binding because the Fourth Circuit has cited the *Africa* test instead, but also cannot be applied given the record before this Court.
While the Fourth Circuit has not explicitly adopted the multi-part *Africa* test to determine

### 3. This Court Will Apply a Modified *Africa/Meyers* Test

Defendants here have not disputed whether Versatile, a member of NGE since January 27, 1987 (Pl.'s Ex. 1, Versatile Decl. ¶ 3; Tr. 51:14-16), holds his beliefs sincerely. Versatile has therefore met the threshold inquiry of establishing that his beliefs are truly held. Yet, this Court still must determine whether the record before it demonstrates that the beliefs espoused by Versatile and NGE are religious in nature. To make this determination, the Court will utilize a hybrid *Africa/Meyers* test, using the following four factors: (1) whether NGE espouses a comprehensive belief system that speaks to ultimate questions;[12] (2) whether NGE expresses metaphysical ideas or beliefs; (3) whether NGE maintains an ethical or moral code; and, (4) whether NGE utilizes external signs that suggest it is a religion.

## III. Findings of Fact Relevant to Whether NGE is a Religion for the Purposes of RLUIPA

Based on the evidence and testimony presented at the evidentiary hearing, the Court makes the following factual findings relating to NGE's beliefs.

### A. Comprehensiveness of NGE's Belief System

1. Clarence 13X or Father Allah, once a member of the Nation of Islam ("NOI"), founded NGE on October 10, 1964. (Pl.'s Ex. 1, Versatile Decl. ¶ 4; Tr. 24:11-14.) NGE adherents describe their beliefs as a "God centered culture" (Pl.'s Ex. 1, Versatile Decl. ¶ 2; Defs.' Ex. 19, Vol. 15.4, at 3), and they believe that the "Blackman with knowledge of self is in fact a God" (Pl.'s Ex. 1, Versatile Decl. ¶ 23; *see* Tr. 71:20-21). They teach that "[t]he Original Man is the Asiatic Black Man, the Maker, the Owner, the

---

whether a belief is religious in nature, it cited *Africa* with approval over then-existing Second Circuit case law utilizing the different Jamesian approach. *Dettmer*, 799 F.2d at 932. Further, the only court in the Eastern District of Virginia to consider *Marria* found its conclusion that NGE's "beliefs are religious in nature and therefore deserving of protection under the First Amendment and RLUIPA" to be "neither controlling nor persuasive." *Harrison*, 609 F. Supp. 2d at 573-74. This Court similarly finds that the more subjective approach does not offer clear boundaries that a court, and therefore litigants, must follow when evaluating or presenting claims. The Court thus declines to apply the Second Circuit's Jamesian approach when analyzing Versatile's RLUIPA claims.

[12] Because there is generally a "relationship between the criterion of comprehensiveness and the existence of fundamental and ultimate ideas," *Jacques v. Hilton*, 569 F. Supp. 730, 734-35 (D.N.J. 1983), the Court combines these two *Meyers* factors into one.

Cream of the Planet Earth, God of the Universe." (Pl.'s Ex. 5, Enc. A, Answers ¶ 1; *see also* Defs.' Ex. 4 ¶ 7; Defs.' Ex. 5 ¶ 7.) Every black woman is referred to as an Earth "[b]ecause she gives that universal life to that black child . . . ." (Tr. 154:4-9.)

2.      While the term "Allah" is used interchangeably with "God," NGE adherents recognize the term as an acronym ("Arm Leg Leg Arm Head") that refers literally to black men and their physical form. (Pl.'s Ex. 1, Versatile Decl. ¶ 23; Tr. 84:1-9.) NGE adherents also refer to their teachings as Islam, but recognize the term as an acronym ("I Self Lord And Master") used to describe their culture and way of life. (Pl.'s Ex. 27, at 3; Defs.' Ex. 5 ¶ 9.) The central significance of Islam is to "gain knowledge of yourself . . . [and] become a lord and master of your own judgments." (Tr. 94:13-16.)

3.      NGE teaches that the white man is the devil, genetically engineered by a black man named Yacob (referred to in the Judeo-Christian bible as Jacob) through a process called "grafting" whereby their skin tone was lightened. (Tr. 72:6-73:5, 75:11-12; Pl.'s Ex. 5, Enc. A, Answers ¶ 2 ("The Colored Man is the Caucasian (white man) or Yacob's grafted devil . . . ."); Pl.'s Ex. 5, Enc. D ¶¶ 28, 30-33; *see also* Pl.'s Ex. 23, Vol. 14.4, at 5 (differentiating Caucasians from "the **Original Man** who possess[es] . . . 'melanin'").) Because of the grafting process, NGE texts teach that Caucasians are physically and mentally inferior to blacks:

> The mental power of a real devil is nothing in comparison with the original man. He only has six ounces of brain, while the original man has seven and one-half ounces of brain which are original. The devil has six ounces of brain. They are grafted brains.

> The devil's physical power is less than one-third that of the original man. The devil is weak bone, weak blood because he is grafted from the original, therefore, his mental and physical power is much weaker than the original man.

(Pl.'s Ex. 5, Enc. D ¶ 32.)

4.      Versatile testified that NGE identifies white people as the devil based on history:

> When we say that the white man is devil, I mean that is based on the history. That is based on the history of what white people have inflicted to us. . . . I mean, these are people who enslaved

us; these are people who raped us. I mean, these are the people who, I mean, inflicted all type[s] of atrocities upon us. That is why we identify [them] as the devil.

(Tr. 75:11-19.) According to NGE texts, the devil tries to keep black people illiterate "[s]o that he can use them for a tool and, also, a slave. [The devil] keeps them blind to themselves so that he can master them. Illiterate means ignorant." (Pl.'s Ex. 5, Enc. B ¶ 7.) NGE texts also state that the devil cannot be reformed and must be taken "off the planet" (Pl.'s Ex. 5, Enc. D ¶ 34) or murdered "[b]ecause he is one hundred percent wicked and will not keep and obey the laws of Islam" (Pl.'s Ex. 5, Enc. B ¶ 10; *see also* Tr. 74:16-17). Versatile presented testimony suggesting that NGE adherents attempt to destroy or murder the evil nature of the devil, and not physically murder the devil. (Tr. 129:22-130:5, 155:18-21.) Caucasians may join NGE. (Tr. 91:16-18, 115:7-12; Pl.'s Ex. 21, Vol. 14.1, at 9 (letter from white NGE member in W. Va. prison).) However, Caucasians can never become "Gods" in the sense that black men are, but white NGE members are simply referred to as civilized people. (Tr. 74:24-75:5, 91:22-23, 116:7-9.) Versatile contends that NGE members are not "anti white" (Tr. 74:24) and testified that "Father Allah taught [that] the worst devil is the black devil" (Tr. 75:19-21).

     5.     NGE adherents are also commonly known as "Five Percenters." (Pl.'s Ex. 1, Versatile Decl. ¶ 18.) This name derives from their classification of humanity into groups based on their attitude towards the proposition that black men literally are God:

> [The 85% are the] uncivilized people; poison animal eaters; slaves from mental death and power; people who do not know the living God or their origin in this world, and they worship that they know not what – who are easily led in the wrong direction, but hard to lead into the right direction.

> [The 10% are the] rich; the slave makers of the poor, who teach the poor lies – to believe that the almighty, true and living God is a spook and cannot be seen by the physical eye. Otherwise known as the blood sucker of the poor.

> [The 5% are] the poor, righteous teachers, who do not believe in the teaching of the 10%; and are all wise; and know who the living God is; and teach that the living God is the Son of man, the supreme being, the (black man) of Asia; and teach Freedom,

> Justice and Equality to all the human family of the planet Earth. Otherwise known as civilized people . . . .

(Pl.'s Ex. 5, Enc. D ¶¶ 14-16; *see also* Pl.'s Ex. 1, Versatile Decl. ¶ 18.) The 10% who mislead the 85% are the devils. (Pl.'s Ex. 5, Enc. D ¶¶ 9, 37.)

    6.    NGE adherents typically possess handwritten copies of what they call their foundational works (Tr. 55:20-56:4, 58:9-21, 61:24-62:24, 81:21-83:2; *see* Pl.'s Ex. 5, Encs. A-F ("120 Degrees"); Defs.' Ex. 4 ("Supreme Mathematics"); Defs.' Ex. 5 ("Supreme Alphabet")) and a personalized collection of commentaries and other relevant material (*see* Defs.' Ex. 6 ("Book of Knowledge")). Versatile testified: "[O]ur lessons are the foundation to our God and culture. Our lessons teach us about God, how we are to conduct oursel[ves], how we are to live in accord to the laws of Islam." (Tr. 48:13-16.)

    7.    The foundational works of NGE are embodied in two sets of short written passages. The first is the 120 Degrees, also referred to as the 120 Lessons, Book of Knowledge, or Book of Life. (Tr. 56:19-25, 89:6-8.) It incorporates the following passages: the Student Enrollment (Rules of Islam and Answers), the Lost Found Muslim Lesson No. 1, English Lesson Number C1, the Lost Found Muslim Lesson No. 2, Actual Facts, and Solar Facts. (Pl.'s Ex. 1, Versatile Decl. ¶ 19; Tr. 56:19-24.) In addition to these passages, the Book of Life constantly grows, as NGE members add messages, interpretations, and commentary on the lessons. (Tr. 57:4-9.) The Student Enrollment, the Lost Found Muslim Lesson No. 1, English Lesson Number C1, and the Lost Found Muslim Lesson No. 2 explain the origin of the black man and why he is God; discuss how Yacob created the Caucasian race–the devils, the migration of the devils, and the destruction of the devils; and define the 85%, 10%, and 5%. (*See* Pl.'s Ex. 5, Encs. A-D.) The Actual Facts lists thirteen propositions about geography, and the Solar Facts lists distances from the Sun to each planet (including Pluto) in our solar system. (Pl.'s Ex. 5, Encs. E, F.)

    8.    The second set of works consists of the Supreme Mathematics and Supreme Alphabet, which are systems of numerology and cryptology and are referred to as the "National Lessons." (Pl.'s Ex. 1, Versatile Decl. ¶ 19; *see* Defs.' Exs. 4-5.) NGE members use the Supreme Mathematics and Supreme Alphabet to interpret their lessons. (Tr. 56:13-15; Pl.'s Ex. 1, Versatile Decl. ¶ 22.) The Supreme Mathematics imposes upon each of the digits 0-9 a corresponding meaning, accompanied by a definition or a lesson, and is used to uncover a deeper meaning when applied to numbers. (Defs.' Ex. 4.) For example, when applied to a date, the Supreme Mathematics yields a

lesson for the day. (Tr. 59:12-16 ("To common society today is the 27th. To me and the principles that I live for, that means wisdom God [because "2" corresponds to wisdom and "7" corresponds to God under the Supreme Mathematics]. So the order of the day for me would be to express the wisdom of God.").) Similarly, the Supreme Alphabet assigns to every letter of the English language a word and a definition or deeper meaning. (Defs.' Ex. 5.) For example, the letter "N" stands for "Now/Nation/End," meaning "Now is the time to build our rightful Nation and put a [sic] End to the devil[']s nation." (Defs.' Ex. 5 ¶ 14.) "[NGE] members often speak or write using terms of Supreme Mathematics and Alphabets . . . ." (Pl.'s Ex. 1, Versatile Decl. ¶ 22.)

     9.    NGE members also study *The Five Percenter*, NGE's national newspaper produced by NGE's National Headquarters located at the Allah Youth Center in New York City. (Pl.'s Ex. 1, Versatile Decl. ¶¶ 4, 9.) Versatile has subscribed to *The Five Percenter* since 1997. (Pl.'s Ex. 1, Versatile Decl. ¶ 9.) NGE's National Office of Cultural Affairs also circulates important lessons in bi-monthly statements to enhance NGE adherents' understanding. (Pl.'s Ex. 29, Enc. A; Tr. 77:20-78:9.)

     10.    The Bible and Qur'an are secondary texts for NGE. (Tr. 87:12-16.) These texts are not mandatory, and NGE adherents do not take the texts at face value, but instead interpret the texts using the Supreme Mathematics. (Tr. 87:17-88:19.)

### B.    Metaphysical Ideas or Beliefs Encompassed by NGE

     11.    NGE adherents "[do not] claim to be a religion [and do not] believe in a God that exists outside of [them]selves." (Tr. 52:22-25; *see also* Tr. 69:3-4, 108:12, 153:23-25.) *The Five Percenter* has published various articles affirming that NGE members do not label their beliefs as a religion:

> Allah the Father is the Lord of all the worlds and it was he who born the Righteous Truth to [NGE], that "**WE ARE NOT A RELIGION.**" Islam is not a religion, but it is a science that comes to take the Mystery out of religion. Religion is based on Faith and Belief, and belief is the absence of knowledge . . . . In religion there is a point where reasoning and logic ands [sic] and faith begins. When a religious person is confronted with a situation that he cannot explain he usually makes a big leap from logic to faith. . . . [A]nother word for religion is "faith". Faith is the substance of things hoped for-the evidence of things not

> seen! . . . [R]eligion is not binding upon the Gods and Earths nor has it ever been nor will it ever be.

(Defs.' Ex. 17, at 3.)

> According to religion men can never sati[s]fy their needs without help, and that help, according to religion, is not the mundane[ ]help of other men nor the help afforded by scientific knowledge, but Extra-Human Supernatural help. "All religions say in one way or another that man does not and cannot stand alone. He is vitally related with and even dependent on powers in Nature and Society external to himself". Islam is True Science. . . . Islam is the Blackman. The Blackman is God, whose proper name is ALLAH. The Father Allah said that WE ARE NOT A RELIGION. It is a dangerous thing to ADD TO or SUBTRACT FROM God's word.

(Defs.' Ex. 17, at 8; *see also* Defs.' Ex. 18, at 3 (rejecting lawsuits that use freedom of religion arguments to seek NGE recognition); Pl.'s Ex. 23, Vol. 14.4, at 3 ("Those who have chosen a religious path to God cannot discredit me for choosing the non religious Cultural path of my Father.").) NGE adherents refer to the external god or gods of other religions using the derogatory terms "mystery God" and "spook." (Pl.'s Ex. 5, Enc. D ¶ 10; Defs.' Ex. 17, at 4; Tr. 349:13-21; Pl.'s Ex. 22, Vol 14.3, at 11.)

    12.    Versatile describes NGE as a "cultural pathway to God," consisting of his knowledge, wisdom, understanding, and "attendance of [his] faith," as well as the things he eats and the way he dresses. (Tr. 71:11-16.) Versatile, however, contends that while NGE does not specifically call itself a religion, NGE should be considered a religion "equivalent to any main stream religion" because NGE members have a belief in God (a black man with knowledge of self). (Pl.'s Ex. 1, Versatile Decl. ¶ 2; *see* Tr. 19:3-6.) Versatile also testified that he believes in a Supreme Being, the great force that created the universe, that lives and dwells within him. (Tr. 52:25-53:2, 69:7-9, 85:11-14.) One NGE member, testifying on Versatile's behalf, also indicated that NGE is a religion. (Tr. 154:17-22.) However, a NOI adherent, testifying on Versatile's behalf, described NOI as a religion, but NGE as a culture or a way of life. (Tr. 132:3-11.)

    13.    As discussed above, NGE adherents use the term "Allah" as an acronym ("Arm Leg Leg Arm Head"), referring to the physical form of black men. (Pl.'s Ex. 1, Versatile Decl. ¶ 23; Tr. 84:1-9.) NOI, a recognized

religion in VDOC, teaches that Allah is a deity who became incarnate in their own founder, Wallace Fard Muhammad. (Tr. 124:13-17.) NOI adherents pray to their founder. (Tr. 128:9-10.) NGE adherents, on the other hand, do not believe that either Clarence 13X or Wallace Fard Muhammad was spiritual or divine in some sense that other members of NGE are not. (*See* Tr. 111:22-112:1 (explaining that Clarence 13X is known as "Allah" because he "was the first example . . . to show us God was right among us in the flesh and not outside of us").) NGE adherents do not pray to their founder or to any other deity. (Tr. 95:16-17, 153:14-15, 155:7.) However, Versatile contends that Clarence 13X was divine. (Tr. 88:20-24.) It is unclear whether Versatile uses the term "divine" in the ordinary sense or as defined by the Supreme Alphabet to mean "anything that has not been mixed, tampered with or diluted." (Defs.' Ex. 5 ¶ 4.)

14.     As discussed above, NGE literature largely describes the creation, migration, and destruction of the white man or devil. (*See* Pl.'s Ex. 5, Encs. A-D.) NGE does not appear to have any teaching regarding an afterlife. (Tr. 86:8-87:10.)

## C.     NGE Beliefs as to an Ethical or Moral Code

15.     Versatile describes the Supreme Mathematics as the "mores and principles of the Nation" and the Supreme Alphabet as the "language of the Nation." (Tr. 24:3-4, 9.) He refers to these texts as his "living Code of Ethics" (Pl.'s Ex. 1, Versatile Decl. ¶ 20) and "a guide of standards for [him] to live daily to express and show [his] godliness. Not as a religio[n], but as a cultural pathway" (Tr. 24:5-8). The documents espouse the basic tenets of family and black unity. (*See* Defs.' Ex. 4, ¶¶ 1-4 (describing the role of the black man, the black woman, and the black child); Defs.' Ex. 5, ¶¶ 6, 11, 17, 23, 26.) However, the Supreme Alphabet also suggests that NGE adherents are free to decide their own code of personal morality within the private sphere. (*See* Defs.' Ex. 5 ("A. (Allah)–is the supreme being, soul controller of the universe."; "U (You/Universe)–You are the sole controller of your universe which is Sun, Moon, and the Star."); *see also* Pl.'s Ex. 23, Vol. 14.4, at 5 ("[E]ach man is in actuality, his own absolute law giver.").)

16.     Versatile contends that NGE adherents "teach freedom, justice, and equality to all the human families of the Planet Earth." (Pl.'s Ex. 1, Versatile Decl. ¶ 17; *see also* Tr. 335:17-22.) Although these terms have universal ethical connotations, they bear different meanings for NGE adherents. For example, the Supreme Mathematics and Supreme Alphabet redefine "freedom" to mean "to be free of all negative thoughts so you may express your culture with no restrictions" (Defs.' Ex. 4 ¶ 4), "justice" to mean

17

"see equally" (Defs.' Ex. 5 ¶ 10), and "equality" to mean "to deal equally with everything" (Defs.' Ex. 4 ¶ 6; *see also* Defs.' Ex. 5 ¶ 5). Thus, Versatile's position that NGE teaches freedom, justice, and equality to all human families must be evaluated in the context of all NGE teachings. NGE also teaches that Caucasians are a mentally and physically inferior race, are the devils, and must be taken off the planet. *See supra* ¶¶ 3-4.

17.   The only concrete code of conduct in the record, contained within materials which Versatile identified as "somebody's Book of Knowledge" (Tr. 83:1-2), is "A Supreme Guidance for Righteous Conduct," which contains 29 rules by which NGE adherents should live (*see* Defs.' Ex. 6, Pt. III, at 11-13).[13] Many of these are rules of general application that forbid vices or crimes (*e.g.*, "No using ugly, indecent language"), prescribe positive conduct ("Be cleanly dressed at all times"), and promote lofty aspirational goals ("Show by demonstration respect for self and others"). (Defs.' Ex. 6, Pt. III, at 11-13.) Other mandates, however, focus solely on the responsibility of NGE adherents to promote group cohesion and strength. For example, the final rule states: "Learn to put nothing before Allah's civilization, It is the only force and Power that could replace the Devil's civilization. The christians, and the muslims had their chance, now its GODS time to take the Devils off our planet." (Defs.' Ex. 6, Pt. III, at 13.) Versatile, however, contends this document is not a part of the 120 Degrees. (Tr. 355:9-18.)

### D.   External Signs Suggesting NGE is a Religion

18.   NGE maintains learning centers at its National Headquarters at the Allah Youth Center in New York City, where youth are recruited and taught the lessons. (Tr. 318:4-9; *see* Pl.'s Ex. 1, Versatile Decl. ¶ 4.) NGE members "conduct civilization classes, in which senior members educate newer members about the lessons, and how they can be applied." (Pl.'s Ex. 1, Versatile Decl. ¶ 3.) The senior members are referred to as "enlighteners," and the new members are required to learn one lesson before continuing on to the next lesson. (Tr. 67:2-14.)

19.   NGE adherents hold "ciphers" in which they "come together and . . . expound upon the lessons or the teachings of Allah." (Tr. 79:6-8.) Versatile contends that "[w]hat church is to a Christian is what a cipher is to [NGE adherents]." (Tr. 79:10-11.) Versatile also testified that NGE adherents "gather monthly for 'Parliaments' and 'Rallies,' during which members make

---

[13]   Because this document does not contain page numbers, the Court refers to the pages as numbered by CM/ECF.

collective decisions and help one another learn their lessons." (Pl.'s Ex. 1, Versatile Decl. ¶ 3.)

20.  NGE adherents observe four honorary days: (1) on February 22nd, NGE members take the day off from work, gather to celebrate the birthday of Clarence 13X and reflect on his legacy, and fast during daylight hours; (2) on the weekend nearest June 13th, NGE memorializes the 1969 assassination of Clarence 13X through a two-day event to show and prove that his legacy lives on; (3) on the last Saturday of August, NGE members gather to socialize with their family and friends and give tribute to Clarence 13X; and, (4) on October 10th, NGE commemorates NGE's birth by reflecting on NGE's history and dressing in black and gold. (Pl.'s Ex. 3, Enc. A, at 6-9; Tr. 45:17-47:2.)

21.  NGE has a Universal Flag which "represents the original family of the universe." (Pl.'s Ex. 1, Versatile Decl. ¶ 10; *see* Pl.'s Ex. 6, Enc. A.) The solid black five-pointed star symbolizes the black child, while the crescent moon stands for the black woman. (Pl.'s Ex. 6, Enc. A.) The "7" on the flag is solid black and "symbolizes the Original Man, the True And Living God, the Supreme Being, Almighty God Allah." (Pl.'s Ex. 6, Enc. A.) The placement of the "7" reflects the black man's dominance over the black woman and child and "shows the authority of ALLAH over the Planets and Stars and the proper order of the Universe." (Pl.'s Ex. 6, Enc. A.) "The white background symbolizes the white clouds of deception that have drowned our people in a sea of ignorance, and the feeble attempts of the wicked to conceal the True And Living God which is The Son of Man!" (Pl.'s Ex. 6, Enc. A.) Versatile asserts that the "Universal Flag is just as significant to [his] life, as the cross is to any Christian, or as important as the Star of David is to any Jewish [follower]." (Pl.'s Ex. 1, Versatile Decl. ¶ 10.)

22.  NGE adherents practice no rites equivalent to marriage, baptism, or other recognized practices. (Tr. 318:13-19.)

23.  NGE adherents do not eat pork or any pork by-product because "[i]t contains 99.9 percent of poisons, infection. It is not a full product, it is a savage, it is a beast. It is basically a garbage can." (Tr. 95:24-96:2; *see also* Pl.'s Ex. 3, Enc. A, at 10.) NGE members are also prohibited from eating scavenging seafood and fish weighing over five pounds. (Tr. 96:20-21.) These are both applications of the larger teachings of Clarence 13X, who forbade consuming any food or drug that is "detrimental to . . . physical growth." (Tr. 96:9-97:9.)

24.  NGE has no central leader. (Tr. 317:2-14.) Clarence 13X taught that there was to be no leader after him. (Tr. 363:11-18.) NGE materials suggest that no leader exists because "[i]t is only the blind who need a leader.

19

God is free and independent and stands on his own two feet!" (Defs.' Ex. 6, Pt. I, at 9.)

25.   Versatile and witnesses testifying on his behalf contend that NGE's foundational works are generally not handwritten and are published and distributed by NGE's National Office of Cultural Affairs. (Tr. 65:11, 67:18-22, 68:5-7, 112:19-25.) To support this contention, Versatile points to an advertisement in *The Five Percenter* stating, "FOR LESSONS CONTACT SEE ALLAH AT ALLAH SCHOOL . . . ." (Pl.'s Ex. 21, Vol. 14.2, at 10.)

26.   Versatile did not produce a published version of NGE's foundational works.   Numerous witnesses testified that they had never encountered or seen a commercially available, standard publication of NGE material and that one was not available from the official NGE website or NGE's national headquarters. (Tr. 264:10-15, 317:16-25, 443:14-17, 462:4-463:24, 485:3-7.)   Further, a subsequent article published in *The Five Percenter* suggests that NGE does not sell or distribute any standard lessons. (Defs.' Ex. 19, Vol. 15.4, at 10.)

## IV.  Analysis:  NGE is not a Religion for the Purposes of RLUIPA

For the reasons set forth below and based on the record before the Court, the Court concludes that Versatile has failed to demonstrate that NGE is a religion for RLUIPA purposes.

### A.   Comprehensive, Ultimate Ideas

"[A] religion must consist of something more than a number of isolated, unconnected ideas." *Africa*, 662 F.2d at 1035. Religious beliefs generally constitute a cohesive system addressing "'fundamental and ultimate questions having to do with deep and imponderable matters.'" *Meyers*, 95 F.3d at 1483 (*quoting Africa*, 662 F.2d at 1032). These "fundamental questions answered by most religions," *Quaintance*, 471 F. Supp. 2d at 1158, address "life and creation, a fear of the unknown, [and] the pain of loss," as well as "an individual's existence, his or her place in the universe, . . . and the origin, structure, and space-time relationships of the universe." *Id.* at 1157. Comprehensive and ultimate ideas "include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Meyers*, 95 F.3d at 1483. Ideas about these imponderables "address[] purpose in relationship to the spiritual or intangible world," not merely a "relatively simplistic purpose confined to the physical world." *Quaintance*, 471 F. Supp. 2d at 1157.

Based on the record before this Court, NGE's fundamental writings largely describe black men as the founders and the rulers of society, while

describing the white race to be a wicked and inferior race created through genetic engineering. This focus on answering the historical or cultural questions about the NGE movement indicates that NGE is more of a social or cultural movement, rather than a religious movement. NGE's core texts also focus on the need to unite the black family, "murder" the devil, and overcome racial oppression. This "monofaceted" concern with race is not a comprehensive system of beliefs about an ultimate concern. *Quaintance*, 471 F. Supp. 2d at 1162.

NGE may have a system of specific rules and attitudes that cover many or most aspects of life. While these tenets are partly derived from the positive and commendable idea that a need exists for a strong, unified black community, these codes of conduct nevertheless fail to comprise a comprehensive system of beliefs because they derive solely from the monofaceted world view of NGE. *See Conner v. Tilton*, No. C07-4965 MMC, 2009 WL 4642392, at *12 (N.D. Cal. Dec. 2, 2009) (concluding that comprehensive quality was absent where, "while plaintiff's evidence shows that Creativity's doctrines address a wide range of concerns, the evidence also shows that the essence of Creativity is confined to 'one question or one moral teaching' . . . 'What is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin'"). No ultimate motivation is apparent other than a self-interested desire to better one's self and community, and these secular beliefs are neither ultimate nor comprehensive in nature. *See Quaintance*, 471 F. Supp. 2d at 1171 ("To the minimal extent any of Defendants' beliefs are 'religious,' these beliefs appear to be derived entirely out of their secular beliefs."); *United States v. Meyers*, 906 F. Supp. 1494, 1508 (D. Wyo. 1995) ("Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes in so deeply that he has transformed them into a 'religion.'").

Based on the evidence presented at the evidentiary hearing, Versatile has failed to demonstrate that NGE's belief system cohesively addresses fundamental and ultimate issues about deep and imponderable matters.

### B.   Metaphysical Beliefs

Metaphysical beliefs "address a reality which transcends the physical and immediately apparent world." *Meyers*, 95 F.3d at 1483. This reality often includes "another dimension, place, mode, or temporality [that is] often . . . inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities." *Id.* Metaphysical beliefs transcend mere physical laws that explain natural phenomena. *Cf. Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 738 (M.D. Pa. 2005) (explaining that, for the purposes of the

Establishment Clause, Intelligent Design is religious in nature because it goes beyond "testable, natural explanations"); *McLean v. Ark. Bd. of Educ.*, 529 F. Supp. 1255, 1267 (E.D. Ark. 1982) (explaining that creation science is religious "because it depends upon a supernatural intervention which is not guided by natural law").

NGE adherents use the term "God," but it refers literally to black men. Instead of carrying a metaphysical connotation, the term "God," as used by NGE members, appears to denote the superiority of black men over other races. Similarly, the terms "Allah" and "Islam" have literal, not metaphysical, meanings for NGE adherents. *See supra* ¶ 2.

The record before this Court establishes that NGE adherents do not believe in a God that exists outside of themselves and refer to the external god or gods of other religions using the derogatory terms "mystery God" and "spook." They teach that belief in the impossibilities and a mystery god, as preached by the 10%, keep the 85% weak and servile. NGE adherents do not pray to any entity, including their founder. Finally, NGE's national newspaper publishes articles stating that NGE is not a religion and differentiating their beliefs from religions that believe, hope, and have faith in the mysterious or supernatural. NGE adherents instead refer to their beliefs as a way of life or a culture.

Versatile, on the other hand, contends that he believes in a Supreme Being that created the universe, but simply believes that it dwells within him. Versatile asserts that NGE's founder was divine. Versatile, also in contravention to NGE teachings as established on this record, contends NGE should be given religious recognition.

The Court finds that Versatile's professions of belief in any transcendental or divine force diverge from the teachings of NGE as otherwise placed on this record. Versatile's beliefs cannot be a sincere product of the tenets of NGE faith as to which this Court has received evidence. At best, the record contains conflicting and equivocal evidence as to whether NGE incorporates any metaphysical ideas, and thus, Versatile has failed to meet his burden of satisfying this inquiry.

## C.  Ethical System

The sort of ethical system contemplated by religion "has a religious, as opposed to secular or philosophical, connotation." *Quaintance*, 471 F. Supp. 2d at 1161. These precepts are linked to ultimate concerns that are "more than intellectual," and generally "a believer would categorically disregard elementary self-interest in preference to transgressing its tenets." *Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981)

22

(internal quotations omitted); *see also Meyers*, 95 F.3d at 1483 (stating that ethics often "require the believer to abnegate elemental self-interest").

Although Versatile contends that NGE teaches freedom, justice, and equality to all human families, these terms have different connotations for an NGE adherent. For example, for an NGE adherent "teaching freedom" appears to mean teaching NGE beliefs so that a person can become civilized and express the NGE culture. *See supra* ¶ 16. Versatile's assertion that NGE teaches freedom, justice, and equality as commonly understood is undermined by NGE teachings that suggest Caucasians are mentally and physically inferior, are devils, and must be taken "off the planet." *See supra* ¶¶ 3-4.

Aside from the basic tenets of family and black unity, there appears to be no moral component to NGE. Instead, adherents appear free to decide their own code of personal morality within the private sphere. NGE's teachings lack the rigidity and universal application of a religious ethical system. *See Jacques*, 569 F. Supp. at 734 ("Self-determination of one's beliefs on an individual basis can scarcely be considered a religion.").

Although the document entitled "A Supreme Guidance for Righteous Conduct" contains what could be considered an ethical or moral code, Versatile asserts that this document is not a part of the 120 Degrees. Furthermore, even this document suggests that self-interest and self-preservation should be the ultimate goal for NGE adherents. Any values espoused appear to be applicable only to the 5% and do not have a universal application. Based on the record before this Court, Versatile has failed to establish the presence of an ethical or moral code within NGE's belief system.

**D.   External Signs and Accoutrements of Religions**

The final factor, accoutrements of religions, is determined "[b]y analogy to many of the established or recognized religions" which include "external signs" of religious belief. *Meyers*, 95 F.3d at 1483. These include the following subfactors: (1) a divine founder or prophet; (2) important writings; (3) gathering places; (4) keepers of knowledge; (5) ceremonies and rituals "imbued with transcendent significance;" (6) a structure or organization "of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc.;" (7) holidays celebrating sacred or holy days; (8) dietary restrictions or fasting days; (9) appearance and clothing; and, (10) propagation and proselytizing. *Id.* at 1483-84.

Even assessing whether the subfactors regarding accoutrements of religion are "minimally satisfied," *Meyers*, 95 F.3d at 1484, only five are shown to exist in this case. The Court heard testimony that NGE has important writings and texts (although it appears that these documents are largely

23

handwritten and fluid), maintains gathering places at the Allah Youth Center in New York City, recognizes four honorary days (although NGE adherents do not appear to celebrate anything holy or sacred on these days), establishes dietary restrictions (although Versatile did not provide a religious explanation for such restrictions), and recruits and teaches new members NGE beliefs at the Allah Youth Center.

Five other subfactors are absent from NGE's belief system. First, NGE does not recognize a divine founder or prophet. Despite Versatile's testimony to the contrary, the vast majority of the evidence before this Court suggests that Clarence 13X is not recognized as divine in any supernatural sense. Aside from being the founder of NGE, he is considered no different than any other black man.

Second and third, no evidence before the Court suggests that NGE maintains a structure or organization of leaders or has any keepers of knowledge. No definitive "hierarchy" of believers or ultimately authoritative leader exists. This lack of a hierarchy, coupled with Versatile's failure to identify and explain a universal and consistent body of NGE teachings, suggests that NGE does not have any "Keepers of Knowledge" equivalent to "clergy, ministers, priests, reverends, monks, shamans, teachers, or sages." *Meyers*, 95 F.3d at 1483. Indeed, these titles lack meaning in the NGE context because each adherent is his own keeper of a body of self-selected knowledge.

Fourth, Versatile has presented no evidence of NGE ceremonies or rituals which are "imbued with transcendent significance." *Id.* at 1483. No evidence indicates that NGE has any clergy "with authority to marry and bury." *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969). No evidence suggests that NGE has any counterpart to communion, baptism, or ritual washings practiced in other religions. This record suggests that NGE's Universal Flag, which Versatile argues should be considered a "holy" object, symbolizes the black man's dominance and superiority over everything else. Given this symbolism, the Court cannot find that Versatile has even minimally satisfied establishing that the flag carries transcendent significance rather than serving as an icon for a social or cultural movement.

Finally, aside from Versatile's testimony that NGE adherents wear gold and black during one of the honorary days, no other evidence indicates that NGE mandates a specific physical appearance or dress.

On the whole, the record before the Court at best contains conflicting evidence as to whether sufficient external signs of religiosity exist within NGE's belief system. The Court therefore weighs the final factor as to external signs and accoutrements of religions in favor of neither party.

Moreover, even a strong showing that NGE externally resembles a religion would not alter the Court's analysis because, based on the record before the Court, the other factors so clearly weigh against affording religious protection to NGE.

### E.   Conclusion

Versatile has failed to demonstrate the factors articulated in *Meyers* and *Africa*. Based on the record before this Court, Versatile has failed to demonstrate, even by the preponderance of the evidence, that NGE contains a unifying comprehensive set of beliefs about ultimate matters, includes metaphysical beliefs, upholds a universal moral or ethical code, or possesses traditional indicia of religiosity. The evidence presented by the parties thus demonstrates that NGE should be distinguished from those systems of belief protected by RLUIPA. It is therefore RECOMMENDED that Claims One and Two be DISMISSED.

## V. Findings of Fact Relevant to VDOC Decisionmaking

Even if the Court were to find or assume that NGE is a religion protected by RLUIPA, Versatile's claims fail if Versatile cannot demonstrate that the challenged procedures substantially burdened his religion or if VDOC can demonstrate that the challenged procedures are the least restrictive means to further compelling interests. Accordingly, based on the evidence presented at the evidentiary hearing, the Court makes the following findings of facts regarding VDOC decisionmaking.

### A.   VDOC Has Labeled NGE as a Security Threat Group and a Gang

27.   By maintaining a large, identifiable group, gangs can use intimidation and fear to control prisons, recruit members, and gain power. (Tr. 370:4-371:8, 424:17-425:13.) Visibility is thus important to gangs. (Tr. 425:18-23.)

28.   Gary Clore,[14] the manager of VDOC's Gang Management Unit, testified that in the early 1990s, a group of about 150 to 200 NGE adherents existed at Powhatan Correctional Facility. (Tr. 372:2-13, 374:21-25.) During group meetings, NGE adherents taught their lessons and engaged in militant training activities. (Tr. 372:5-373:7.)

---

[14]  Clore testified as an expert in gang activity in VDOC.

29.    Clore and Michael Duke,[15] a gang specialist with VDOC's Gang Management Unit, testified that enlighteners, or senior NGE members, would recruit new members and teach them the lessons. (Tr. 380:15-381:12, 445:5-446:1, *see also* Tr. 67:2-14.)  They have witnessed senior NGE members physically assault newer NGE members as punishment for their inability to properly recite the lessons. (Tr. 380:15-381:12, 445:5-446:1.)

30.    Defendants stipulate that many incidents and disturbances occur within VDOC that are committed by persons of different religions or belief systems. (Tr. 43:12-14.)

31.    Clore and Duke testified that NGE members use a hand signal, certain greetings, and the Universal Flag to signify membership, increase visibility, and intimidate others. (Tr. 369:22-370:24, 382:22-383:6, 427:1-2.) According to Clore and Duke, NGE members have used the Supreme Alphabet, the Supreme Mathematics, or other codes to "talk around security staff or non Five Percenters in a coded manner." (Tr. 379:20-21; *see also* Tr. 383:1-16, 456:3-9; Defs.' Ex. 14.) While Versatile and witnesses testifying on his behalf admit that NGE members often communicate using the Supreme Mathematics and Supreme Alphabet, he claims this does not pose a security threat because "anyone can easily get them an[d] they can be decipher[ed] with ease by the VDOC officials or anyone who ha[s] a copy of them." (Pl.'s Ex. 1, Versatile Decl. ¶ 22; Tr. 136:17-19.)

32.    Clore and Duke testified that they have come across Five Percenters who are also members of other gangs, including the Bloods, Crips, and Gangster Disciples. (Tr. 387:13-18, 454:17-23.) Documentation suggests that gangs have attempted to recruit NGE members and that NGE has encouraged its members to recruit gang members. (*See* Defs.' Ex. 10 (recounting the New Black Panther Party's national unity efforts with NGE and other gangs); Defs.' Ex. 12 ("**Bloods** will become Gods as soon as they are given the basic awareness to fight **for** their own people. . . .").) Versatile, on the other hand, contends NGE does not recruit members, including gang members. (Pl.'s Ex. 1, Versatile Decl. ¶ 22.)

33.    Due to the increase in gang activity within VDOC in the 1990s, VDOC established a Security Threat Group Committee to identify gangs and gang members, track gang activities, and share information with other law

---

[15] Duke testified as an expert in gangs and Five Percenters in VDOC. In Versatile's revised proposed findings of facts and conclusions of law, Versatile appears to contest Clore's and Duke's expert designations. (Pl.'s Resp. to Mem. Order of June 10, 2010, at 26.) To the extent this filing could be construed as an objection to Clore and Duke testifying as expert witnesses, the Court overrules the objection as untimely and waived. *See Parodi*, 703 F.2d at 783; *DiPaola*, 581 F.2d at 1113.

enforcement agencies. (Tr. 533:1-534:24.) By 1996, VDOC had identified NGE as a security threat group. (Tr. 548:24-549:7.)

34.    On July 23, 1996, Defendant Gene Johnson, then-Deputy Director of VDOC, issued a memorandum prohibiting the assembly of Five Percenters:

> Please be advised that "Five Percent" groups should not be allowed to meet in any [VDOC] facility. Review of information about this group indicates that they are non-religious in nature, and that these groups consider their beliefs to be a "way of life" rather than a religion. . . .
>
> Take note that these groups may attempt to meet covertly, and that some members may present a threat to the orderly and secure operation of the institution. . . .

(Defs.' Ex. 7; *see also* Pl.'s Ex. 1, Versatile Decl. ¶ 5.) Johnson instituted this policy because Five Percenter disturbances had increased in prisons in Virginia and in other states. (Tr. 529:8-530:15.) After VDOC implemented the new policy, NGE groups began to splinter and problems caused by Five Percenter groups significantly reduced. (Tr. 378:3-6, 530:17-23.)

35.    At some point after 2001, the Security Threat Group Committee evolved into the Gang Management Unit (Tr. 533:15-534:11), and VDOC adopted a zero tolerance policy for gang activity, including recruiting, unauthorized assembly, assaults, disorderly conduct, and any other conduct "that would disrupt the safe security and orderly operation of [VDOC] facilities" (Tr. 368:13-15). VDOC defines a gang, previously identified as a security threat group, as:

> A group of individuals who: (a) possess common characteristics that distinguish them from other offenders or groups of offenders and who, as an entity, pose a threat to the safety and security of staff, the facility, or other offenders or the community; (b) have a common distinctive goal, symbolism or philosophy; (c) possess identifiable skills or resources, or engage in unauthorized/illegal activities.

(Defs.' Ex. 16, VDOC Operating Procedure ("VDOC OP") 803.2(III); *see also* Tr. 369:1-9; Va. Code Ann. § 18.2-46.1.) VDOC has classified NGE as

a gang. (Tr. 536:24-537:2.) Versatile contests this classification, stating that NGE is not a gang. (Tr. 19:24; *see also* Pl.'s Ex. 27.)

36.     According to VDOC, approximately 8,000 VDOC inmates are known gang members, of which 900 are Five Percenters. (Tr. 391:2-22, 464:20-24.)

**B.     Findings Relevant to VDOC's Review of NGE Publications**

**1.     VDOC Operating Procedure Regarding Publication Disapproval**

37.     To "maintain security, discipline, and good order" in VDOC facilities, VDOC reviews all incoming publications. (Defs.' Ex. 16, VDOC OP 803.2(V)(D) (effective Aug. 1, 2007).)[16] "Offenders are prohibited from receiving publications that promote violence, disorder or the violation of state or federal law or any material containing sexually explicit acts . . . ." (Defs.' Ex. 16, VDOC OP 803.2(V)(C).)

38.     VDOC regulations provide specific criteria for publication disapproval. A publication should be disapproved for receipt and possession by inmates "if the publication can be reasonably documented to contain" (Defs.' Ex. 16, VDOC OP 803.2(V)(L)):

7.     Material that promotes or advocates violence, disorder, insurrection or terrorist activities against individuals, groups, organizations, the government, or any of its institutions

.  .  .  .

12.    Material whose content could be detrimental to the security, good order, discipline of the facility, or offender rehabilitative efforts or the safety or health of offenders, staff, or others

13.    Material that depicts, describes, or promotes gang signs, language, clothing, jewelry, codes or paraphernalia, gang participation, or other gang-related activity or association

---

[16] The Court notes that VDOC Operating Procedure 803.2 relating to incoming publications has since been amended with an effective date of November 1, 2010. These amendments were largely structural and were not substantive. Thus, the following findings of facts and conclusions of law apply equally to the amended VDOC Operating Procedure 803.2.

14.   Material, documents or photographs that depict, describe or suggest the use of violence, weapons, illegal drugs, or other activities that counter the stated goal of rehabilitation within the [V]DOC

15.   Material written in code or written in a foreign (non-English) language (unless obtained from an approved vendor . . . )

(Defs.' Ex. 16, VDOC OP 803.2(V)(L).)  Thus, no matter what group, organization, or religion a publication might be associated with, VDOC applies these specific criteria to each publication to determine whether it is appropriate for introduction into VDOC facilities. (Tr. 224:11-16.)

39.   VDOC's Publication Review Committee ("PRC") meets at least quarterly (Defs.' Ex. 16, 803.2(V)(H); Tr. 501:10-16) and reviews all "publications submitted from [V]DOC facilities to determine if they violate [these specific criteria] and are therefore not appropriate for possession by an offender in a [V]DOC facility" (Defs.' Ex. 16, VDOC OP 803.2(III); *see* Tr. 217:3-14).  Any publication disapproved by the PRC is placed on the Disapproved Publication Log, which is distributed to all VDOC facilities. (Defs.' Ex. 16, VDOC OP 803.2(III); Tr. 212:7-11.)  If a publication is disapproved, it is restricted across all VDOC facilities. (Tr. 223:20-224:2.) The PRC "should notify the publisher of the Committee's decision to disapprove the publication." (Defs.' Ex. 16, VDOC OP 803.2(V)(H)(3).)

40.   If a publication has not yet been approved or disapproved by the PRC, each VDOC facility must review the publication, applying the specific criteria, to determine whether it is appropriate for possession by an inmate. (Defs.' Ex. 16, VDOC OP 803.2(V)(F), (G); Tr. 216:21-24, 501:6-8.)  If a facility determines it is not appropriate for inmate receipt, the publication must be forwarded to the PRC for review. (Defs.' Ex. 16, VDOC OP 803.2(V)(F), (G); Tr. 216:24-217:3.)

41.   Each edition or issue of every publication must be individually reviewed. (Defs.' Ex. 16, VOC OP 803.2(V)(E)(6); Tr. 217:14-17, 225:7-10.)

## 2.   The Disapproval of NGE Publications

42.   The PRC has reviewed NGE lessons and numerous issues of *The Five Percenter* and has placed them on the Disapproved Publication Log as violating one or more of the specific criteria and as containing material "which could be detrimental to institutional order, security and/or the rehabilitation of

inmates." (Pl.'s Ex. 4, Enc. A; *see* Pl.'s Ex. 1, Versatile Decl. ¶ 19.)[17] VDOC has determined that the racially inflammatory rhetoric of NGE materials is a general threat to institutional security. (Tr. 506:17-507:8; *see, e.g.,* Pl.'s Ex. 21, Vol. 14.1, at 2 (encouraging NGE members to fight back against the devils and rebel); Pl.'s Ex. 23, Vol 14.5, at 8 (referring to the Blackman as God and the Caucasian man as the devil).) VDOC has notified the publisher of each disapproved NGE publication, specifying the page numbers that violate VDOC Operating Procedure and often specifying the specific criteria violated. (Pl.'s Ex. 25, Enc. A.)

43.    On June 23, 2004, the PRC denied an issue of *The Five Percenter*, Vol. 9.8, because it "[d]epict[ed] lynchings that could cause violence/racial unrest." (Pl.'s Ex. 4, Enc. B, at 8.)

44.    In March of 2006, the Security Threat Group Subcommittee ("STGS") of the PRC was formed and all issues of *The Five Percenter* were referred to the STGS for review. (Pl.'s Ex. 4, Encs. B, D; Tr. 409:15-21.) Between March 2006 and March 2007, the STGS disapproved Volumes 9.10, 9.11, 10.1, 10.2, 10.3, 10.5, 10.6, 10.7, 10.8, 10.9, 10.11, 10.12, 11.1, 11.2, 11.3, 11.4, 11.5, 11.6, 11.7, 11.9, 11.10, 11.12, and 12.1 of *The Five Percenter* as violative of specific criteria. (Pl.'s Ex. 4, Enc. B, at 8-9; *see* Pl.'s Ex. 25, Enc. A, at 2-3.) In making this determination, the STGS looked at each issue individually and did not disapprove issues simply because they were related to NGE. (Tr. 410:7-8.) The majority of these volumes were disapproved as violative of Criteria 13 (containing gang-related material) because they featured the Universal Flag and photographs of individuals displaying hand signs, both of which are considered gang material by VDOC. (Pl.'s Ex. 4, Enc. B, at 8-9; Tr. 429:6-9; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(13).) However, many volumes were also disapproved as violative of Criteria 7 (promoting violence or disorder) and Criteria 12 (detrimental to security and rehabilitative efforts) due to articles that, according to VDOC, referred to

---

[17] At the evidentiary hearing, Versatile and a NOI member both testified that NOI members study and possess the 120 Degrees within VDOC. (Pl.'s Ex. 1, Versatile Decl. ¶ 19; Tr. 120:9-121:14.) VDOC officials, however, testified that NOI members may not possess the 120 Degrees (*see, e.g.,* Tr. 290:20-291:2), and the Disapproved Publication Log prohibits the possession of the Book of Lessons Issued by Elijah Muhammad, NOI's founder. (Pl.'s Ex. 4, Enc. A.) Similarly, the Disapproved Publication Log prohibits the possession of various issues of *The Final Call*, NOI's newspaper, even though NOI is a recognized religion within VDOC. (Pl.'s Ex. 4, Enc. A; Tr. 133:24-134:1.) Further, if a publication is disapproved, it is restricted across all VDOC facilities and prohibited among all groups. (Tr. 223:20-224:2.) Based on this evidence, the Court finds that possession of the 120 Degrees by any inmate within VDOC, including NOI members, violates VDOC regulations.

Caucasians as the devil, taught readers how to write in code, and contained other "inflammatory seeds of hate that [do not] fit in with the environment where [VDOC is] forcing all cultures and subcultures to live in close quarters." (Tr. 429:11-14; *see* Pl.'s Ex. 4, Enc. B, at 8-9; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(7), (12).)

45.     In March of 2007, the PRC re-assumed its role as reviewer of *The Five Percenter* and has disapproved every issue of *The Five Percenter* from Volume 12.2 through Volume 15.3. (Pl.'s Ex. 4, Enc. B, at 9-10.) These volumes have been disapproved as containing material violative of Criteria 7 (promoting violence or disorder), Criteria 12 (detrimental to security and rehabilitative efforts), and/or Criteria 13 (containing gang-related material). (Pl.'s Ex. 4, Enc. B, at 9-10; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(7), (12), (13); Tr. 502:22-503:11.) One volume was also disapproved as containing material violative of Criteria 14 (depicting violence, weapons, or illegal drugs). (Pl.'s Ex. 4, Enc. B, at 10; Defs.' Ex. 16, VDOC OP 803.2(V)(L)(14).)

46.     Versatile contends that VDOC has implemented a "Blanket Ban" on *The Five Percenter* since August 2006. (Pl.'s Ex. 1, Versatile Decl. ¶ 9; Tr. 28:11-18.) VDOC employees, however, testified that no blanket ban on *The Five Percenter* has been implemented, and instead each issue is reviewed separately. (Tr. 225:3-10, 500:23-25.) Defendants, however, could not offer a definite explanation as to why a majority of issues of *The Five Percenter* starting with Volume 9.8 were disapproved, while previous volumes were approved. Defendants offered the amendment of Virginia gang laws, the addition of Criteria 13 (prohibiting gang-related material) to VDOC Operating Procedure 803.2, and the creation of the Gang Management Unit and adoption of the zero tolerance policy as possible explanations for the recent and frequent disapproval of *The Five Percenter*. (Tr. 430:14-431:1, 526:8-17, 565:15-24.)

### 3.     Findings Relevant to Whether Disapproval Is the Least Restrictive Means

47.     Roughly 32,000 inmates are detained in forty facilities within VDOC. (Tr. 538:14-20.)

48.     Since 2002, VDOC has endured $160 million in budget cuts and has lost 2,295 positions. (Tr. 528:14-17, 540:2-6.) In 2010, VDOC was placed under a hiring freeze and is operating under a considerable amount of vacancies. (Tr. 540:19-22.)

49.     VDOC regulations prohibit the redaction of publications. (Defs.' Ex. 16, VDOC OP 803.2(V)(E)(5) ("[P]ublications that have been altered (pages or pictures removed, blotted out, etc.), regardless of the source, are not authorized."); Defs.' Ex. 16, VDOC OP 803.2(V)(E)(7) ("When a portion of

a publication is disapproved, the entire publication will be disapproved. There will be no attempt to remove or censor the disapproved material."); Tr. 509:13-17.) Redaction would require a tremendous amount of resources, and VDOC adopted the zero tolerance policy instead. (Tr. 392:10-24, 509:21-24.) VDOC contends it does not have the time, staff, or money it would take to go through the magazines, newspapers, books, and other writing materials and redact violative material. (Tr. 392:10-24, 538:8-12.)

50.     VDOC does not place a copy of NGE lessons or *The Five Percenter* in VDOC libraries because VDOC contends the documents often disappear which could result in unfettered access. (Tr. 544:1-15.) VDOC libraries are not staffed by VDOC employees, and VDOC does not have the manpower to staff libraries with security officers to ensure that theft does not occur. (Tr. 544:1-8.)

51.     Segregating NGE adherents to allow possession of their lessons is not feasible because VDOC does not have the capacity in segregation to house the 900 identified NGE members within VDOC. (Tr. 541:3-10.)

C.     **Findings Relevant to the VDOC's Processing of Versatile's Request for Religious Recognition**

1.     **VDOC Operating Procedure Regarding Requests for Religious Recognition**

52.     At the time Versatile submitted his request for religious recognition of NGE, requests for new religious programs or groups were governed by VDOC Operating Procedure 841.3. (Pl.'s Ex. 2, VDOC OP 841.3 (effective Apr. 1, 2007).) "This operating procedure establishes protocols to provide reasonable opportunities for incarcerated offenders to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources." (Pl.'s Ex. 2, VDOC OP 841.3(I).)

53.     The religious recognition process requires the offender to submit an application and all supporting documentation to the facility, and the facility must then forward completed applications to the Faith Review Committee ("FRC"), along with a recommendation as to whether a request should be approved or disapproved:

1.     Offender requests for new religious groups or activities not previously or currently offered at a facility shall be submitted on a *Request for Recognition of Religious Group*, (see Attachment #3) to the Facility Unit Head or designee who shall be a [V]DOC employee. Each

request shall be as complete and well documented as possible.

2.    The Facility Unit Head shall review the *Request for Recognition of Religious Group* and, if complete, attach a *Routing Slip for Recognition of Religious Groups* (see Attachment #4) indicating recommendation to approve or disapprove the *Request for Recognition of Religious Group.*

3.    The Facility Unit Head will refer the request and supporting documentation through the Regional Director (Assistant Director for Community Corrections Facilities) to the *Faith Review Committee* for recommendation to the Deputy Director.

4.    The Deputy Director shall make the final decision as to whether a proposed religious group will meet based on information presented.

(Pl.'s Ex. 2, VDOC OP 841.3(IV)(C); Tr. 178:24-179:3.)  Facilities may, however, restrict or deny religious activities under certain circumstances: "Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources."  (Pl.'s Ex. 2, VDOC OP 841.3(IV)(D)(1).)

54.    The FRC is "[a] panel of representative [VDOC] staff who serve in an advisory and decision making capacity regarding religious accommodation as it relates to, and impacts on, security and legitimate penological interests of [V]DOC." (Pl.'s Ex. 2, VDOC OP 841.3(III); *see* Tr. 257:17-19.) Issues before the FRC are placed on a docket and referred to the religious advisor who researches the issue and reports back to the six-member committee. (Tr. 257:21-25, 265:11-12.)  The FRC convenes every four months and makes a recommendation to the Deputy Director about issues on its docket. (Pl.'s Ex. 2, VDOC OP 841.3(IV)(C)(3); Tr. 257:21-258:1, 286:23-24.) The FRC usually decides by reaching a consensus rather than by taking a vote. (Tr. 276:17-21.)

## 2.   The Southampton Correctional Center Request for Religious Recognition of NGE

55.   In 2007, an inmate incarcerated at Southampton Correctional Center submitted a request for religious recognition of NGE ("the SCC request") which was referred to the FRC. (Tr. 324:15-18.)

56.   John Meyers,[18] an ordained clergyman and Vice President of Chaplain Service Prison Ministry of Virginia,[19] was the religious advisor at the time of the SCC request. (Tr. 257:21-23, 293:22-23, 296:13-21.) As religious advisor, Meyers "advocate[s] for religious freedom and rights and balance[s] those with the needs of corrections." (Tr. 295:21-23.)

57.   In recommending whether a belief system should be given religious recognition within VDOC, Meyers evaluates the belief system looking at the following factors: (1) whether the belief system includes spiritual or metaphysical beliefs that "permeate[] reality and give[] a larger meaning to life" (Tr. 298:4-5); (2) whether an ethical or moral system applicable to humanity as a whole exists within the belief system (Tr. 298:15-22); (3) the comprehensiveness of the belief system (Tr. 299:8-18); and, (4) the history of the belief system, such as its founder, leaders, structure, houses of worship, rituals or worship services, prescribed prayers or meditation, and authoritative scriptures (Tr. 300:5-18).

58.   In considering the SCC request, Meyers reviewed NGE lessons, including the Supreme Alphabet, the Supreme Mathematics, and the 120 Degrees. (Tr. 301:4-9.) He also relied on his own expertise and performed internet research on NGE. (Tr. 303:21-304:6.) Meyers attempted to find contact information for local NGE leaders in the community, but found none. (Tr. 303:21-25.)

59.   Meyers determined that the facts before him regarding NGE suggested that NGE should not receive religious recognition. Meyers determined that NGE does not espouse any spiritual or metaphysical beliefs (Tr. 304:15-308:3), that any ethical or moral code espoused by NGE applies only to the five percent and not to humanity as a whole (Tr. 313:7-314:22, 335:13-16), that NGE has a narrow focus on overcoming racial oppression (Tr. 312:1-11, 316:10-12), and that the history of NGE suggests it is a cultural or

---

[18] Meyers did not testify as an expert witness. Accordingly, Meyers's reasoning and conclusions are relevant only insofar as it establishes the procedures by which VDOC determined that NGE would not be recognized as a religion.

[19] Chaplain Service Prison Ministry of Virginia is an inter-denomination agency independent from VDOC. (Tr. 293:21-25, 294:4-6.)

ethnic movement rather than a religion (Tr. 326:14-22). Meyers additionally found NGE's beliefs to be racist, antisocial, and religiously intolerant and that such beliefs would detract from a therapeutic prison environment.[20] (Tr. 320:16-321:15.)

60.     On October 31, 2007, the FRC determined that NGE "presented a significant security risk" in the prison setting and ultimately recommended that the Deputy Director deny the SCC request. (Tr. 261:24-25; *see* Pl.'s Ex. 11, Enc. A; Tr. 168:2-22.)   The Deputy Director accepted the FRC's recommendation and denied the SCC request. (Tr. 168:2-12.)

61.     In 2008, the FRC conducted subsequent reviews of NGE and again recommended that NGE not be recognized as a religion in VDOC. (Tr. 258:8-16.)

62.     Although Meyers admits the information in Versatile's request for recognition would have been helpful to his review, no evidence suggests that the information in Versatile's request would have resulted in a different recommendation from Meyers or the FRC. (*See* Tr. 324:23-25.)

### 3.     Versatile's Request for Religious Recognition of NGE

63.     On December 4, 2007, about a month after the FRC denied the SCC request, Versatile submitted a request for VDOC recognition of NGE as a religion. (Pl.'s Ex. 3, Enc. A; Pl.'s Ex. 1, Versatile Decl. ¶ 12.)

64.     On January 22, 2008, after receiving no response from VDOC to his request, Versatile filed an informal complaint. (Pl.'s Ex. 3, Enc. B; Pl.'s Ex. 1, Versatile Decl. ¶ 13.)  In a February 9, 2008 response to Versatile's informal complaint, VDOC stated that NGE is not recognized as a religion. (Pl.'s Ex. 3, Enc. B; Pl.'s Ex. 1, Versatile Decl. ¶ 13.)

65.     On February 10, 2008, Versatile filed a regular grievance challenging the denial of NGE religious recognition and contending that VDOC Operating Procedure had been violated because Defendant Kelly did not attach a routing slip to his application and forward it the FRC. (Pl.'s Ex. 3, Enc. C; Pl.'s Ex. 1, Versatile Decl. ¶ 14.)  On March 4, 2008, Defendant Kelly found Versatile's formal grievance to be unfounded because the FRC had determined that VDOC did not recognize NGE as a religion in October 2007. (Pl.'s Ex. 3, Enc. C; Pl.'s Ex. 1, Versatile Decl. ¶ 14; Tr. 177:16-20.)

66.     Versatile appealed Defendant Kelly's decision on March 7, 2008 to Defendant Robinson, the Regional Director, again challenging the denial of NGE religious recognition and contending that VDOC Operating Procedure

---

[20] The Court did not weigh this factor in determining whether NGE was a religion under RLUIPA.

had been violated because his request had not been forwarded to the FRC. (Pl.'s Ex. 3, Enc. D; Pl.'s Ex. 1, Versatile Decl. ¶ 15.) Defendant Robinson agreed that Versatile's grievance was unfounded and informed Versatile that his administrative remedies had been exhausted. (Pl.'s Ex. 3, Enc. D; Pl.'s Ex. 1, Versatile Decl. ¶ 15; Tr. 237:14-18.)

67. In rendering his decision on Versatile's appeal, Defendant Robinson did not consider the issue of Defendant Kelly's failure to affix a routing slip to the application and forward it to the FRC because his staff had not brought the matter to his attention. (Tr. 246:11-15.) Defendant Robinson, however, testified he would not have considered that issue anyway because VDOC policy requires that each grievance and appeal raise only one issue, and Defendant Robinson stated the issue ascribed to Versatile's grievance and appeal was the denial of religious recognition to NGE and not a violation of VDOC Operating Procedure. (Tr. 252:20-253:22.) Defendant Robinson further testified that, even had he considered the procedural violation issue as well, his decision on the appeal would not have changed. (Tr. 248:6-23.)

68. Versatile contends that Defendant Kelly violated the mandatory, nondiscretionary language in VDOC Operating Procedure 841.3(IV)(C) by failing to forward his request for religious recognition to the FRC. (Pl.'s Ex. 1, Versatile Decl. ¶ 14; *see* Pl.'s Ex. 2, VDOC OP 841.3(IV)(C).)

69. VDOC officials, however, contend that the relevant regulations allow for discretion to refuse to process duplicative requests, notwithstanding the mandatory language, in part because the regulations had already been satisfied. Because the FRC had denied the SCC request for NGE religious recognition less than two months earlier, Defendant Kelly contends that VDOC Operating Procedure 841.3(IV)(D)(1) gave her the discretion to preserve resources and deny Versatile's request without forwarding it to the FRC. (Tr. 179:4-180:19, 184:7-185:4; *see* Pl.'s Ex. 2, VDOC OP 841.3(IV)(D)(1) ("Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources.").) VDOC officials testified that administrators must have discretion "in the day-to-day activities of management" so that VDOC does not have to continually address a single "issue over and over and over repeatedly." (Tr. 238:1, 12-13; *see also* Tr. 562:16-22.)

70. However, VDOC officials recognized that at some point an issue would need to be reconsidered if different facts and circumstances are present. (Tr. 251:5-21.) Further, Louis Cei, the Chairman of the FRC, testified that if the FRC had denied a specific group religious recognition in the previous four to eight months and no new information was presented in a new request from

the same group, it would not be cost-beneficial or practical for the FRC to conduct another review. (Tr. 287:3-8.)

## VI.  Versatile's Blanket Ban Claim (Claim One)

### A.  Standard of Review

Government officials impose a substantial burden on the free exercise of religion by "'put[ting] substantial pressure on an adherent to modify his [or her] behavior and to violate his [or her] beliefs.'" *Lovelace*, 472 F.3d at 187 (*quoting Thomas*, 450 U.S. at 718). Any substantial burden on the exercise of religion must represent "the least restrictive means of furthering a compelling governmental interest." *Id.* at 189. Defendants bear the burden of "providing an explanation for the [challenged] policy's restrictions" that demonstrates its validity, and courts are not to provide such an explanation on their behalf. *Id.* at 190. Defendants cannot satisfy the burden of persuasion with conclusory statements that do not explain why less restrictive policies would not suffice. *Smith v. Ozmint*, 578 F.3d 246, 252 (4th Cir. 2009); *see also Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 989 (8th Cir. 2004) ("The threat of racial violence is of course a valid security concern, but to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation of [an inmate's] request."). Nevertheless, courts should afford "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," in assessing any proffered explanation. *Murphy*, 372 F.3d at 988 (*quoting* S. Rep. 103-111, at 10 (1993)).

"To meet its burden to show a compelling interest, [Defendants'] 'first job' is 'to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs.'" *Smith*, 578 F.3d at 252 (*quoting Lovelace*, 472 F.3d at 190). Generally, "[p]rison safety and security are compelling government interests." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009) (*citing Fegans v. Norris*, 537 F.3d 897, 906 (8th Cir. 2008)). Nevertheless, "[e]ven in light of the substantial deference given to prison authorities, the mere assertion of security . . . is not, by itself, enough for [Defendants] to satisfy the compelling governmental interest requirement." *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007). Officials "must do more than speculate that the accommodation of a religious practice will lead to safety and security problems." *Hummel v. Donahue*, No. 1:07cv1452, 2008 WL 2518268, at *4 (S.D. Ind. June 19, 2008) (citing cases). Rather, prison

officials must supply adequate record evidence that the particular security concerns that prompted the policy are compelling and are advanced by their policy. *See Smith*, 578 F.3d at 252 (concluding prison officials failed to provide adequate evidentiary support for their assertion that their security concerns constituted a compelling governmental interest); *Lovelace*, 472 F.3d at 190-91 (same).

**B.  Analysis**

**1.  Defendants Have Demonstrated a Compelling Interest in Preventing the Security Risks Posed by Unrestricted Access to NGE Materials**

VDOC has demonstrated a compelling interest in preventing security risks posed by unrestricted access to NGE materials which promote racial and religious animosity, incite violence, or encourage gang activity.

NGE tenets constitute a system describing the inherent superiority of black men. *See supra* ¶¶ 1-4. "It is undisputed that permitting a religious group that advocates racial purity to exist in the prison setting would create a perception among . . . inmates, staff, visitors and members of the public that defendants endorse these repugnant beliefs."[21] *Wood v. Me. Dep't of Corr.*, No. 1:06cv156, 2007 WL 3237789, at *3 (D. Me. Oct. 25, 2007) (*quoting Lindell v. Casperson*, 360 F. Supp. 2d 932, 955 (W.D. Wis. 2005)); *see also Self-Allah v. Annucci*, No. 97-CV-607(H), 1999 WL 299310, at *10 (W.D.N.Y. Mar. 25, 1999) (denying First Amendment challenge to blanket ban of NGE materials as "reasonable response to a perceived threat to prison security").[22] Thus, VDOC has a compelling interest in preventing security

---

[21] Versatile's general averments that NGE is not racist do not alter the Court's decision. Where, as here, the *specific* materials "promote[ racial] supremacy and encourage[] contempt and denigration of other races" and religions, an assertion that the religion or belief system "*generally* . . . does not encourage racist or violent behavior" is irrelevant to whether officials may ban the offensive materials. *Wood v. Me. Dep't of Corr.*, No. 1:06cv156, 2008 WL 2222037, at *2 (D. Me. May 22, 2008).

[22] Versatile appears to argue that preventing access to materials that promote racial supremacy cannot be a compelling interest. In support of this argument, Versatile points to VDOC's grant of religious recognition to Odinism even though he considers Odinism is a white supremacist group. The Court, however, cannot make the finding that Odinism is a white supremacist group based on Versatile's conclusory allegations.

The record before the Court also countermands such a finding. Meyers testified that Odinism was approved as a religion because the belief system met Meyers's four-part test, *see supra* ¶ 57, and "[i]t is not a central tenet of the faith group that any particular race is inferior to others or needs to be wiped off the face of the earth" (Tr. 333:9-12). VDOC officials also

risks posed by the permeation of materials that promote racial supremacy or incite racial animosity. *See Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003).

Additionally, many of the passages may be interpreted to promote violence and could be construed as derogatory toward other religions. *See supra* ¶ 4 (discussing passages instructing NGE members to murder the white devils or take them "off the planet"); ¶ 11. Even the possibility that these passages could be interpreted as an incitement to violence poses a risk to security. Defendants present uncontradicted evidence that they could not both allow NGE texts into VDOC and restrict access to the materials to sincere NGE adherents. *See supra* ¶ 51. The dissemination of some passages throughout VDOC could harm institutional security.

The Court makes no finding that Versatile himself has ever used the Supreme Mathematics or Supreme Alphabet to commit any offense at VDOC. Nevertheless, Versatile and his own witness testified that NGE adherents use the Supreme Mathematics and Supreme Alphabet to communicate, both orally and in writing. *See supra* ¶ 31. Defendants also presented evidence that NGE members have used the Supreme Mathematics and Supreme Alphabet, as well as other codes, to communicate with each other and talk around correctional officers. *See id.* Although Versatile contends that NGE members do not speak code in a deceptive way and that the code could easily be deciphered, coded messages between prisoners present an obvious threat to prison security.

VDOC has also presented uncontroverted evidence that NGE members have common identifiers and goals, communicate using the Supreme Mathematics and Supreme Alphabet, and have engaged in unauthorized activities within VDOC, including, in the past, assaults of new members who could not adequately repeat their lessons. *See supra* ¶¶ 27-36. Based on this evidence and VDOC Operating Procedures, VDOC has classified NGE as a gang and has prohibited the display of gang signs or symbols. No evidence suggests that this classification is arbitrary or unreasonable. While the Defendants have not made any strong showing that NGE adherents are currently disrupting VDOC facilities, they are not legally obligated to wait until the "ever-present potential for violent confrontation and conflagration" has actually manifested. *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977)); *see also Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008). VDOC officials may act to "forestall such a threat, and they must be permitted to act before . . . the eve of a riot." *Jones*, 433 U.S. at 132-33.

---

testified that the PRC has disapproved certain Odin publications based upon white supremacist teachings. (Tr. 513:18-23.)

VDOC has a compelling interest in restricting gang activity and visibility, including restricting material promoting gang activity or displaying gang symbols.

### 2. Defendants Have Implemented the Least Restrictive Means in Furtherance of Their Compelling Interests

Prison officials generally must demonstrate they considered and rejected the efficacy of less restrictive measures before adopting the challenged practice. *Washington*, 497 F.3d at 284; *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 (1st Cir. 2007); *Murphy*, 372 F.3d at 989; *see also Smith*, 578 F.3d at 254 (vacating grant of summary judgment where prison officials failed to demonstrate why forcible shaving, rather than some lesser restriction, was necessary to enforce grooming policy). The Court concludes that VDOC has implemented the least restrictive means through its adoption and application of the operating procedure related to publication approval.

The Court first notes that, despite Versatile's contention otherwise, no blanket ban on NGE publications exists. Instead, VDOC has implemented an individualized review process under which time, effort, and resources are expended on reviewing each publication, including every individual volume or issue of the publication, to determine whether the material may be allowed within VDOC without jeopardizing the security, discipline, and good order of its facilities. VDOC regulations also list specific criteria under which publications should be denied and require that the PRC notify the publisher when a publication is disapproved. Based on these regulations, VDOC has disapproved numerous NGE publications due to the presence of material that VDOC has determined could be detrimental to institutional order, security, and the rehabilitation of inmates.[23]

Given the pervasive racist content and potential for misuse, redaction of NGE's foundational lessons and mandatory texts would not promote prison security unless almost all of the materials were redacted. Redaction of NGE publications is also not feasible as a least restrictive means. VDOC has suffered budget cuts and hiring freezes that make it difficult to hire new security personnel. Given the number of inmates housed within VDOC, including the number of identified NGE members, VDOC lacks the resources

---

[23] The Court is not unsympathetic to Versatile's indignation over Defendants' disapproval of every issue of *The Five Percenter* since August 2006. However, the Court notes that VDOC has notified the publisher of *The Five Percenter* regarding each disapproval, specifying the page numbers that violate VDOC regulations and often specifying the reason for the disapproval. *See supra* ¶ 42. VDOC has thus given the publisher the opportunity to modify *The Five Percenter* in a manner that would alleviate VDOC's concerns.

to implement the redaction of objectionable material from NGE's foundational lessons or *The Five Percenter*.[24] VDOC has also considered other alternatives but has demonstrated that segregation of NGE adherents is not feasible and that placing disapproved NGE materials in VDOC libraries would not sufficiently alleviate VDOC's security concerns.

Based on the record before the Court, it is RECOMMENDED that the Court finds VDOC regulations regarding publication approval to constitute the least restrictive means of furthering VDOC's compelling interest in security. Therefore, it is RECOMMENDED that Claim One be DISMISSED.

### VII. Versatile's Routing Slip Claim (Claim Two)

In Claim Two, Versatile asserts that Defendants Kelly and Robinson violated Versatile's rights under RLUIPA by failing to refer his request to have NGE recognized as a religion to the FRC, in violation of VDOC regulations. Because of this failure, Versatile contends that he is unable to freely exercise his NGE beliefs.

To the extent Versatile complains about VDOC's failure to follow procedure, Versatile is not entitled to relief under § 1983 or RLUIPA. Even assuming a violation of VDOC Operating Procedure occurred, that does not necessarily implicate federal due process rights. *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990); *Coward v. Jabe*, No. 1:10cv147, 2011 WL 1827358, at *4 n.2 (E.D. Va. May 11, 2011) ("To the extent that [plaintiff] alleges that defendants failed to follow proper VDOC procedures . . . , he fails to state a claim of constitutional dimension."). Versatile has failed to establish that he was denied any right guaranteed by federal law by VDOC's failure to follow its operating procedure. Further, nothing under RLUIPA mandates the right to state procedural requirements.

---

[24] Even the *Marria* court, which granted relief, merely required the New York Department of Corrections to hold a hearing to make findings to determine whether redaction was possible because of the lack of response to the plaintiff's suggested less restrictive means. 2003 WL 21782633, at *20. The *Marria* court ultimately accepted a settlement whereby the New York Department of Corrections agreed to make available at each institution a redacted copy of each issue of *The Five Percenter*. 2004 WL 1724984, at *1 n.3 (S.D.N.Y. July 30, 2004). However, "Courts have repeatedly recognized that 'evidence of policies at one prison is not conclusive proof that the same policies would work at another institution.'" *Fowler*, 534 F.3d at 941 (*quoting Spratt*, 482 F.3d at 42). VDOC is not stripped of its discretion in deciding and implementing policy simply because the New York Department of Corrections has adopted another policy. *Id.* Moreover, this Court has no mechanism to mirror the negotiated outcome in the *Marria* case.

*See Fegans*, 537 F.3d at 907 (stating that RLUIPA does not "call[] for the federal courts to impose procedural requirements" on prisons).

Claim Two also fails to the extent Versatile argues that the failure to forward his request to the FRC resulted in a substantive RLUIPA violation. As discussed above, to demonstrate a RLUIPA violation, Versatile bears the initial burden of showing that the challenged practice substantially burdens an exercise of religion, which he has not done. Moreover, even assuming that a violation of VDOC procedure occurred, Versatile has not demonstrated that he was harmed. The uncontradicted evidence establishes that the FRC had denied a similar request for NGE religious recognition less than two months prior to Versatile's request for NGE recognition. Further, the Chairman of the FRC testified that after rendering a decision on a particular group, duplicative requests for religious recognition would not be considered for four to eight months. Even if Defendant Kelly had processed Versatile's application correctly, the FRC would not have considered it based on the timing of Versatile's duplicative request.

Even if the FRC would have considered Versatile's request, Versatile has not established that the FRC would have recommended that NGE be recognized as a religion based on his application. Although Meyers testified that information in Versatile's request would have been helpful in making a determination, no evidence suggests that any information in Versatile's request would have altered the FRC's recommendation that NGE not be recognized as a religion. Indeed, the record shows that the FRC again denied NGE religious recognition after Versatile submitted his request. Thus, Versatile has failed to demonstrate that Defendant Kelly's actions, and Defendant Robinson's subsequent ratification of those actions, were the proximate cause of any infringement of Versatile's religious liberty.

Regardless, during the evidentiary hearing, all the appropriate individuals looked over Versatile's request, considered whether NGE should be granted religious recognition, and opined that NGE should not be recognized as a religion within VDOC. Versatile has received full and fair process and has not demonstrated any harm under Claim Two. It is therefore RECOMMENDED that Claim Two be DISMISSED.

## VIII.  Conclusion

For the reasons stated above and based on the record presented in this case, it is RECOMMENDED that the Court DISMISS Claims One and Two based on Versatile's failure to demonstrate by a preponderance of the evidence that NGE is a religion which triggers RLUIPA's protections. Further, even if the Court were to assume that NGE is a religion, it is RECOMMENDED that

42

Claim One be DISMISSED because Defendants have demonstrated that the challenged procedures are the least restrictive means of furthering VDOC's compelling interest in prison security and that Claim Two be DISMISSED because Versatile has failed to demonstrate that any failure to follow VDOC procedure caused any infringement of Versatile's religious liberty. Accordingly, it is RECOMMENDED that Versatile's § 1983 action be DISMISSED WITH PREJUDICE.

(June 22, 2011 R&R.) On July 25, 2011, the Court received Versatile's objections.

## II. STANDARD OF REVIEW

This Court reviews *de novo* any part of the Magistrate Judge's R&R to which a party has properly objected. 28 U.S.C. § 636(b)(1). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). "[W]hen a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations," *de novo* review is unnecessary. *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982) (citations omitted); *see also Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 316 (4th Cir. 2005).

## III. ANALYSIS

### A.    Scope of the Court's Holding

At the outset, it is important to denote the scope of the Court's decision in this case. Defendants have argued that NGE, to which Versatile subscribes, is not a "religion" within the meaning of RLUIPA. In her proposed findings in Defendants' favor, the

43

Magistrate Judge did not accept Defendants' contention wholesale; rather, Judge Lauck found that Versatile had failed to sustain his burden to show that his beliefs are "religious in nature" for the purposes of his particular claim.

Notably, neither the Fourth Circuit nor any district court therein has definitively determined whether NGE "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986) (quoting *United States v. Seeger*, 380 U.S. 163, 166 (1964)). This Court need not decide that ultimate issue, and thus declines to do so. Instead, the Court agrees with Magistrate Judge Lauck that, for the limited purposes of the case at bar, Versatile has not established beyond a preponderance of the evidence that NGE is a "religion"–and not merely a "way of life"–such that it triggers RLUIPA's protections.[25] *See Lovelace v. Lee*, 472 F.3d 174, 185-86 (4th Cir. 2006) ("Under RLUIPA, ... 'the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion.'") (quoting 42 U.S.C. § 2200cc-2(b)). Therefore, this Court does not hold that NGE is not religion in *all* cases; rather, the Court finds that, given the record in this

---

[25]Although it was not central to the Magistrate Judge's analysis, the Court also notes that Versatile has not offered any evidence which suggests that the VDOC regulations at issue here imposed a "substantial" burden on the practice of his NGE beliefs, even if those beliefs are deemed "religious" in the first instance. "[F]or RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (citing *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). There is no indication in the record before the Court that VDOC's ban on Five Percenter news letters put substantial pressure on Versatile to modify his behavior and to violate his beliefs.

*particular* case, Versatile cannot carry his burden of persuasion to that end.

**B.      Disposition of Frivolous or Non-Dispositive Objections**

Versatile has filed sixty-one objections to the Report and Recommendation. The vast majority of these objections do not "focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas*, 474 U.S. at 147. That is, most of Versatile's objections are not probative of the Magistrate Judge's ultimate determination that Versatile's beliefs are not religious in nature and that Defendants employed the least restrictive means available to regulate Versatile's alleged religious exercise. Although Versatile asserts that Judge Lauck's discussion of NGE is incomplete, he fails to demonstrate that a more detailed treatment would alter the conclusion that NGE is not a religion. Thus, the Court will dispose of objections of this ilk as non-dispositive.

Versatile has also asserted numerous "[f]rivolous, conclusive or general" objections. Although such objections "need not be considered," *Tessler v. NBC Universal, Inc.*, No. 2:08cv234, 2009 WL 866834, at *2 (E.D. Va. Mar. 31, 2009) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)),[26] this Court will address each of Versatile's objections in turn.

---

[26] A petitioner's objections to an R&R must be specific and clear, and, where appropriate, include quotations from relevant testimony and cite directly to pertinent record evidence. *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988); *see also Orpiano*, 687 F.2d at 47; *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (requiring that objections direct the Court to a factual finding which is both "dispositive and contentious"); *Muscarella v. Barnhart*, 117 F. App'x 333, 334 (5th Cir. 2004) (rejecting irrelevant objections which have no bearing on the Magistrate Judge's report and recommendation).

## B.    Analysis of Individual Objections

### 1.    Objection 1

Objection 1 contests the Magistrate Judge's purported "mischaracterization" of a list of documents which NGE members must study. (Objections 2.) The quote with which Versatile takes issue reads, "In Claim One ('the Blanket Ban Claim'), Versatile alleges that, as a member of NGE, he is required to study the following documents: the 120 Degrees, the Supreme Mathematics, the Supreme Alphabet, NGE monthly national statements, and NGE's national newspaper, *The Five Percenter*." (R&R 2–3.)

Versatile argues that the "Magistrate Judge failed to include that plaintiff is required to study the universal flag (history), observe holy days (honor days), conduct civilization classes and gather monthly for parliaments."[27] (Objections 2–3.) The Magistrate Judge made a list of *documents* which NGE members must study. Versatile does not list additional documents which NGE members must study. His objection, therefore, "do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982) (citations omitted). Accordingly, Objection 1 will be overruled.

### 2.    Objections 2 and 3

In Objections 2 and 3, Versatile objects to the Magistrate Judge's statement: "[S]ince 1996, VDOC has classified NGE as a Security Threat Group or gang rather than

---

[27] The Court has corrected the capitalization in quotations to Versatile's submissions.

a religion." (R&R 3.)  Specifically, Versatile argues that other five-percent groups–but
not NGE–have been classified as Security Threat Groups.  (Objections 4 ("Because the
term Five Percent refers to Muslims and Muslim-sons, the NGE was never officially
classified as a STG or gang since 1996.").)  Versatile contends that the record does not
support the proposed finding that NGE was classified as a gang in 1996.

The record refutes Versatile's assertion.  Versatile cross-examined Gene Johnson
as follows:

BY MR. VERSATILE:

Q   Mr. Johnson, isn't true that your underlying reason that you gave in
     1996 for disallowing Five Percenters Nation of Gods and Earths was
     because based on review of information that we was not religious in
     nature?

A   It was based on information that it was not a religion, and it was also
     based on information that Five Percenters had been identified as
     security threat groups.

     . . . .

Q   When did the Department of Corrections classify Nation of Gods and
     Earths as a gang?

A   As a gang?

Q   Yes.

A   They were identified as a security threat group back in prior to '95, I
     would say.

(Evid. Hr'g Tr. 548–49, 557.)  The record makes clear that NGE was classified as a
Security Threat Group in the 1990s.  Objections 2 and 3 lack merit and will be overruled.

47

### 3.    Objection 4

In Objection 4, Versatile complains about the Magistrate Judge's proposed finding that "Defendants dispute whether Kelly violated VDOC regulations and argue that her failure to act did not result in any harm." (R&R 3–4; *see* Objections 5–6.) Versatile contends that the record conclusively shows that Kelly violated VDOC regulations.

The record supports the Magistrate Judge's characterization of Defendants' positions. Robinson testified that Kelly's actions, as alleged, technically would have violated VDOC policy. (Evid. Hr'g Tr. 248.) Nevertheless, Robinson and Johnson agreed that Kelly was free to use her discretion regarding whether to route Versatile's grievance. (Evid. Hr'g Tr. 243, 563.) The record, therefore, supports the Magistrate Judge's proposed finding that the Defendants generally disputed whether Kelly violated the prison's regulations. Versatile's objection lacks merit. Accordingly, Objection 4 will be overruled.

### 4.    Objection 5

In Objection 5, Versatile argues that he suffered harm from Defendant Kelly's failure to route his request properly. (Objections 6.) The record is clear that any error Defendant Kelly committed was harmless. Testimony at the evidentiary hearing showed that even if Kelly had appropriately processed and routed Versatile's request, the Faith Review Committee would have denied the request. (Evid. Hr'g Tr. 248 ("If there would have been a routing slip the decision would have been the same."); *id.* at 287 ("[I]f we

48

had turned it down in the previous four months, or the previous eight months, and there is no new information that is presented, then I really don't think it is cost beneficial for us to review it.").) Versatile's present objection merely argues that the Magistrate Judge should have arrived at the opposite conclusion. As this conclusory objection "do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations," *Orpiano*, 687 F.2d at 47 (citations omitted), it will be overruled.

### 5. Objection 6

In Objection 6, Versatile contends that Defendants' Exhibit 6 should not have been admitted into evidence. (Objections 8.) Exhibit 6 was "a fairily [sic] lengthy document." (Evid. Hr'g Tr. 82.) Versatile was able to review Exhibit 6 before the evidentiary hearing. (*Id.*) While he was on the stand at the evidentiary hearing, he reviewed it again.

Exhibit 6 began "with the Student Enrollment." (*Id.*) In addition to the Student Enrollment, Exhibit 6 included other documents. One of those documents was a document which "was confiscated as a Book of Knowledge, or 120 Degrees."[28] (*Id.*) Versatile agreed that the document was "somebody's Book of Knowledge." (*Id.* at 83.) At the time Versatile authenticated Exhibit 6, it was not offered into evidence.

Randy Meyers, Vice-President of Chaplain Service Prison Ministry of Virginia, testified on direct examination about Exhibit 6. He identified it as the 120 Degrees or 120 Questions. (Evid. Hr'g Tr. 302.) At that time, although Defendants had not offered the

---

[28] The Book of Knowledge and 120 Degrees refer to the same thing. (Evid. Hr'g Tr. 89.)

Exhibit into evidence, Versatile objected to the Exhibit's introduction. Versatile

explained that he had read Exhibit 6 and that the 120 Degrees were not in it. (*Id.*) The

Court asked Versatile about his previous testimony that Exhibit 6 did include the 120

Degrees. Versatile's response was unclear.[29] The Court overruled the objection but

permitted Versatile to cross-examine Meyers about the Exhibit. (*Id.* at 303.) On cross-

examination, Versatile asked Meyers several questions about the Exhibit. (*Id.* at 355–56.)

None of his questions raised the issue of the admissibility of the Exhibit.

Thereafter, VDOC Gang Specialist Michael Duke testified about Exhibit 6. Duke

testified that Exhibit 6 was part of the Book of Knowledge. (*Id.* at 443.) At that time, the

Defendants offered Exhibit 6 into evidence. Versatile did not object to the Exhibit's

admissibility.

In the Report and Recommendation, the Court overruled Versatile's objection to

the admissibility of Exhibit 6 once more. (R&R 6 n.6) Versatile objects to the Magistrate

Judge's ruling on three grounds. First, Versatile argues that Exhibit 6 was not properly

authenticated. The objection will be overruled because three individuals, including

Versatile, authenticated Exhibit 6. Second, Versatile argues that Exhibit 6 was not made

available to him sufficiently in advance of being admitted into evidence. This objection

will be overruled because the record makes clear that the Exhibit was provided to

---

[29] The Court explained Versatile's inconsistent statements: "You testified before. You said, I would say this is someone's Book of Knowledge when asked about that exhibit." (Evid. Hr'g Tr. 302–03.) Versatile responded, "I specifically stated what are required, which is --." (*Id.* at 303.)

Versatile before the May 27, 2010 evidentiary hearing (Evid. Hr'g Tr. 82), and it was not offered into evidence until June 2, 2010 (*id.* at 444). Third, Versatile argues that the various subparts of Exhibit 6 were not properly labeled and numbered. This objection will be overruled because Versatile has not shown that any lack of labeling or numbering prejudiced the outcome of the proceeding. Accordingly, Objection 6 will be overruled.

### 6.    Objection 7

In Objection 7, Versatile contends that the Magistrate Judge applied the incorrect pleading standard for RLUIPA claims. (Objections 7.) Specifically, Versatile complains that he should not have to bear the initial burden of showing *by a preponderance of the evidence* that (1) he seeks to engage in an exercise of religion, and (2) the challenged practice substantially burdens that exercise. 42 U.S.C. § 2000cc-2(b). Versatile's objection lacks merit. The Magistrate Judge appropriately cited and applied the correct pleading standard. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 663 (10th Cir. 2006) (explaining that a jury should be instructed that a RLUIPA plaintiff must plead evidence beyond a preponderance of the evidence). Accordingly, Objection 7 will be overruled.

### 7.    Objection 8

In Objection 8, Versatile argues that the Magistrate Judge erred when she employed a modified *Africa/Meyers* test to determine whether his belief in NGE's tenets is religious in nature. (Objections 15.) Versatile contends that the Court should use a

51

Jamesian or anthropological evaluative test instead. (Objections 17.) As the Magistrate Judge noted, however, the Fourth Circuit has cited with approval–albeit in an unpublished opinion–the test that the Third Circuit announced in *Africa*. *See Doswell v. Smith*, No. 94-6780, 1998 WL 110161, at *3 (4th Cir. Mar. 13, 1998). More significantly, the record before the Court does not contain the pertinent anthropological expert testimony or outside community evidence necessary to apply either of the approaches Versatile now urges this Court to adopt. (R&R 12 n.11.)

Versatile offers no argument for using a different standard other than conclusively stating that the modified *Africa/Meyers* test is discriminatory. Versatile does not elaborate on this contention, and does not direct the Court to anything in the record which suggests that an alternative standard would yield a different conclusion than the one reached here by Judge Lauck. The Court agrees with the Magistrate Judge's use of the *Africa/Meyers* test. Accordingly, Objection 8 will be overruled.

### 8. Objection 9

Objection 9 contests the following quotation used in the R&R: "'The Original Man is the Asiatic Black Man, the Maker, the Owner, the Cream of the Planet Earth, God of the Universe.'" (R&R 13–14 (alteration in original) (quoting Pl.'s Ex. 5, Enc. A, Answers ¶ 1).) Versatile argues that different wordings may be used to represent this idea. Even if that is so, this is a direct quotation from Versatile's exhibit. Additionally, the issue is not dispositive to the Court's ruling. Accordingly, Objection 9 will be overruled.

### 9.     Objection 10

Objection 10 challenges the Magistrate Judge's observation that members of NGE use the words ALLAH and ISLAM as acronyms.  (Objections 20.)  Versatile contends that the Magistrate Judge mischaracterized NGE adherents' understanding of those acronyms, resulting in what Versatile calls theological discrimination.  This objection does not "focus attention on those issues—factual and legal—that are at the heart of the parties' dispute."  *Thomas*, 474 U.S. at 147.  Accordingly, Objection 10 will be overruled.

### 10.     Objection 11

In Objection 11, Versatile complains about the Magistrate Judge's proposed finding that "NGE teaches that the white man is the devil."  (Objections 21; R&R 14.)  Versatile contends that not all white people are devils, "just the ones who do devilishment."  (Objections 21.)  Versatile clarifies that there are worse devils than the white devil, which includes the black devil.  (*Id.*)  This objection is not dispositive and will therefore be overruled.

### 11.     Objection 12

In Objection 12, Versatile complains about the Magistrate Judge's following statement:  "Versatile presented testimony suggesting that NGE adherents attempt to destroy or murder the evil nature of the devil, and not physically murder the devil."  (R&R 15 (citing Evid. Hr'g Tr. 129–30, 155).)  Versatile explained that this testimony

was from a Nation of Islam member who was reciting his understanding of Lost and Found Muslim Lesson Number One.

Versatile also objects to the Magistrate Judge's quotation of Versatile, who stated, "That is why we identify [them] as the devil." (R&R 15 (alteration in original).) Versatile explains that he said, "That is *what* we identify as the devil."[30] (Objections 24.) Objection 12 is not dispositive, and therefore will be overruled.

### 12.   Objection 13

Objection 13 takes issue with the Magistrate Judge's proposed finding that the name Five Percenters "derives from their classification of humanity into groups based on their attitude towards the proposition that black men literally are God." (R&R 15; Objections 25.) Versatile argues that the term Five Percent actually derives from teachings of prophets. Versatile also complains that the Magistrate Judge did not explain that the Five Percent are also known as Muslim and Muslim-son. (Objections 25.) Objection 13 is not dispositive. Accordingly, it will be overruled.

### 13.   Objection 14

Objection 14 asserts that the Magistrate Judge misquoted the record and by doing so, the Magistrate Judge excluded "key evidence that shows that VDOC officials are theologically discriminating against the NGE members by denying NGE members from

---

[30] This is the first of several objections centered on alleged errors in the transcript. Versatile submitted a comprehensive list of the alleged errors on July 16, 2010. (Dk. No. 97.) He re-raised those errors in his Motion for Relief from Judgment. (Dk. No. 109.) None of the alleged errors is dispositive to the Court's determinations. Accordingly, Versatile's Motion for Relief from Judgment (Dk. No. 109) will be denied.

studying the same body of lessons that are allowed to NOI members." (Objections 26.)
The basis for Versatile's objection is unclear. Versatile essentially tries to distinguish the
Nation of Islam from the NGE. Versatile's objection is not dispositive. Consequently, it
will be overruled.

### 14.    Objection 15

In Objection 15, Versatile takes issue with the Magistrate Judge's proposed
finding that "NGE adherents typically possess handwritten copies of what they call their
foundational works." (R&R 16; Objections 27.) Versatile explains that sometimes these
documents are handwritten, and other times they are printed. This objection is not
dispositive. Accordingly, it will be overruled.

Versatile also objects to the admission of Defendants' Exhibit 6. (Objections 27.)
Versatile's argument is substantially similar to that raised in Objection 6. The Court will
overrule this objection for the same reasons it will overrule Objection 6.

### 15.    Objection 16

In Objection 16, Versatile objects to the Magistrate Judge's characterization of the
NGE's mandatory lessons. (Objections 28–29.) The Magistrate Judge found that "[t]he
foundational works of NGE are embodied in two sets of short written passages." (R&R
16.) Versatile explains that the mandatory teachings appear in eight different writings.
(Objections 29.) The evidence Versatile cited in support of his objection largely tracks

the Magistrate Judge's description of the relevant writings. (*See* R&R 16–17.) This objection is not dispositive and will be overruled.

### 16     Objection 17

In Objection 17, Versatile complains about the Magistrate Judge's characterization of NGE's Supreme Mathematics and Supreme Alphabets. (Objections 30.) He further explains how the Supreme Alphabets and Supreme Mathematics work. Objection 17 is not dispositive and will be overruled.

### 17.     Objection 18

In Objection 18, Versatile explains that "NGE do not define ourselves as a religion." (Objections 31.) Nevertheless, Versatile argues that "just because he does not use the word religion to describe the NGE," he still wants protections afforded under RLUIPA. (Objections 31.) This is a conclusory objection "that do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano*, 687 F.2d at 47 (citations omitted). Accordingly, it will be overruled.

### 18.     Objection 19

Objection 19 takes issue with the Magistrate Judge's proposed finding that a Nation of Islam member, testifying on Versatile's behalf, explained that Nation of Islam is a religion, whereas NGE is a culture or way of life. (Objections 32; R&R 19.) The Court has reviewed the transcript, and finds Judge Lauck's summary of the testimony to

be accurate. (Evid. Hr'g Tr. 132.) Versatile also re-raises Objection 18. This objection will be overruled.

### 19.    Objection 20

In Objection 20, Versatile clarifies the meanings of the acronyms NGE uses. (Objections 33–34.) The objection is not dispositive and will be overruled.

### 20.    Objection 21

In Objection 21, Versatile complains about the Magistrate Judge's proposed finding that "NGE adherents . . . do not believe that either Clarence 13X or Wallace Fard Muhammad was spiritual or divine in some sense that other members of NGE are not." (R&R 20; *see* Objections 33, 35.) Versatile distinguishes between Nation of Islam and NGE in this regard. Because Objection 21 is not dispositive, it will be overruled.

### 21.    Objection 22

In Objection 22, Versatile complains about the Magistrate Judge's proposed finding that "[i]t is unclear whether Versatile uses the term 'divine' in the ordinary sense or as defined by the Supreme Alphabet to mean 'anything that has not been mixed, tampered with or diluted.'" (R&R 20 (citing Defs.' Ex. 5 ¶ 4).) Versatile complains that he does not know how Defendants' Exhibit 5 defines the Supreme Alphabet because he was provided only a redacted copy of that Exhibit. (Objections 36.) This objection does not "focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas*, 474 U.S. at 147. Accordingly, it will be overruled.

57

### 22.    Objection 23

Objection 23 challenges the Magistrate Judge's proposed finding that "NGE does not appear to have any teaching regarding an afterlife." (R&R 20.)  Versatile then explains his beliefs about the afterlife.  (Objections 37.)  The record supports the Magistrate Judge's proposed finding regarding NGE's position on the afterlife.  (Evid. Hr'g Tr. 86–87.)  Versatile's explanation does not add to this finding.  Therefore, the objection will be overruled.

### 23.    Objection 24

In Objection 24, Versatile complains that the Magistrate Judge misquoted the transcript when she found that "Versatile describes the Supreme Mathematics as the 'mores and principles of the Nation.'" (R&R 20 (quoting Evid. Hr'g Tr. 24).)  Versatile explains that he said "morals" not "mores." (Objections 38.)  This objection is not dispositive.  Accordingly, it will be overruled.

### 24.    Objection 25

Objection 25 disputes the Magistrate Judge's finding that freedom, justice, and equality "have universal ethical connotations" but "bear different meanings for NGE adherents." (R&R 21.)  Versatile objects because the Magistrate Judge based her proposed finding on Defendants' exhibits rather than Versatile's own testimony.  Versatile's objection is not dispositive.  It will be overruled.

### 25.   Objection 26

In Objection 26, Versatile takes issue with the Magistrate Judge's proposed

finding that "NGE also teaches that Caucasians are a mentally and physically inferior

race, are the devils, and must be taken off the planet." (R&R 21.) Versatile clarifies that

NGE does not teach its members to murder white people. (Objections 40.) Versatile

explains that NGE members live righteously by not permitting devilishment to enter their

mental, emotional, physical, or spiritual planes of mind and body. (Objections 41.) This

objection is not dispositive. Accordingly, it will be overruled.

### 26.   Objection 27

In Objection 27, Versatile reasserts arguments raised in Objection 6. (Objections

42.) The Court will overrule Objection 27 for the reasons it will overrule Objection 6.

### 27.   Objection 28

Objection 28 challenges the Magistrate Judge's description of NGE honorary days

as tributes to Clarence 13X. (Objections 43.) Versatile explains that he refers to

Clarence 13X as Father Allah. According to Versatile, the Magistrate Judge was

incorrect when she found that "NGE adherents do not appear to celebrate anything holy

or sacred on these days." (R&R 30.)

The Magistrate Judge merely lists the honorary days that NGE adherents

recognize. Versatile "do[es] not direct the court to a specific error in the magistrate's

proposed findings and recommendations." *Orpiano*, 687 F.2d at 47 (citations omitted). Accordingly, Objection 28 will be overruled.

### 28.   Objection 29

Objection 29 contests the Magistrate Judge's characterization of the NGE flag. (Objections 43–44.) Versatile explains the symbolism in the flag in greater detail than did the Magistrate Judge. However, Versatile's objection is not dispositive, and it will therefore be overruled.

### 29.   Objection 30

In Objection 30, Versatile complains about the Magistrate Judge's proposed finding that "NGE adherents practice no rites equivalent to marriage, baptism, or other recognized practices."[31] (R&R 23.) Versatile does not dispute this finding, but merely explains other ways in which NGE adherents act in accordance with NGE principles. (Objections 45.) This objection "do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano*, 687 F.2d at 47(citations omitted). Accordingly, Objection 30 will be overruled.

### 30.   Objection 31

In Objection 31, Versatile disputes the Magistrate Judge's quote, "'[Pork] is not a full product, it is a savage, it is a beast.'" (R&R 23 (quoting Evid. Hr'g Tr. 95–96).)

---

[31] This issue is not conclusive of whether NGE is a religion. (R&R 31.)

Versatile contends he said that pork is not a *food* product.  (Objections 46.)  Versatile's

objection is not dispositive.  Accordingly, it will be overruled.

### 31.    Objection 32

In Objection 32, Versatile complains about the Magistrate Judge's proposed

finding that NGE does not have a leader.  (R&R 24.)  Versatile contends that NGE has a

national office and national headquarters.  (Objections 47.)  He does not identify any

leader of the NGE.  The objection does not identify any error in the Report and

Recommendation.  Accordingly, it will be overruled.

### 32.    Objection 33

Objection 33 challenges the Magistrate Judge's proposed finding that "[n]umerous

witnesses testified that they had never encountered or seen a commercially available,

standard publication of NGE material and that one was not available from the official

NGE website or NGE's national headquarters."  (R&R 24.)  In essence, Versatile argues

that the witnesses who testified in this manner did so untruthfully.  (Objections 48.)

Versatile nevertheless does not identify any "commercially available, standard publication

of NGE material" or otherwise dispute any aspect of the Magistrate Judge's proposed

finding.  (R&R 24.)  Accordingly, the objection will be overruled.

### 33.    Objection 34

Objection 34 contests the Magistrate Judge's entire analysis and the R&R as a

whole.  (Objections 49.)  Because this is a conclusory objection "that do[es] not direct the

court to a specific error in the magistrate's proposed findings and recommendations," *Orpiano*, 687 F.2d at 47 (citations omitted), it will be overruled.

### 34.    Objection 35

In Objection 35, Versatile objects to the Magistrate Judge's application of the *Africa/Meyers* test. (Objections 50–52.) This objection will be overruled for the reasons explained in the discussion rejecting Objection 8.

### 35.    Objection 36

In Objection 36, Versatile takes issue with the Magistrate Judge's proposed finding that "the term 'God,' as used by NGE members, appears to denote the superiority of black men over other races." (R&R 27.) Versatile does not identify any error in the Magistrate Judge's finding. He merely explains what he thinks the implications of this finding are. (Objections 52 ("So basically the magistrate has said it is illegal for the Blackman to be God, and that it is also dangerous for the Blackman to be God.").) Accordingly, this objection will be overruled.[32]

### 36.    Objection 37

In Objection 37, Versatile complains about the Magistrate Judge's proposed finding that "[a]side from the basic tenets of family and black unity, there appears to be no moral component to NGE." (R&R 29.) In response, he explains that the Supreme

---

[32] Versatile also makes various conclusory objections regarding (1) the NGE's definition of their beliefs as a way of life or a culture, (2) the fact that NGE adherents believe a supreme being lives and dwells within them, (3) Versatile's assertion that NGE's founder is divine, and (4) Versatile's beliefs. (Objections 50–51.) Versatile does not devote any facts or argument to these objections. Accordingly, they will be overruled.

Mathematics and Supreme Alphabets are an NGE adherent's "living code of ethics." (Objections 53.) Versatile admits, however, that NGE does not have a "scripted" system of morals. (Objections 54.) Versatile asserts that "no man can judge for another we all must judge for our own selves." (Objections 54.) This concession is not at odds with the Magistrate Judge's finding. *Cf. Jacques v. Hilton*, 569 F. Supp. 730, 734 (D.N.J. 1983) ("Self-determination of one's beliefs on an individual basis can scarcely be considered a religion."). Accordingly, this objection will be overruled.

### 37. Objection 38

Objection 38 disputes the Magistrate Judge's proposed finding that NGE does not recognize a divine founder or prophet. (Objections 54–55.) Versatile claims that he believes Clarence 13X to be divine. The weight of the record, however, "suggests that Clarence 13X is not recognized as divine in any supernatural sense. Aside from being the founder of NGE, he is considered no different than any other black man." (R&R 30.) Versatile has not countered this finding with anything other than his own testimony. Moreover, Judge Lauck explained that the conflicting evidence regarding this factor weighed in favor of neither party. (R&R 31.) Therefore, this objection will be overruled.

### 38. Objection 39

Objection 39 contests the Magistrate Judge's proposed finding that NGE does not compare to established or recognized religions which include external signs of religious beliefs. (Objections 54, 56.) The Magistrate Judge found that the evidence of external

signs of religiosity was, at best, "conflicting." (R&R 31.) Versatile cites cases which

suggest an opposite finding. He does not, however, identify any particular error in the

Magistrate Judge's finding or analysis. Additionally, the Magistrate Judge explained that

the conflicting evidence regarding this factor weighed in favor of neither party. (R&R

31.) Accordingly, this objection will be overruled.

### 39.    Objection 40

In Objection 40, Versatile disputes the Magistrate Judge's proposed finding that

the record does not suggest that NGE maintains a structure of organization or keepers of

knowledge. (Objections 55, 57.) Although Versatile explains that NGE has

representatives that work in a national headquarters, he does not identify any error with

the Magistrate Judge's finding that these representatives are not equivalent to "clergy,

ministers, priests, reverends, monks, shamans, teachers, or sages."[33] *United States v.*

*Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996). Further, the Magistrate Judge explained

that the conflicting evidence regarding this factor weighed in favor of neither party.

(R&R 31.) Therefore, this objection will be overruled.

### 40.    Objection 41

Objection 41 takes issue with the Magistrate Judge's proposed finding that

Versatile failed to identify and explain a universal and consistent body of NGE teachings.

(Objections 55, 67; R&R 30.) Versatile contends that he testified about literature that

---

[33] To the extent that Versatile objects to the Magistrate Judge's finding on this specific
point (Objections 55), the objection is not supported by any factual or legal argument.

NGE adherents are mandated to study. The NGE teachings, however, are not consistently applied. "NGE adherents are free to decide their own code of personal morality" (R&R 21) and "each adherent is his own keeper of a body of self-selected knowledge" (R&R 30). Versatile's objection does not identify any error in the Magistrate Judge's proposed findings. Because "differing beliefs and practices are not uncommon among followers of a particular creed," *Dettmer*, 799 F.2d at 932 (citing *Thomas v. Review Bd.*, 450 U.S. 707, 715 (1981)), the Magistrate Judge properly deemed the conflicting evidence on this issue not to weigh in favor of either party. (R&R 31.) Thus, Objection 41 will be overruled.

### 41.    Objection 42

In Objection 42, Versatile complains about the Magistrate Judge's proposed finding that Versatile presented no evidence of NGE ceremonies or rituals imbued with transcendental significance. (Objections 55, 58.) Versatile explained on cross-examination that whereas Christians gather at churches, NGE adherents gather at ciphers, during which the NGE adherents "come together and . . . expound upon the lessons or the teachings of Allah." (Evid. Hr'g Tr. 79.) But, the record does not support Versatile's assertion that such group ciphers provide a transcendental experience for NGE adherents, and Versatile directs the Court to no additional evidence that would suggest otherwise. Moreover, the Magistrate Judge found the conflicting evidence regarding this factor to weigh in favor of neither party. (R&R 31.) Accordingly, the objection will be overruled.

### 42.   Objection 43

Objection 43 challenges the Magistrate Judge's proposed finding that the NGE flag symbolizes the black man's dominance. (Objections 55, 59; R&R 31.) Specifically, Versatile argues that the Magistrate Judge did not fully explain the symbolic meaning of each aspect of the flag. He does not, however, identify any error in the Magistrate Judge's Report and Recommendation. Further, Judge Lauck explained that the conflicting evidence regarding this factor weighed in favor of neither party. (R&R 31.) Therefore, Versatile's objection will be overruled.

### 43.   Objection 44

In Objection 44, Versatile contests the Magistrate Judge's proposed finding that the record does not indicate that NGE mandates a specific physical appearance or dress. (Objections 55, 60.) Versatile cites evidence which suggests that, on one day only, ceremonial garb may be worn. (Pl.'s Ex. 3, Enc. A, at 6–9.) But, Versatile admits that NGE members "normally ... do not have a certain dress code." (Objections 60.) Additionally, the Magistrate Judge found the conflicting evidence as to this factor to weigh in favor of neither party. (R&R 31.) Because the Magistrate Judge accurately summarized the record and assessed its relevance to the determination of whether NGE is a religion, this objection will be overruled.

### 44.   Objection 45

In Objection 45, Versatile complains about VDOC's classification of NGE as a security threat group or a gang.  Versatile explains that VDOC exaggerates the security concerns presented by NGE.  (Objections 65.)  Versatile also objects to VDOC's classification of NGE has a gang.  The objection, however, "do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations."  *Orpiano*, 687 F.2d at 47 (citations omitted).  Accordingly, the objection will be overruled.

### 45.   Objection 46

In Objection 46, Versatile complains about the Magistrate Judge's proposed finding that Gary Clore testified that NGE adherents taught their lessons and engaged in militant training activities.  (Objections 67; R&R 32.)  Versatile contends that the Magistrate Judge should not have given credence to Clore's testimony because Clore was lying.  The record reflects that Clore testified about the violent nature of NGE adherents.  (Evid. Hr'g Tr. 372–73.)  NGE adherents taught each other to march and defend themselves against pat downs.  (*Id.*)  Versatile did not object to the questions or answers.  Although Versatile cross-examined Clore, Versatile did not ask any questions regarding the testimony he now challenges.  Because Versatile offers no discernible reason for discrediting Clore's testimony, Objection 46 will be overruled.

### 46.   Objection 47

In Objection 47, Versatile objects to the Magistrate Judge accepting Clore and

Duke as expert witnesses.  When Clore and Duke were proffered as experts, Versatile did

not object.  (Evid. Hr'g Tr. 366, 441.)  Accordingly, Versatile's present objection is

untimely.  *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983);  *DiPaola v. Riddle*,

581 F.2d 1111, 1113 (4th Cir. 1978) ("A party should not be permitted to stand silently by

and later to contest the admissibility of crucial evidence only after the fact finding has

gone against him.");  Fed. R. Evid. 103(a)(1) (requiring a "timely objection . . . stating the

specific ground of objection").  Objection 47 will be overruled.

### 47.   Objection 48

Objection 48 disputes the Magistrate Judge's proposed finding that by 1996,

VDOC had identified NGE as a security threat group.  (Objections 70; R&R 34.)  The

objection will be overruled for the same reasons that the Court rejects Objections 2 and 3.

### 48.   Objection 49

In Objection 49, Versatile complains that the Magistrate Judged did not cite the

Virginia Code when explaining how a gang is defined.  (Objections 70–71; R&R 35.)

This objection is not dispositive and will be overruled.

### 49.   Objection 50

In Objection 50, Versatile objects to the Magistrate Judge citing the VDOC

Operating Procedure 803.2 as amended November 1, 2010.  (Objections 71; R&R 35

n.16.) Versatile contends that the policy changed on February 28, 2011. Versatile does

not allege that the new policy affects any specific dispositive finding by the Magistrate

Judge.[34] The objection is not dispositive and will be overruled.

### 50.    Objection 51

Objection 51 contests the Magistrate Judge's proposed finding that the Publication

Review Committee reviewed NGE lessons and "placed them on the Disapproved

Publication Log as violating one or more of the specific criteria and as containing

material which could be detrimental to institutional order, security and/or the

rehabilitation of inmates." (R&R 37 (internal quotation marks omitted).) Versatile

contends that the record establishes that VDOC officials have never seen a *published* set

of NGE lessons. Versatile overlooks the fact that the record is clear that the lessons are

normally handwritten. (*See, e.g.*, Evid. Hr'g Tr. 317.) This objection will be overruled.

### 51.    Objection 52

In Objection 52, Versatile objects to the Magistrate Judge's proposed finding that

"VDOC officials . . . testified that NOI members may not possess the 120 Degrees."

(R&R 37 n.17.) Versatile mischaracterizes the testimony concerning whether NOI

members may possess the 120 Degrees. Versatile fails to demonstrate that NOI members

and NGE adherents study the same lessons.

---

[34] The only specific change that Versatile alleges—one that he calls "notable"—concerns
the fact that the Publications Review Committee now meets monthly instead of quarterly.
(Objections 73; R&R 36.)

The Magistrate Judge's finding was based in part on the testimony of Special Programs Manager Louis Cei. Cei testified that members of the Nation of Islam do not study the 120 Degrees, and are not allowed to possess it. (Evid. Hr'g Tr. 290–91.) Versatile bases his objection on testimony by Clore and Meyers. The testimony to which Versatile directs the Court does not suggest any error in the Magistrate Judge's proposed findings. Rather, the testimony suggests that members of the Nation of Islam study their own lessons, including the writings and teachings of Elijah Muhammad. (Evid. Hr'g Tr. 310, 336, 401–04, 557.) Because this testimony does not contradict with Cei's testimony, Versatile's objection will be overruled.

### 52.   Objection 53

In Objection 53, Versatile complains about the Magistrate Judge's proposed finding that "Defendants . . . could not offer a definite explanation as to why a majority of issues of *The Five Percenter* starting with Volume 9.8 were disapproved, while previous volumes were approved." (R&R 39.) Versatile's objection rests solely on the allegation that he is a party to a 2002 settlement agreement with the Commonwealth of Virginia, permitting him to possess issues of *The Five Percenter*. Versatile does not identify any error in the Report and Recommendation, and his argument is beyond the scope of his complaint. Accordingly, Objection 53 will be overruled.

### 53.    Objection 54

In Objection 54, Versatile disputes the Magistrate Judge's proposed finding that

"[i]n 2010, VDOC was placed under a hiring freeze and is operating under a considerable

amount of vacancies." (R&R 40.) Versatile argues that because Virginia has a $311

million surplus for the fiscal year, VDOC will receive all necessary funds. (Objections

77–78.) Versatile also contends that VDOC is no longer on a hiring freeze. Versatile

does not direct the Court to any evidence in support of these assertions. Moreover,

Versatile has not identified any particular error in Judge Lauck's determination that no

less restrictive measure is available to VDOC to effectively maintain security and order in

its facilities. Accordingly, the objection will be overruled.

### 54.    Objection 55

Objection 55 contests the Magistrate Judge's proposed finding that VDOC

regulations prohibit the redaction of publications. (R&R 40.) Versatile alleges that

operating procedure has been revised to permit redaction. The document that he attached

to his objection does not mention redaction. Because Versatile has not directed the Court

to evidence substantiating his claim, Objection 55 will be overruled.

### 55.    Objection 56

In Objection 56, Versatile asserts that Clore lied on the stand because NGE is not

on the Homeland Security Watch List. (Objections 78.) The testimony that Versatile

cites, however, supports Clore's contention and the Magistrate Judge's corresponding

finding. (*See* Evid. Hr'g Tr. 269–70 (indicating that NGE is on the Homeland Security watchlist).) Versatile does not offer any evidence to suggest that Clore perjured himself. The objection will be overruled.

### 56.    Objection 57

In Objection 57, Versatile contends that the Court violated the separation of power doctrine and the separation of church and state by permitting Meyers to testify for the Defendants, because Meyers is not employed by the State.[35] (Objections 79.) Versatile offers no legal authority to support this position. His objection is therefore overruled.

### 57.    Objection 58

Objection 58 concerns the Magistrate Judge's decision not to consider some of Meyers's testimony. (Objections 80.) The Magistrate Judge reported that Meyers found NGE's beliefs to be racist, antisocial, and religiously intolerant and that such beliefs would detract from a therapeutic prison environment. In a footnote, the Magistrate Judge noted that she did not weigh this factor in determining whether NGE was a religion under RLUIPA. (R&R 44 n.20.) Versatile appears to attribute this footnote to a different section beginning at the bottom of the same page of the Report and Recommendation. He contends that the Magistrate Judge's failure to consider certain evidence violates his rights. Because the evidence the Magistrate Judge declined to consider was disfavorable to Versatile, Objection 58 will be overruled.

---

[35] Meyers is an ordained clergyman and Vice President of Chaplain Service Prison Ministry of Virginia, an inter-denomination agency independent from VDOC.

### 58.   Objection 59

Objection 59 challenges the Magistrate Judge's proposed finding that "VDOC has demonstrated a compelling interest in preventing security risks posed by unrestricted access to NGE materials which promote racial and religious animosity, incite violence, or encourage gang activity." (R&R 48.) In support of his objection, Versatile asserts that (1) no evidence exists showing that NGE lessons cause violence; (2) Clore has set out to destroy NGE; (3) Meyers's testimony violates the separation of powers and the separation of church and state; and (4) the Magistrate Judge's Report and Recommendation is not rational, sound, or justified. (Objections 80–83.) Versatile's objection is rife with conclusions. For example, Versatile suggests that because both Randy Meyers and Gary Clore are on the Faith Review Committee, and because neither has approved a Five Percenter newspaper, VDOC acted arbitrarily or unreasonably. (Objections 83.) Versatile also equates the Supreme Alphabet and Supreme Mathematics to foreign languages which offenders are permitted to speak in the presence of correctional officers.

Versatile's arguments are unpersuasive. He generally disagrees with the Magistrate Judge's proposed findings. Versatile repeats many of the objections previously rejected and fails to cogently identify any specific error in the Magistrate Judge's reasoning. For the reasons stated by the Magistrate Judge, however, and because "courts must accord wide-ranging deference to prison administratosr' decisions concerning the proper means to accomodate prisoners' rights to the needs of internal

order and discipline," *Dettmer*, 799 F.2d at 934 (quotations and citation omitted), the Court concludes that NGE adherents may present a security risk if VDOC provides them unrestricted access to materials which promote racial and religious animosity, incite violence, or encourage gang activity. *Cf. In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999) ("In the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order...."). Accordingly, Objection 59 will be overruled.

### 59.    Objection 60

In Objection 60, Versatile challenges the Magistrate Judge's proposed finding that VDOC has implemented the least restrictive means through its adoption and application of the operating procedure related to publication approval. (Objections 85; R&R 51.) Although the "least restrictive means" standard is a demanding one, it must be applied "with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Lovelace*, 472 F.3d at 189-90 (citations omitted). This Court treats security concerns with "particular sensitivity." *Id.* Here, Versatile's objections do not overcome the deference to which VDOC is entitled in the operation of its facilities.

74

First, Versatile suggests that the fact that VDOC has a new director and the fact that the Operating Procedures have been amended somehow invalidates the Magistrate Judge's finding.  Versatile offers no persuasive support for this conclusion.

Versatile also claims that the Defendants have not responded to his proposal for a less restrictive means.  (Dk. No. 30.)  The Court did not order Defendants to do so. Moreover, Versatile's proposal would merely subject NGE's newspapers to the same process they now undergo.  Specifically, Versatile proposed that NGE newspapers be subject to VDOC Operating Procedure 803.2.  This is precisely the individualized review process that each issue of NGE's newspapers is currently subjected.

Finally, Versatile asserts that VDOC no longer suffers from a hiring freeze. (Objections 86.)  Versatile offers no evidence to support this contention.  Accordingly, he has not demonstrated any error in the Magistrate Judge's analysis.

The Court concludes that, for the reasons explained in the Report and Recommendation, VDOC's publication approval procedure–both at large and as applied to Versatile's particular case–constitutes the least restrictive means of furthering the government's compelling interest in prison security and order.  Accordingly, Versatile's objection will be overruled.

### 60.   Objection 61

In Objection 61, Versatile asserts that the Magistrate Judge mischaracterized Claim Two as a routing slip claim.  (Objections 87.)  Instead, he argues, Claim Two

alleges a violation of RLUIPA.  Even under RLUIPA, Versatile's assertions in Claim

Two are subject to the same overarching analysis as his contentions in Claim One, which

claims were adequately and properly addressed in the Magistrate Judge's proposed

findings.  Accordingly, the objection will be overruled.

## IV. MISCELLANEOUS MOTIONS

Versatile also submitted a motion for a temporary restraining order and preliminary

injunction.  Versatile bases these requests on allegations that prison guards retaliated

against him because he filed this lawsuit.  Versatile claims that prison guards confiscated

his legal documents and charged him with disciplinary infractions for possession of gang-

related material.

It is a well-settled principle that "preliminary injunctions are extraordinary

interlocutory remedies that are granted in limited circumstances and then only sparingly."

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003).  The party

seeking a preliminary injunction must show "that he is likely to succeed on the merits,

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

All four of the factors set forth in *Winter* must be satisfied.  *Real Truth About

Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter*,

555 U.S. at 20), *overruled on other grounds*, 130 S. Ct. 2371 (2010).  Accordingly, when

a Plaintiff seeks preliminary injunctive relief in a case in which he is not entitled to relief

76

on the merits, the motion for preliminary relief may be denied.  Here, because Versatile

cannot demonstrate *any* likelihood of success on the merits, his motions for preliminary

injunctive relief will be denied.

## V.  CONCLUSION

For the foregoing reasons, Versatile's objections will be overruled, and the R&R

issued by the Magistrate Judge will be accepted and adopted.  Accordingly, the Court will

dismiss this action and deny Versatile's Motion for Relief from Judgment, Motion for a

Temporary Restraining Order, and Motion for a Preliminary Injunction.

An appropriate Order will accompany this Memorandum Opinion.

                                   /s/

                                 Henry E. Hudson
                                 United States District Judge

Date: Oct. 26, 2011
Richmond, Virginia